Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
David J. Harris, Jr. (SBN 286204)
djh@classactionlaw.com
FINKELSTEIN & KRINSK LLP
501 West Broadway, Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Counsel for Plaintiffs and
the Putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SUSKI, JAIMEE MARTIN, JONAS CALSBEEK, and THOMAS MAHER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COINBASE, INC. and MARDEN-KANE, INC.,<br><br>Defendants. | Case No. 3:21-cv-04539-SK<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO COINBASE'S MOTION TO COMPEL ARBITRATION AND TO DISMISS**<br><br>Hearing:      January 10, 2022<br>Time:          9:30 a.m.<br>Courtroom:   C |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................ 2

        A.      Merits-Related Facts ................................................................................... 2

        B.      Contract-Related Facts ............................................................................... 5

III.    THE COURT MUST DENY COINBASE'S SELF-CONTRADICTING MOTION TO
        COMPEL AS A MATTER OF FEDERAL AND STATE LAW ............................... 6

        A.      The "Official Rules" formed a valid and enforceable contract between the parties. .... 6

        B.      The Court must apply ordinary state-law principles of contract interpretation. ........... 9

        C.      The parties' Sweepstakes agreements "superseded" and modified the parties'
                previous agreements to arbitrate all disputes. ............................................. 11

                1.      The parties' original arbitration agreement and subsequent litigation
                        agreement deal with "the same subject matter." ............................. 11

                2.      The parties' original arbitration agreement and subsequent litigation
                        agreement are "inconsistent" as to Plaintiffs' Sweepstakes-related claims. .... 12

        D.      Coinbase has no right to arbitrate the issue of how to resolve Sweepstakes disputes. 14

IV.     THE COURT SHOULD DENY COINBASE'S RULE 12(b)(6) MOTION ......................... 16

        A.      Standard of Review on Coinbase's Rule 12(b)(6) Motion to Dismiss ....................... 16

        B.      The Court should not find, at this pleading stage, that Coinbase's DOGE
                Sweepstakes as a non-"lottery." ................................................................... 17

        C.      Plaintiffs plausibly allege in the alternative that Coinbase violated the California
                sweepstakes statute, by failing to make the required disclosures. ............................. 20

        D.      Coinbase's Sweepstakes ads were objectively false, misleading, and confusing to
                reasonable consumers ................................................................................. 22

        E.      Coinbase's Sweepstakes solicitations were "unfair" under the UCL ......................... 24

V.      CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**  PAGE(S)

*Applied Energetics, Inc. v. NewOak Capital Markets, LLC*,
645 F.3d 522 (2d. Cir. 2011) ........................................................................................... 9, 13, 14, 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 16, 22

*Cal. Gas. Retailers v. Regal Petroleum Corp.*,
50 Cal.2d 844 (1958) .......................................................................................................... 17

*Capili v. Finish Line, Inc.*,
116 F.Supp.3d 1000 (N.D. Cal. 2015) ................................................................................. 11

*Chan v. Society Expeditions, Inc.*,
123 F.3d 1287 (9th Cir. 1997) ............................................................................................. 11

*Couch v. Telescope, Inc.*,
611 F.3d 629 (9th Cir. 2010) ............................................................................................... 17

*Curry v. YelpInc.*,
875 F.3d 1219 (9th Cir. 2017) ............................................................................................. 17

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) ............................................................................................... 24

*Falkowski v. Imation Corp.*,
309 F.3d 1123 (9th Cir. 2002) ............................................................................................. 11

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ............................................................................................................ 14

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) ................................................................................................. 24

*Goldman, Sachs & Co. v. City of Reno*,
747 F.3d 733 (9th Cir. 2014) ........................................................................................... 9, 14, 15

*Granite Rock Co. v. Int'l Brotherhood of Teamsters*,
561 U.S. 287 (2010) ............................................................................................................ 9

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S.Ct. 524 (2019) ........................................................................................................... 14

*Holmes v. Saunders*,
114 Cal.App.2d 389 (1952) ................................................................................................. 19

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) .............................................................................................................. 9

*Hunt Wesson Foods, Inc. v. Supreme Oil Co.*,
817 F.2d 75 (9th Cir. 1987) ................................................................................................. 13

iii

*Luhr v. Berryhill,*
  2018 WL 1536669 (N.D. Cal. Mar. 29, 2018) ........................................................ 8, 10

*Neitzke v. Williams,*
  490 U.S. 319 (1989) ........................................................................................................ 17

*Nguyen v. Barnes & Noble Inc.,*
  763 F.3d 1171 (9th Cir. 2014) ......................................................................................... 7

*People v. Cardas,*
  137 Cal.App.Supp. 788 (1933) ........................................................................................ 17

*People v. Shira,*
  62 Cal.App.3d 442 (1976) ............................................................................................... 18

*Peter v. DoorDash, Inc.,*
  445 F.Supp.3d 580 (N.D. Cal. 2020) ............................................................................... 7

*Polion v. Colvin*, 2013
  WL 3527125 (C.D. Cal. July 10, 2013) ...................................................................... 8, 10

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967) .......................................................................................................... 7

*Rent-A-Center, West, Inc. v. Jackson,*
  561 U.S. 63 (2010) ............................................................................................................ 9

*Rubenstein v. Gap, Inc.,*
  14 Cal.App.5th 870 (2017) .............................................................................................. 22

*Southern Cal. Gas Co. v. City of Santa Ana,*
  336 F.3d 885 (9th Cir. 2003) .......................................................................................... 11

*Trinkle v. California State Lottery,*
  105 Cal.App.4th 1401 (Cal. Ct. App. 2003)

*Tucker v. Chase Bank USA, N.A.,*
  399 F.Supp.3d 105 (S.D.N.Y. 2019) .............................................................................. 21

*Welles v. Turner Entertainment Co.,*
  503 F.3d 728 (9th Cir. 2007) .......................................................................................... 16

*Westinghouse v. Hanford Atomic,*
  940 F.2d 513 (9th Cir. 1991) .......................................................................................... 15

*Williams v. Gerber Prods. Co.,*
  552 F.3d 934 (9th Cir. 2008) ..................................................................................... 22, 24

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL OR DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| **STATUTES** | **PAGE(S)** |
|---|---|
| 9 U.S.C. § 2 | 1, 14, 15, 19 |
| Cal Civ. Code § 1770 | 22 |
| Cal. Bus. & Prof. Code § 17500 | 22 |
| Cal. Bus. & Prof. Code § 17539.15 | 2, 20, 21, 22 |
| Cal. Civ. Code § 1605 | 19 |
| Cal. Civ. Code § 1639 | 11 |
| Cal. Penal Code § 319 | 17, 18 |
| Cal. Penal Code § 320 | 17 |

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL OR DISMISS

## I.      **INTRODUCTION**

In hindsight, Defendant Coinbase, Inc. ("Coinbase") regrets its own contractual decisions.  In June 2021, Coinbase contractually required all "Entrants" in its Dogecoin Sweepstakes to bring their Sweepstakes-related "controversies" before a court like this one.  Dkt. 22-1, ¶10.  Plaintiffs, being Sweepstakes "Entrants," did just that.  Dkt. 1; Dkt. 36.  Coinbase now wishes that it had not required Plaintiffs to adhere to its Sweepstakes terms and conditions.

Congress did not enact the Federal Arbitration Act ("FAA") to save corporations from regretting their own adhesive contracts.  The FAA requires courts to enforce private agreements to arbitrate.  9 U.S.C. § 2.  It does not, however, require or even permit courts to ignore private agreements to litigate.  *Id.*  Originally, the parties' User Agreement required the arbitration of all disputes.  Later, the parties' "Official Rules" agreement required the litigation of all Sweepstakes-related disputes.  There is only one way to interpret these agreements together; the parties historically agreed to arbitrate all disputes, but in June 2021, agreed to litigate all Sweepstakes-related disputes and to arbitrate all other disputes.  The Court cannot grant Coinbase's motion to compel arbitration, without ignoring the plain language of the parties' Sweepstakes agreements, which Coinbase itself drafted and insisted upon as a condition of conducting the Sweepstakes.

On the merits, Coinbase argues that its Dogecoin Sweepstakes complied with California's lottery statutes, sweepstakes statutes, and other consumer protection statutes.  Coinbase argues that its Sweepstakes was not a "lottery" because its ads linked to a webpage showing a free, alternative method of entry (or "FAME").  Coinbase contends that, as a matter of law, the consideration element of a "lottery" is necessarily lacking so long as entrants can *somehow* obtain a free chance to win.  California lottery law is not that simple.  No court has addressed the precise lottery question presented here: namely, whether a defendant can evade California's lottery statutes by expressly advertising that consideration is required for entry, while technically permitting a free method of entry.  Coinbase told Plaintiffs and the Class here that they would "need to" trade Dogecoins on Coinbase to obtain a chance to win prizes.  Consequently, Plaintiffs and the Class traded Dogecoins on Coinbase to obtain a chance to win prizes.  That is "consideration," and therefore an unlawful lottery, plain as day.  No court has held otherwise in a comparable case.

1

Even if the Court or a jury ultimately deems this "Sweepstakes" to be a non-lottery, Coinbase's Sweepstakes was still unlawfully conducted for lack of the clear and conspicuous disclosures required by California law.   Coinbase maintains that it complied with California's sweepstakes law by typing the words "no purchase necessary" into the fine print of its ads.   Yet Coinbase fails to address Plaintiffs' detailed allegations that its "no purchase necessary" disclosure was neither clearly nor conspicuously stated on *any* "entry-order device."  Cal. Bus. & Prof. Code § 17539.15(b).   Coinbase's only response to Plaintiffs' allegations under § 17539.15(b) is that such allegations are "not credible." Dkt. 33 at 19.   That is not a defense at the motion to dismiss stage.

Coinbase also says that its Sweepstakes ads were not false or misleading because any reasonable consumer would have learned the truth by reading the "no purchase necessary" statement at the bottom of its ads.   Yet Coinbase's motion fails to address Plaintiffs' allegations that the "no purchase necessary" statement was *itself* misleading, and failed to objectively correct the more prominent misstatements in Coinbase's ads.   Both the large print and the fine print of Coinbase's ads were false and misleading, so those ads were most certainly false and misleading.

For the reasons summarized above, and the reasons detailed below, the Court should deny Coinbase's self-contradicting motion to compel or to dismiss.  Dkt. 33.

## II.   STATEMENT OF FACTS

### A.  Merits-Related Facts

Coinbase is one of the largest online cryptocurrency exchanges in the world. ¶1.[1]   In or about May 2021, Coinbase decided to add a cryptocurrency called "Dogecoin" (or "DOGE") to the list of cryptocurrencies it sells to users.  ¶¶3-5.  Coinbase opened for DOGE trading on June 3, 2021.  ¶7. That same day, Coinbase launched a "Sweepstakes" promotion.   *Id.*   Coinbase's goals in launching DOGE trading and the Sweepstakes on the same day were: (1) to ensure that there would be enough trading activity to support a "liquid" market for DOGE on Coinbase; and (2) to maximize the trading fees that Coinbase would earn from users' DOGE transactions.  ¶¶2, 6, 47.

---

[1] References to ¶_ or ¶¶___ are to Plaintiffs' Second Amended Class Action Complaint (Dkt. 36) ("SAC"), unless otherwise indicated.

On June 3, 2021, Coinbase emailed and otherwise directly solicited Plaintiffs and millions of Coinbase users to enter the Dogecoin Sweepstakes. ¶¶7-9.  Coinbase's mass emailing and digital advertising displayed large, colorful graphics and language stating:

> *Trade DOGE. Win DOGE*. Starting today, you can trade, send, and receive Dogecoin on Coinbase.com and with the Coinbase Android and iOS apps. *To celebrate, we're giving away $1.2 million in Dogecoin. Opt in and then buy or sell $100 in DOGE on Coinbase by 6/10/2021 for your chance to win. Terms and conditions apply.*

*Id.*[2]   Below that text was a link to the Sweepstakes' official rules, as well as a larger and bolder action button stating, "See how to enter." *Id.*   If recipients clicked the link before the button, then they were taken to Coinbase's "Official Rules" webpage; if recipients clicked the button before the link, then they were taken to another web or mobile-app page (Coinbase's "Opt in" page). ¶¶9-10.

Plaintiffs clicked the button before the link, and were thereby taken to Coinbase's "Opt-in" page. ¶¶28-39.  The Opt in page contained similar, colorful graphics and text, which said:

> *Trade DOGE.  Win DOGE.*  Dogecoin is now on Coinbase, and we're giving away $1.2 million in prizes to celebrate.  *Opt in and then buy or sell $100 in DOGE on Coinbase by 6/10/2021 for your chance to win.*

¶10.  Below that text was a link labeled "*View sweepstakes rules," and then a larger and bolder action button stating, "Opt in."  *Id.*  If recipients clicked the link before the button, then they were taken to a footnote at the bottom of the page, which contained a link to the "Official Rules" page.  But if they clicked the button before the link, they would see the "Opt in" page change slightly and state:

> You're one step closer to winning. You've successfully opted in to our Dogecoin Sweepstakes. *Remember, you'll still need to buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win.*

¶¶10-11.  Below that text, the "*View sweepstakes rules" link would remain, and the larger, bolder "Opt in" button would digitally morph into a "Make a trade" button.  *Id.*

Plaintiffs first clicked the "Opt in" button, and thus saw Coinbase's assertion that they would "need" to buy or sell "$100 in Dogecoin" on Coinbase "for a chance to win" prizes.  ¶¶28-39.  Because Plaintiffs believed Coinbase's assertion, they clicked the "Make a trade" button, and were thereby routed directly to Coinbase's trading platform.  There, Plaintiffs made their purportedly "need[ed]" trades, before clicking any link to the Official Rules webpage.  *Id.*; ¶¶12-14.

---

[2] All emphasis in quotations contained herein is added unless otherwise stated.

1    Coinbase's solicitation emails, "Opt in" pages, and "Make a trade" pages displayed false and

2 misleading statements of fact.  The solicitations reasonably suggested (and affirmatively represented)

3 to Plaintiffs and the Class that they "need[ed] to buy or sell $100 in Dogecoin on Coinbase by

4 6/10/2021 for a chance to win." *Id.*; ¶15.  Coinbase's emails and digital ads were false and misleading

5 because the true facts were that: (1) mailing an index card would have sufficed for entry; and (2)

6 opting in and buying *less than* "$100 in DOGE" would have sufficed for entry.  *Id.*; *see also* ¶¶40-48,

7 ¶¶57-63.  Those facts were (somewhat) disclosed on the Official Rules page, to which Coinbase's ads

8 linked.  ¶16; Dkt. 22-1, ¶3.  Yet Coinbase designed its digital ads "with the knowledge and intent"

9 that they would cause most users to "Opt in" and "Make a trade"—*i.e.,* spend their money—before

10 seeing the Official Rules page.  ¶¶16, 49-56.

11    Coinbase successfully executed its "Sweepstakes" plan.  Most entrants did not see Coinbase's

12 "Official Rules" page until after they had traded at least "$100 in Dogecoin" to enter, and paid

13 Coinbase's associated fees.  ¶¶8-14, 28-39.  Plaintiffs and the Class spent and lost many millions of

14 dollars trading at least "$100 in DOGE" on Coinbase from June 3 to June 10, 2021: because Coinbase

15 said that they "need[ed]" to do so "for a chance to win" prizes.  ¶¶17-18.

16    Coinbase counters Plaintiffs' falsity allegations by pointing out that, in addition to linking to

17 the Official Rules, all of its emails, "Opt in" pages and "Make a trade" pages stated the following:

> Not investment advice or a recommendation to trade Dogecoin. NO PURCHASE
> NECESSARY TO ENTER OR WIN. PURCHASES WILL NOT INCREASE YOUR
> CHANCES OF WINNING. Opt-in required. Alternative means of entry available.
> [***] Promotion ends 11:59 PM (PT) on 6/10/21. Winners must have a Coinbase
> account on Coinbase.com to receive a prize. Receipt and use of prizes subject to
> Coinbase terms and conditions. Odds of winning depend on the number of eligible
> entries received. One entry per person.  Sponsor: Coinbase: Coinbase Sweepstakes, 100
> Pine Street, Suite #1250, San Francisco, CA 94111. See Official Rules for details.

¶¶64-78.  Plaintiffs acknowledge that Coinbase's digitial ads contained that statement.  *Id.*; ¶¶101-

106. Yet Plaintiffs allege this statement was: (1) not "substantially similar" to the statement required

by statute; (2) neither "clear" nor "conspicuous" as required by statute; and (3) misleading when read

in the full context of Coinbase's ads.  *Id.*  Specifically, the statement "NO PURCHASE

NECESSARY," standing alone, was logically consistent with the ads' false statement that users must

18
19
20
21
22
23
24
25
26
27
28

4

"buy *or sell*" $100 in Dogecoin for a chance to win.  *Id.*  The same was true of the statement that "[a]lternative means of entry [were] available"; the ads prominently stated that entrants had the "[a]lternative" to buy *or* to sell Dogecoins.  *Id.*  Neither of those statements, when read in context, revealed that mailing an index card to Coinbase might suffice for entry.  *Id.*  The statement "Opt-in required" was also misleading because clicking Coinbase's "Opt in" action button was not actually "required" for entry.  *Id.*  Nor did the "no purchase necessary" paragraph reveal the true fact that opting in and buying *less than* "$100 in DOGE" would suffice for entry.  ¶¶40-48.[3]

**B.  Contract-Related Facts**

Lacking any real merits defense, Coinbase has moved to compel the arbitration of Plaintiffs' claims.  At various times between January 2018 and May 2021, each Plaintiff created a Coinbase account.  Dkt. 33 at 2-6.  Upon creating their Coinbase accounts, Plaintiffs and the Class accepted Coinbase's adhesive "User Agreements," which contained mandatory arbitration clauses.  *Id.*

Later, however, Coinbase solicited Plaintiffs and the Class to enter the DOGE Sweepstakes.  Dkt. 36, ¶7.  The Sweepstakes solicitations offered the chance to win a prize, by "[o]pt[ing] in and then buy[ing] or sell[ing] $100 in DOGE on Coinbase by 6/10/2021."  ¶8.  The solicitations conspicuously indicated that "[t]erms and conditions appl[ied]," and invited users to "[s]ee" and "view" the "sweepstakes rules" and "details."  ¶¶8-11.  Plaintiffs and the Class accepted Coinbase's Sweepstakes offers by "[o]pt[ing] in," and "buy[ing] or sell[ing] $100 in DOGE on Coinbase by 6/10/2021."  *Id.*; ¶¶28-39.  Plaintiffs, however, did not view the Sweepstakes "rules," "[t]erms and conditions until after they bought DOGE to enter, per the solicitations' entry instructions.  *Id.*

The "[t]erms and conditions" and Sweepstakes "rules" referenced in the solicitations included, *inter alia*, a mandatory forum-selection clause governing "any" Sweepstakes-related "controversies."  Dkt. 22-1, ¶10.  Specifically, Coinbase's adhesive Sweepstakes terms emphasized as follows:

> **Disputes:** All federal, state and local laws and regulations apply.  THE CALIFORNIA COURTS (STATE AND FEDERAL) SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THE PROMOTION[4] AND THE LAWS

---

[3] Coinbase's motion to dismiss (Dkt. 33) offers no substantive response to Plaintiffs' allegations that the "NO PURCHASE NECESSARY" paragraph was unclear, inconspicuous, misleading, and not "substantially similar" to the disclosure statement required by statute.  *See generally* Dkt. 33.

[4] The word "PROMOTION" here refers to the DOGE Sweepstakes.  *See* Dkt. 22-1, ¶1.

5

OF THE STATE OF CALIFORNIA SHALL GOVERN THE PROMOTION. EACH ENTRANT WAIVES ANY AND ALL OBJECTIONS TO JURISDICTION AND VENUE IN THOSE COURTS FOR ANY REASON AND HEREBY SUBMITS TO THE JURISDICTION OF THOSE COURTS.  Claims may not be resolved through any form of class action.

*Id.* (original emphasis).  The Sweepstakes terms also conditioned Plaintiffs' and the Class's entries and potential prizes upon their compliance with ¶10.  *Id.*, ¶9 ("[Coinbase] reserves the right to prohibit the participation of an individual . . . if the participant fails to comply . . . with any provision in these Official Rules."); *id.*, ¶1 ("Winning a prize is contingent upon fulfilling all requirements set forth herein.").  Thus, if Plaintiffs had filed suit outside of California, or filed an arbitration demand with the AAA to resolve their Sweepstakes-related claims, then they would have violated ¶10's mandatory, exclusive jurisdiction clause and faced potential *disqualification* from the Sweepstakes.

Hence, after Plaintiffs reviewed Coinbase's adhesive "Official Rules," and learned that they were deceived into paying for entry, they complied with Official Rules ¶10 by invoking this Court's exclusive "JURISDICTION" to resolve their Sweepstakes-related "CONTROVERSIES."  Dkt. 1; Dkt. 22; Dkt. 36.  In response, Coinbase seeks to disavow the parties' express litigation agreement, which Coinbase itself drafted and insisted upon as a condition of conducting this Sweepstakes.  Not one statute or judicial decision supports Coinbase's attempt to evade its own adhesive contract.

## III.  THE COURT MUST DENY COINBASE'S SELF-CONTRADICTING MOTION TO COMPEL AS A MATTER OF FEDERAL AND STATE LAW

### A.  The "Official Rules" formed a valid and enforceable contract between the parties.

Plaintiffs do not dispute the validity of their original arbitration agreements with Coinbase, as those agreements existed on "March 31, 2021."  *See* Dkt. 33-9 at 1 & ¶8.3.

On the other hand, Coinbase's motion does not dispute the validity of its subsequent "Official Rules" agreements with Plaintiffs, as those agreements have existed since June 2021.  *See generally* Dkt. 33.  The parties' "Official Rules" agreements are just as valid and enforceable as the parties' original arbitration agreements.  *Rent-A-Center*, 561 U.S. at 67 (explaining that the FAA "places arbitration agreements on an equal footing with other contracts") *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, n.12 (1967) (holding that the FAA "make[s] arbitration agreements as enforceable as other contracts, *but not more so*").  Coinbase cannot unilaterally disavow its own

6

Sweepstakes agreements with Plaintiffs and the Class, just because Coinbase has decided—after being sued—that it no longer likes its own Sweepstakes terms.

As Coinbase points out, "[o]nline agreements are enforceable when they put a 'website user on actual or inquiry notice of [their] terms.'"  Dkt. 33 at 9 (quoting *Peter v. DoorDash, Inc.*, 445 F.Supp.3d 580, 585 (N.D. Cal. 2020)).  Courts enforce online agreements "where the *existence* of the terms was reasonably communicated to the user."  *Id.*  Here, Plaintiffs did not read the Official Rules agreement until after they had followed Coinbase's ads and action buttons to "See how to enter," "Opt in," and "Make a trade": per the ads' entry instructions.  ¶¶10, 28-36.

Nevertheless, Plaintiffs admit that they and the Class were on reasonable inquiry notice of the *existence* of the Official Rules when they entered the DOGE Sweepstakes.  *DoorDash, Inc.*, 445 F.Supp.3d at 583.  Coinbase's email ads contained a conspicuous statement that "Terms and conditions [would] apply" to the Sweepstakes, as well as a reasonably conspicuous hyperlink inviting users to "[s]ee all rules and details" applicable to the Sweepstakes.  ¶8.  The combination of those statements was sufficient to put Plaintiffs on "inquiry notice" of the "existence" of Coinbase's Sweepstakes "rules" and "[t]erms and conditions."  *DoorDash, Inc.*, 445 F.Supp.3d at 583; *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (distinguishing case where a conspicuous hyperlink to terms "was reinforced" by language prompting users to "Review terms," from cases where a conspicuous hyperlink existed, but "no [other] notice to users" of the terms appeared on the website).  The combination of Coinbase's conspicuous statement that "[t]erms and conditions appl[ied]"—coupled with reasonably conspicuous hyperlinks inviting users to "[s]ee" and "[v]iew" the same (¶¶8-11)—was enough to inform reasonable consumers that they would be subject to Coinbase's Sweepstakes "[t]erms" and "rules" once they entered to win.[5]

---

[5] It was not enough, however, to inform reasonable consumers that the ads' entry instructions were *affirmatively false and misleading* as to the true entry options.  *Cf. Cheslow v. Ghirardelli Chocolate Co.*, 445 F.Supp.3d 8, 20 (N.D. Cal. 2020) ("'*Williams* stands for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception.'") (citing *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939-40 (9th Cir. 2008)).  The common law of contract formation and the statutory law of false advertising *are not the same thing*.  That is why, for example, California's CLRA prohibits misrepresenting the contractual "rights" and "obligations" involved in a "transaction."  Cal. Civ. Code § 1170(a)(14).  It is easy for companies to *contractually* bind consumers to various "rights" and "obligations," while also lying to consumers about what their true contractual "rights" and "obligations" actually are.  *Id.*

Notably, Coinbase's motion to compel does not dispute that the parties' "Official Rules" agreement is an enforceable contract.  *See generally* Dkt. 33.[6]  Moreover, much of Coinbase's motion to dismiss assumes or affirmatively asserts that reasonable consumers would have been aware not only of the *existence* of the Sweepstakes terms, but also of the specific *contents* of those terms.  *Id.* at 11-12 (arguing that Plaintiffs could have "easily navigate[d] to the Official Rules" agreement); *id.* at 21 (arguing that Plaintiffs should not have been deceived about the true entry requirements because "the Official Rules clearly disclosed both methods of entry"); *id.* at 24-25 (arguing that Plaintiffs should have known the Official Rules' specific contents before entering to win).  Coinbase thus concedes the formation of its Official Rules contracts with Plaintiffs and other Class members.

Even if Coinbase contends on reply that Plaintiffs and other Class members were not on "inquiry notice" of the Sweepstakes terms, such an argument should fail for three more, independent reasons.  First, arguments raised for the first time on reply are waived.  *Luhr v. Berryhill*, 2018 WL 1536669, at *21 (N.D. Cal. Mar. 29, 2018); *Polion v. Colvin*, 2013 WL 3527125, at n.4 & n.7 (C.D. Cal. July 10, 2013).  Second, courts do not allow website owners to disclaim the formation of their own, adhesive "browsewrap" agreements with individuals that the owners clearly meant to bind.  *Nguyen*, 763 F.3d 1171 at n.2 (noting that "courts have been willing to enforce [browsewrap] terms of use against corporations, but have not been willing to do so against individuals").  Third, Plaintiffs admit they were on *actual notice* of Coinbase's Sweepstakes terms, albeit not until they had already bought DOGE to enter.  *See* ¶¶28-36, 79.  Because of such actual notice, Plaintiffs brought their Sweepstakes-related "CONTROVERSIES" before this Court, to comply with Coinbase's Sweepstakes terms.  *Id.*; Dkt. 1, ¶29 (June 11 complaint, quoting the "Official Rules" agreement).

In fact, Coinbase left Plaintiffs with no choice but to adhere to the Official Rules' forum selection clause.  Under the Official Rules, an "individual['s]" failure to comply with "any provision" thereof could result in the forfeiture of their paid entries and any prizes they might have won.  Dkt. 22-1, ¶1 ("Winning a prize is contingent upon fulfilling all requirements set forth herein."); *id.*, ¶9 ("[Coinbase] reserves the right to prohibit the participation of an individual . . . if

---

[6] Coinbase argues only that Official Rules ¶10 was not intended to apply to DOGE-trading "Entrants" like Plaintiffs.  Dkt. 33 at 11-12.  That argument is a far cry from contesting the formation of the parties' Official Rules agreement as a whole.

the participant fails to comply . . . with any provision in these Official Rules.").  If—when this action commenced on June 11, 2021—Plaintiffs or any Class member had filed their Sweepstakes-related "CONTROVERSIES" in an arbitration forum, then they would have violated the plain language of ¶10, and thereby subjected themselves to *disqualification* from the Sweepstakes.  *Id.*

For all of the above reasons, Coinbase does not and cannot dispute that its "Official Rules" for the Dogecoin Sweepstakes formed valid and enforceable contracts with Plaintiffs and the Class.

**B.  The Court must apply ordinary state-law principles of contract interpretation.**

"The FAA reflects the fundamental principle that arbitration is a matter of contract."  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010).  It merely "places arbitration agreements on an equal footing with other contracts."  *Id.*  Consequently, "a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *see also Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 302-03 (2010) ("[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties.").  Sometimes, it is unclear whether contracting parties intended to submit a particular dispute to arbitration.  Courts have settled rules for discerning the parties' intent, when their intent is unclear from the plain text of their contract (or contracts).

Under the FAA, ambiguities concerning the scope of an arbitration clause, as applied to a particular dispute, create a rebuttable presumption in favor of arbitration.  *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742-43 (9th Cir. 2014).  In other words, ambiguities in arbitration clauses themselves give rise to a rebuttable presumption in favor of arbitration.  *Id.*  Importantly, however, ambiguities concerning the *existence* of an agreement to arbitrate a dispute create no presumption.  *Id.*  Instead, ambiguities concerning the existence of an agreement to arbitrate must be resolved by ordinary rules of contract interpretation.  *Id.* (citing *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522 (2d. Cir. 2011)).  Where—as here—the interpretive question does not concern the scope of an arbitration clause itself, but rather, concerns whether a later forum-selection clause "superseded" or modified an earlier arbitration clause, the dispute is one "over the existence, rather than the scope, of the agreement to arbitrate."  *Id.*  Ordinary rules of contract interpretation therefore apply, and "the presumption in favor of arbitrability [does] not apply."  *Id.*

9

1        In this case, there is no dispute about the scope of the parties' original arbitration agreements,

2 as set forth in the User Agreements.  Indeed, Plaintiffs concede that their instant claims *would have*

3 fallen within the plain terms of the parties' original arbitration agreements.  That is not the

4 contractual issue here.  The contractual issue here is whether the parties' more recent, more specific

5 "Official Rules" agreement for the DOGE Sweepstakes (Dkt. 22-1) "superseded" or modified the

6 parties' original arbitration agreements.  *Id.*  Therefore, the parties' contractual dispute here concerns

7 the existence—not the scope—of an agreement to arbitrate Plaintiffs' claims.  *Id.*

8        In particular, Plaintiffs say that Official Rules ¶10 modified and superseded the parties'

9 earlier, generalized arbitration agreements, by specifically and unambiguously requiring "EACH"

10 Sweepstakes "ENTRANT" to litigate all Sweepstakes-related "CONTROVERSIES" in a federal or

11 state court in California.  ¶79; Dkt. 22-1, ¶10.  Coinbase, for its part, argues that Official Rules ¶10

12 does not apply to "EACH ENTRANT," but instead, applies only to "ENTRANTS" who have no

13 User Agreement with Coinbase.  Dkt. 33 at 11-12.  Given the parties' positions here, they disagree

14 not about *which types of disputes* Coinbase's *arbitration agreement* originally covered, but rather,

15 about *which types of people* Coinbase's *litigation agreement* covers.  Hence, Coinbase's motion only

16 further highlights that the parties are disputing the existence, not the scope, of an agreement to

17 arbitrate Plaintiffs' and the Class's claims.  *Goldman, Sachs & Co.*, 747 F.3d at 742-43; *Applied*

18 *Energetics*, 645 F.3d at 524-26.  Thus, once again, there is no presumption in favor of arbitration

19 here.  *Id.*  The Court must apply state-law rules of contract interpretation to decide whether the

20 parties agreed to litigate or to arbitrate their Sweepstakes-related disputes.  Applying those rules to

21 the facts here shows that the parties agreed to litigate—not arbitrate—Plaintiffs' and other Class

22 members' Sweepstakes-related claims.[7]

23

24

25   [7] Coinbase's motion concedes Plaintiffs' claim that in the absence of an agreement to arbitrate
Sweepstakes-related disputes, the class action waiver in Coinbase's adhesive *litigation agreement* is

26 unconscionable and thus unenforceable.  *See* ¶79; Dkt. 33 (no dispute).  Any new argument to the
contrary that Coinbase might raise on reply is waived.  *Luhr*, 2018 WL 1536669, at *21; *Polion*,

27 2013 WL 3527125, at n.4 & n.7.  Class action waivers are also unenforceable under the CLRA in a
*litigation* context (Cal Civ. Code § 1751), even if the CLRA's anti-waiver provisions are preempted

28 in an *arbitration* context.  *DIRECTV v. Imburgia*, 577 U.S. 47, 50-51 (2015).

**C. The parties' Sweepstakes agreements "superseded" and modified the parties' previous agreements to arbitrate all disputes.**

The parties' User Agreements and subsequent Official Rules agreements contain California choice-of-law clauses.  *E.g.,* Dkt. 22-1, ¶10; Dkt. 33-9, ¶9.10.  Thus, California law applies.  *Id.*  "As the California Supreme Court has explained, [t]he primary object of all [contract] interpretation is to ascertain and carry out the intention of the parties."  *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1131-32 (9th Cir. 2002).  "[T]he parties' intent 'is to be ascertained from the writing alone, if possible.'"  *Id.* (quoting Cal. Civ. Code § 1639).   Here, there are two "writing[s]" relevant to determining the parties' intent for resolving their Sweepstakes-related disputes: the parties' original User Agreements, and their subsequent "Official Rules" agreements for the DOGE Sweepstakes. *Id.*

"[T]he general rule is that when parties enter into a second contract dealing with the same subject matter as their first contract[,] without stating whether the second contract operates to discharge or substitute for the first contract, the two contracts must be interpreted together and the latter contract prevails to the extent they are inconsistent."  *Capili v. Finish Line, Inc.*, 116 F.Supp.3d 1000, n.1 (N.D. Cal. 2015).  Here, the parties originally formed User Agreements requiring the arbitration of all disputes, but later, formed "Official Rules" agreements requiring the litigation of "ANY CONTROVERSIES REGARDING THE [Sweepstakes] PROMOTION."  To the extent that the parties' original arbitration agreements and subsequent litigation agreements cover "the same subject matter," and are "inconsistent" with each other, the Court must find that the later, more specific agreement "supersedes" and "prevails" over the former, more general agreement.   *Id.*; *Goldman, Sachs & Co.*, 747 F.3d at 742-43; *Applied Energetics*, 645 F.3d at 524-26; *see also Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 891 (9th Cir. 2003) ("A standard rule of contract interpretation is that when provisions are inconsistent, specific terms control over general ones."); *Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997) ("Under well-settled contract principles, specific provisions control over more general terms.").

**1. The parties' original arbitration agreement and subsequent litigation agreement deal with "the same subject matter."**

There is no disputing that Plaintiffs' claims fall within the plain terms of the parties' original arbitration clauses, as such claims "arise[] out of or relate[] to [Plaintiffs'] use of the Coinbase

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL OR DISMISS

services." Dkt. 33 at 11.   Similarly, there is no disputing that Plaintiffs' claims constitute "CONTROVERSIES REGARDING THE SWEEPSTAKES."   Dkt. 22-1, ¶10.   Hence, the parties' original arbitration clauses and Official Rules ¶10 unambiguously "deal[] with the same subject matter": namely, the proper forum for resolving Plaintiffs' claims.   *Capili*, 116 F.Supp.3d 1000, n.1.

### 2.   The parties' original arbitration agreement and subsequent litigation agreement are "inconsistent" as to Plaintiffs' Sweepstakes-related claims.

Coinbase argues that "there is no conflict between the terms of the User Agreement and the Official Rules."   Dkt. 33 at 11.   Specifically, Coinbase surmises that "[t]he 'Disputes' section of the Official Rules applies [only] to Dogecoin Sweepstakes participants *who never agreed to [Coinbase's] User Agreement*."   Dkt. 33 at 11-12.   That argument lacks merit.

The Official Rules provide that "[p]articipation constitutes *entrant's* full and unconditional agreement to these Official Rules . . . ."   Dkt. 22-1, ¶1.   It further provides that all Sweepstakes "*[p]articipants* must comply with these Official Rules and the Conditions of Entry."   *Id.*, ¶3.   The Official Rules clearly purport to bind all Sweepstakes "entrants," regardless of whether such entrants have Coinbase accounts.   Moreover, Official Rules ¶10 unambiguously applies to "EACH ENTRANT," regardless of each "ENTRANT's" preexisting contractual status with Coinbase.   Dkt. 22-1, ¶10.   There is no legal basis for surmising that ¶10 somehow applies only "to [Sweepstakes] participants who never agreed to the User Agreement."   Dkt. 33 at 11-12.   Where Coinbase intended to distinguish between mail-in "entrants" and other entrants, it did so expressly.   *E.g.,* Dkt. 22-1, ¶5 (referencing "[p]otential winners *that entered the Sweepstakes by mail*").   In sum, Official Rules ¶10 unambiguously applies to Plaintiffs and all Class members as Sweepstakes "ENTRANTS."

As applied to Plaintiffs and the Class, Official Rules ¶10 is manifestly "inconsistent" with the parties' original arbitration agreements.   *Capili*, 116 F.Supp.3d 1000, n.1.   Coinbase does not dispute this.   *See generally* Dkt. 33.   Coinbase correctly points out that Plaintiffs' claims are "dispute[s] that arise[] out of or relate[] to the use of the Coinbase Services" (*id.* at 11); thus, the parties agree that the plain text of their original arbitration agreements *mandated* an *arbitration forum* as the *exclusive* forum for resolving Plaintiffs' claims.   *Id.*

12

The problem for Coinbase, however, is that Official Rules ¶10 plainly *mandates* a *judicial forum* as the *exclusive* forum for resolving Plaintiffs' claims.  Dkt. 22-1, ¶10.  Indeed, ¶10 expressly provides that "THE CALIFORNIA COURTS (STATE AND FEDERAL) SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THE [Sweepstakes] PROMOTION." *Id.*  Such a mandatory and exclusive forum selection clause cannot reasonably be read as consistent with the parties' prior, mandatory arbitration clause.  *See Goldman, Sachs & Co.*, 747 F.3d at 743-46 (holding that a provision stating that "all actions and proceedings . . . shall be brought in the . . . District of Nevada" expressly "superseded" a party's default obligation to arbitrate); *Applied Energetics*, 645 F.3d at 525-26 (holding that language stating that "'any dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict" with parties' earlier arbitration agreement); *cf. Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77-78 (9th Cir. 1987) ("[I]n cases in which forum selection clauses have been held to require litigation in a particular court, the language of the clauses clearly required *exclusive* jurisdiction.").

In sum, ¶10 unambiguously applies to Plaintiffs and the Class, and ¶10 is in direct conflict with the parties' earlier agreements to arbitrate all disputes.  Interpreting the parties' earlier, general arbitration agreements "together" with the parties' later, specific litigation agreements for this Sweepstakes, the Court must find that the parties' Sweepstakes litigation agreement "supersedes," modifies, and "prevails" over the parties' original arbitration agreements.  *Capili*, 116 F.Supp.3d 1000, n.1; *Goldman, Sachs & Co.*, 747 F.3d at 743-46; *Applied Energetics*, 645 F.3d at 525-26.  No court has ever held otherwise in an analogous case.   This conclusion is only bolstered by the plain language of ¶10, which expressly precludes "EACH ENTRANT" from disputing the jurisdiction of California courts "FOR ANY REASON."  Dkt. 22-1, ¶10.  The phrase "ANY REASON" clearly includes the parties' prior agreements to arbitrate.  *Id.*

The FAA cannot save Coinbase from its own contractual choices and business decisions.  If a company expressly demands that its customers litigate certain disputes in certain courts, and customers then litigate those disputes in a certain court, as expressly demanded by the company, then the court should hold the company to its own words.  *Prima Paint*, 388 U.S. at n.12 (holding that the FAA "make[s] arbitration agreements as enforceable as other contracts, but not more [enforceable]").

13

**D. Coinbase has no right to arbitrate the issue of how to resolve Sweepstakes disputes.**

Coinbase's argument that an arbitrator must decide the arbitrability of Plaintiffs' claims (Dkt. 33 at 12-14) suffers from the same defect as its argument that an arbitrator must decide the merits of Plaintiffs' claims. Both arguments completely ignore the parties' Official Rules agreement.

"To be sure, before referring a dispute to an arbitrator, the court [must] determine[] whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 530 (2019) (citing 9 U.S.C. § 2.). This rule holds true for disputes regarding arbitrability; courts can refer the question of arbitrability to an arbitrator only "if a valid [arbitration] agreement *exists*, *and . . . the agreement delegates the arbitrability issue to an arbitrator.*" *Id.* But no agreement to arbitrate even *exists* where an express litigation agreement has "superseded" or modified an earlier arbitration agreement. *Goldman, Sachs & Co.*, 747 F.3d at 742-43; *Applied Energetics*, 645 F.3d at 524-26.

Here, since Official Rules ¶10 "superseded" the parties' prior arbitration agreements, any prior agreement to arbitrate *Sweepstakes*-related disputes no longer exists. *Id.* It is thus nonsensical for Coinbase to say that an arbitrator must decide how to resolve the parties' Sweepstakes disputes, when as a matter of law, there is no contract to arbitrate Sweepstakes disputes. *Id.*

Furthermore, courts "should not assume that the parties agreed to arbitrate arbitrability unless there is *clear and unmistakable* evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995). In this case, the parties expressly agreed that courts within California would have exclusive jurisdiction over "ANY CONTROVERSIES REGARDING" the Sweepstakes. Dkt. 22-1, ¶10. The phrase "ANY CONTROVERSIES REGARDING" the Sweepstakes clearly encompasses the parties' "CONTROVERS[Y]" over how to resolve Sweepstakes disputes. This common-sense conclusion is only further bolstered by the plain language of ¶10, and by settled rules of contract interpretation.

The question of who decides arbitrability is fundamentally a question of who has "jurisdiction" to decide arbitrability. *Goldman, Sachs & Co.*, 747 F.3d at 738; *cf. Westinghouse v. Hanford Atomic*, 940 F.2d 513, 516 (9th Cir. 1991) (explaining that the "threshold question of arbitrability" is a question of "jurisdiction"). Consequently, when ¶10 invoked the exclusive "JURISDICTION" of the courts to decided "ANY CONTROVERSIES" regarding the Sweepstakes,

14

1   it necessarily excluded any arbitrator's "JURISDICTION."  *Id.*  Moreover, when Coinbase chose the

2   word "CONTROVERSIES" for its mandatory forum-selection clause, it mirrored the text of the

3   FAA, which requires courts to enforce agreements to arbitrate "a controversy."  9 U.S.C. § 2.

4   Coinbase manifestly intended ¶10 to displace any arbitrator's "JURISDICTION," and to disclaim

5   any influence from the FAA, over the parties' Sweepstakes-related "CONTROVERSIES."

6       Even if the Official Rules agreement is ambiguous as to who will decide the question of

7   "JURISDICTION" over Sweepstakes-related "CONTROVERSIES," such ambiguity must be

8   resolved against Coinbase as the drafter of its Official Rules.  *Gutierrez v. Wells Fargo Bank, N.A.*,

9   730 F.Supp.2d 1080, 1123 (N.D. Cal. 2010).  In any event, it is hardly "clear and unmistakable" that

10  the phrase "ANY CONTROVERSIES REGARDING" the Sweepstakes excludes

11  "CONTROVERSIES REGARDING" the resolution of Sweepstakes disputes.  *First Options*, 514

12  U.S. at 943-44.

13      In sum, to the extent there remains *any* agreement to arbitrate Sweepstakes-related disputes

14  (there remains none), ¶10 at least creates some ambiguity as to whether the parties intended to

15  arbitrate or to litigate "CONTROVERSIES" over how to resolve Sweepstakes disputes.  The Court

16  must resolve such ambiguities in favor of its own jurisdiction to decide the arbitrability issue.  *See*

17  *First Options*, 514 U.S. at 944-45 (explaining that with respect to the question of who decides

18  arbitrability, "the law reverses the presumption" in favor of arbitration, such that courts must resolve

19  any lack of clarity in favor of judicial resolution of the arbitrability question).

20      Coinbase's citations to cases involving the AAA rules are irrelevant, as none of those cases

21  involved an express and unambiguous agreement *to litigate the precise disputes in question*.  Also,

22  even if the Court were to (improperly) read the parties' original User Agreements in isolation from

23  ¶10, the Court still would not find "clear and unmistakable" evidence of an intent to arbitrate

24  arbitrability here.  Coinbase relies on language in its User Agreements that an arbitrator must decide

25  disputes regarding "the *interpretation or application* of its Arbitration Agreement."  Dkt. 33 at 13.

26  But there is no dispute here about how to "interpret" the parties' original "Arbitration Agreement";

27  there is only a dispute about how to "interpret" their *Official Rules agreement*.  Moreover, the words

28

1  "interpretation" and "application" are expressly limited by the words that follow it: "including *the*

2  *enforceability*, *revocability, scope, or validity of the Arbitration Agreement.*" *Id.*[8]

3        There is no dispute here that the parties' original "Arbitration Agreement" remains generally

4  "valid" and "enforceab[le]," as modified by the Official Rules contract; the dispute here (if any) is

5  whether *the parties' later Official Rules agreement* is valid and enforceable.  Nor is there any dispute

6  about the "scope" of the parties' original "Arbitration Agreement" as written; there is only a dispute

7  about the "scope" of Official Rules ¶10.  Nor do Plaintiffs seek to unilaterally "revo[ke]" the parties'

8  "Arbitration Agreement"; rather, it is Coinbase who seeks to unilaterally revoke the parties'

9  *subsequent litigation agreement*.  *Cf. Welles v. Turner Entertainment Co.*, 503 F.3d 728, 738 (9th

10  Cir. 2007) ("The words `terminate,' `revoke' and `cancel,' . . . all have the same meaning, namely, the

11  abrogation of so much of the contract as might remain executory at the time notice is given.").

12        This Court has mandatory, exclusive jurisdiction to decide whether Plaintiffs' Sweepstakes

13  claims are justiciable or arbitrable because, based on the whole record, there is no "clear and

14  unmistakable" evidence of a contrary intent here.  *First Options*, 514 U.S. at 943-44.  If Coinbase

15  had intended to arbitrate any Sweepstakes-related disputes, including disputes over arbitrability or

16  justiciability, then Coinbase's Sweepstakes terms and conditions would have looked very different.

17  *See, e.g.,* Plaintiffs' Request for Judicial Notice, Ex. C, at ¶11.

18  **IV.**      **THE COURT SHOULD DENY COINBASE'S RULE 12(b)(6) MOTION**

19        **A.  Standard of Review on Coinbase's Rule 12(b)(6) Motion to Dismiss**

20        To survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a

21  right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

22  (2007).  Plaintiffs at this stage are entitled to "the assumption that all the allegations in the complaint

23  are true (even if doubtful in fact)."  *Id.*; *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989)

24  ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's

25

26

---

27  [8] These were limiting (not exemplary) words, as Coinbase used the word "including" here, instead of
the phrase "includ[ing], *without limitation*," as Coinbase did earlier in the same sentence.  Dkt. 33 at

28  13.  *Murphy v. Directv, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) ("[T]he rule of construction
*expressio unius est exclusio alterius* . . . is an aid to resolve the ambiguities of a contract.'").

factual allegations.").  The Court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs."  *Curry v. YelpInc.*, 875 F.3d 1219, 1224-25 (9th Cir. 2017).

### B.  The Court should not find, at this pleading stage, that Coinbase's DOGE Sweepstakes as a non-"lottery."

"A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, . . . whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known."  Cal. Penal Code § 319.  It is unlawful for any person to "contrive[], prepare[], set[] up, propose[], or draw[] any lottery."  Cal. Penal Code § 320. The elements of a "lottery" under § 319 are: (1) consideration given by entrants; (2) in exchange for a chance; (3) to win a prize.  *Trinkle v. California State Lottery*, 105 Cal.App.4th 1401, 1406 (Cal. Ct. App. 2003). Coinbase disputes that its Sweepstakes contained the "consideration" element.  Dkt. 33 at 15-18.

Coinbase says that its Sweepstakes lacked the element of consideration because it allowed participants to enter for free by mail, rather than by trading DOGE and paying the associated fees. *Id.* at 16 ("The difference between an unlawful lottery and a lawful sweepstakes is whether participants are required to pay valuable consideration to participate."); *id.* at 17 ("California lottery law is clear: if a FAME is available, a contest is not a lottery."). The truth is that lottery law is not that "clear," as the law varies according to the facts of each case.  *E.g., Couch v. Telescope, Inc.*, 2:07-CV-039416, Dkt. No. 30, at *2-9 (C.D. Cal. Nov. 30, 2007) (sustaining "lottery" allegations where defendants advertised both paid and free entry options); *Couch v. Telescope, Inc.*, 611 F.3d 629 (9th Cir. 2010) (holding that "no California court ha[d] addressed the precise question at issue," and finding no "substantial ground for difference of opinion" with the district court).

Under California law, there are two settled rules of decision that apply to the facts of the DOGE Sweepstakes.  The first is that the "question of consideration is not to be viewed from the standpoint of the defendant, but from that of the [entrants]."  *Cal. Gas. Retailers v. Regal Petroleum Corp.*, 50 Cal.2d 844, 860 (1958) (citing *People v. Cardas*, 137 Cal.App.Supp. 788 (1933)).  Indeed, Penal Code "section 319 very clearly so states."  *Id.*  The statutory text simply requires that a

17

defendant "distribut[e] property by chance, among persons who have paid . . . for the chance."  Cal.
Pen. § 319.  It says nothing about "persons" who have *not* paid for the chance.

Here, Plaintiffs allege they bought DOGE and paid Coinbase's trading fees "for the chance"
to win prizes.  ¶¶28-38.  Plaintiffs would not have made their purchases, but for the advertised
chances.  *Id.*  The Court must accept Plaintiffs' allegations as true.  *Curry*, 875 F.3d at 1224-25.
Hence, viewing "the question of consideration" from the entrants' perspectives—not from
Coinbase's perspective—Plaintiffs paid for their chances.  *Regal Petroleum*, 50 Cal.2d at 860.

Additionally, Plaintiffs allege a fact that distinguishes this case from every "lottery" case
cited by Coinbase. *Cf. Couch*, 611 F.3d at 634 (recognizing that "no California court ha[d] addressed
the precise question at issue").  The fact is: Coinbase expressly represented that consideration *was*
necessary to obtain a chance to win.  *See, e.g.,* ¶¶11, 28-38 ("Remember, you'll still *need* to buy or
sell $100 in Dogecoin on Coinbase by 6/10/21 for a chance to win.").  Even Coinbase's ***Official
Rules*** stated that "account holders"—*i.e.,* Plaintiffs and the Class—"***must*** opt-in to participate in the
Sweepstakes and ***must*** complete $100usd" in DOGE trades "during the Promotion Period to ***earn***
[an] entry into the Sweepstakes." Dkt. 22-1, ¶3.  The only way to read Coinbase's purported FAME
(entry "Method 2") as being consistent with entry "Method 1" is to read "Method 2" as being
available only to people who are not "[e]xisting account holders" or "new* account holders."  *Id.*
Reading Official Rules ¶3 to make "Method 2" available to "[e]xisting account holders" and/or
"new* account holders" would render the first sentence of "Method 1" entirely false.  *Id.*[9]

No court has held that a defendant-operator can evade California's lottery statutes by telling
entrants that consideration is necessary, and then blaming entrants for believing the operator.  *People
v. Shira*, 62 Cal.App.3d 442, 461 (1976) ("Courts [must] not tolerate subterfuge, however ingenious
may be the scheme devised to evade the law").  To hold as much would upend the settled law that

---

[9] If Coinbase meant to communicate that Method 2 was available to "account holders," then the first
sentence of its "Method 1" paragraph should have said something like:  "Existing account holders
and new* account holders *may* earn one entry into the Sweepstakes by opting in to participate in the
Sweepstakes and completing $100usd in Dogecoin trades on Coinbase (.com and/or Coinbase app)
during the Promotion Period."  Coinbase did not say "may"; Coinbase said "***must***."  *Cf. Shira*, 62
Cal.App.3d at 459 ("[A] promotional scheme is *illegal* where  . . . *some* of the participants who want
a chance to win must pay for it.") (original emphasis).

18

"the question of consideration" must be viewed from the entrants' perspective, not from the operator's perspective. *Regal Petroleum*, 50 Cal.2d at 860.

Coinbase cites *Haskell v. Time, Inc.*, 965 F.Supp. 1398 (E.D. Cal. 1997) for the proposition that "business promotions are not lotteries so long as tickets to enter are not conditioned upon a purchase." Dkt. 33 at 16-17. To the extent that proposition is persuasive, it proves Plaintiffs' point, not Coinbase's. Viewing the facts from the perspective of *entrants*, Coinbase expressly "conditioned" Class members' "tickets to enter" upon their trading "$100 in DOGE." ¶11; *Haskell*, 965 F.Supp. at 1404. Coinbase's *conditional* promise of an entry was the primary impetus for Plaintiffs to spend $100-plus buying Dogecoins and paying Coinbase's trading fees. *Id.*; ¶¶28-39.

By contrast, the *Haskell* plaintiffs had conceded that "none of the defendants condition[ed] sweepstakes entry on a purchase[,] and none of the defendants promise[d] that a purchase [would] lead to additional mailings, entries, or other opportunities or benefits." *Haskell*, 965 F.Supp. at 1402. The *Haskell* court merely rejected those plaintiffs' theory of "*de facto* consideration," under which "there [was] no promise by the sweepstakes operator to send an entry upon a further [purchase]." *Id.* at 1403-04. Here, Coinbase told millions of people that trading $100 in DOGE was both "need[ed]" and sufficient to obtain a chance to win. ¶¶11, 28-39. Here, unlike in *Haskell*, there was "a promisor" (Coinbase); and the alleged "consideration" (DOGE trading) was "an inducement for [Coinbase's] promise" to give Class members their chances to win. *See Haskell*, 965 F.Supp. at 1403-04 (citing Cal. Civ. Code § 1605). At bottom, the element of consideration was clearly present from the perspectives of the alleged lottery *entrants* in this case. *Regal*, 50 Cal.2d at 860.

The second settled rule of decision is that consideration "need not be paid exclusively for the chance to win the prize." *Holmes v. Saunders*, 114 Cal.App.2d 389, 390 (1952). "It is sufficient that the consideration, as here, be paid for something else *and* the chance to win the prize." *Id.* Plaintiffs allege that they paid Coinbase for DOGE *and* for the chance to win prizes. ¶¶28-38. Plaintiffs say they would not have made their relevant DOGE purchases *absent* the promised chance to win. *Id.*

1   Hence, Plaintiffs gave "consideration" for their chances to win, notwithstanding the fact that they

2   received "something else" at the same time.  *Holmes*, 114 Cal.App.2d at 390.[10]

3        At bottom, Coinbase expressly advertised that consideration was necessary for a chance to

4   win prizes. ¶¶11, 28-39; *see also* Dkt. 22-1, ¶3.  For that reason, Plaintiffs and other Class members

5   paid consideration for their chances to win.  *Id.*; *see also* ¶¶17-18.  Under § 319, and the totality of

6   applicable case law, this Court should not hold at the pleading stage that the DOGE Sweepstakes was

7   a *non*-lottery.  The Court should deny Coinbase's motion to dismiss the "lottery" claims, and await a

8   complete evidentiary record before making any final merits judgments on the lottery question.

9        **C.  Plaintiffs plausibly allege in the alternative that Coinbase violated the California**
        **sweepstakes statute by failing to make the required disclosures.**

10       Even if the Court or a jury finds Coinbase's DOGE Sweepstakes to be a non-lottery,

11  Coinbase nonetheless violated California sweepstakes law by making inadequate disclosures.

12       Solicitation materials containing sweepstakes entry materials or solicitation materials
13       selling   information   regarding   sweepstakes   *shall   include   a   clear   and*
         *conspicuous* statement  of  the no-purchase-or-payment-necessary message,  in  readily
14       understandable terms, in the official rules included in those solicitation materials *and*, *if*
         *the official rules do not appear thereon*, on the entry-order device included in those
15       solicitation materials.

16  Cal. Bus. & Prof. Code § 17539.15(b).  There is a dearth of case law on this statute, so the Court

17  should rely primarily on the statutory text.  Coinbase effectively concedes that it violated this statute.

18       In particular, Coinbase does not dispute Plaintiffs' allegations that its Sweepstakes

19  solicitation emails, internet ads, and mobile ads were "[s]olicitation materials containing sweepstakes

20  entry materials." *Id.*; ¶64 & n.5.  Nor does Coinbase dispute Plaintiffs' allegations that the "formal

21  printed statement" of its "official rules d[id] not appear thereon." *Id.*  Consequently, Coinbase

22  concedes that it was required to provide a "clear and conspicuous statement of the no-purchase-or-

23  payment-necessary message . . . *on the entry-order device included in th[e] solicitation materials*."

24  *Id.*  Plaintiffs plainly allege that Coinbase's Opt in button, Make a trade button, and crypto trading

25  ────────────────────

26  [10] The district court in *Couch* failed to recognize this settled rule, which did not actually apply to the
    case before it.  *Couch*, 2:07-CV-039416, Dkt. No. 30, at *6-9 (C.D. Cal. Nov. 30, 2007).  The
27  alleged lotteries in *Couch* did not involve the purchase or sale of products (*ibid.* at *2-9), which may
    explain why the *Couch* court wrongly overlooked the *Holmes* rule.  And unlike Coinbase, the *Couch*
28  defendants had not expressly represented to entrants that a financial transaction was required for
    entry. *Id.* at *2-9.

1   interface were "entry-order devices" within the meaning of the statute.  *Id.*   Nowhere does

2   Coinbase's motion dispute this.  Dkt. 33 at 18-20.  And nowhere does Coinbase contend that it made

3   the required "clear and conspicuous statement" *on* (or even near) its "entry-order devices."  *Id.*; ¶64

4   & n.5.  Thus, the Court must sustain Plaintiffs' UCL claims for violation of the sweepstakes statute.

5   Even if the required statement had appeared "on" Coinbase's "entry-order devices," Cal. Bus.

6   & Prof. Code § 17539.15(b), the SAC shows in detail how Coinbase's "no purchase necessary"

7   disclosure was *inconspicuously* placed.  ¶¶65-68.   Nowhere does Coinbase contend that its "no

8   purchase necessary" disclosure was "conspicuous" within the meaning of the statute.

9   Additionally, the SAC explains how Coinbase's "no purchase necessary" disclosure was not

10  "clear" or "readily understandable" within the meaning of § 17539.15(b), when read in the context of

11  the solicitations' more prominent statements.   ¶¶69-72.   Objectively, Coinbase's "no purchase

12  necessary" disclosure did nothing to alter the ads' prominent statements that a Dogecoin purchase *or*

13  sale was necessary to obtain a Sweepstakes entry.  *Id.*  Plaintiffs thus allege that Coinbase's footnote

14  was at best "ambiguous" when read in context, and therefore unclear. *Id.*; *cf. Tucker v. Chase Bank*

15  *USA, N.A.*, 399 F.Supp.3d 105, 108, 114 (S.D.N.Y. 2019) (holding that statutory disclosures were

16  not "clear and conspicuous" because such disclosures were ambiguous).   Coinbase offers no

17  argument explaining how its footnote "clear[ly]" stated that no purchase *or sale* transaction was

18  "necessary" to enter.  Dkt. 33 at 18-20.

19  Coinbase's only argument that its "no purchase necessary" footnote was "clear" is that

20  "participants could easily navigate to the Official Rules."   Dkt. 33 at 19-20.   But as Plaintiffs

21  allege—and as Coinbase's motion concedes—the "formal printed statement" of Coinbase's "Official

22  Rules" did not "appear on" the "sweepstakes solicitations" themselves.  ¶64 & n.5; Cal. Bus. & Prof.

23  Code § 17539.15(b).  Hence, the "clear and conspicuous" statement was required to be displayed *"on*

24  *the entry-order device[s]."   Id.*   Coinbase cannot refer to a "clear and conspicuous" statement

25  contained in its Official Rules, when those rules did not "appear" on the solicitations themselves.  *Id.*

26  The obvious purpose of the statutory language here is to ensure that people see the "no-

27  purchase-or-payment-necessary message" *before* they enter the Sweepstakes.  *Id.*  By requiring the

28  message to be displayed either "on the entry-device" or in "official rules" which "appear [o]n" the

"[s]olicitation materials," the legislature ensured that people are likely to see the message before paying to enter.  *Id.*  Coinbase intentionally designed its solicitations so that most people would *not* see any FAME before paying to enter.  If Coinbase had intended to communicate the existence of a transaction-free option for entering this Sweepstakes, then its solicitations and "entry-order devices" would have looked very different.  *See, e.g.,* Plaintiffs' Request for Judicial Notice, Ex. A & Ex. B.

Regardless of whether the Court sustains Plaintiffs' "lottery" allegations, the Court should sustain Plaintiffs' UCL claims predicated on § 17539.15(b).

### D. Coinbase's Sweepstakes ads were objectively false, misleading, and confusing to reasonable consumers.

California's False Advertising Law ("FAL") prohibits the dissemination, in "any advertising devise," of "any statement . . . which is untrue or misleading."  Cal. Bus. & Prof. Code § 17500.  "An advertising statement is misleading if members of the public are likely to be deceived."  *Rubenstein v. Gap, Inc.*, 14 Cal.App.5th 870, 876 (2017).   The Consumer Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer."  Cal Civ. Code § 1770(a).  It outlaws advertising "that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." Cal Civ. Code § 1770(a)(14).

Both statutes "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading *or* which has a capacity, likelihood, or tendency to deceive *or* confuse the public."  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)).  "[T]he primary evidence in a false advertising case is the advertising itself."  *Id.* The question of whether an ad is false, misleading, or confusing to reasonable consumers is "usually" a "question of fact" that is "not appropriate" for resolution on a motion to dismiss.  *See id.* at 938-39 (explaining that it is a "rare situation" for "granting a motion to dismiss [to be] appropriate" under the FAL).

Here, Plaintiffs plausibly allege that Coinbase's Sweepstakes ads were false, misleading, and (at best) had the "capacity" to "confuse" reasonable consumers.  This is true because:

(1) The ads' disclaimer-footnote stated, "Opt in required," when in fact clicking Coinbase's bright blue "Opt in" button was not "required" for entry.  ¶¶75-76.

22

(2) When consumers clicked the "Opt in" button, the ads falsely stated: "*Remember, you'll still need to buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win*." *E.g.*, ¶¶11, 110.  This statement was false because obtaining "a chance to win" did not require "buy[ing] or sell[ing]" any DOGE.

(3) When consumers clicked the ads' "See how to enter" button, they were taken to the "Opt in" page, which contained four-step graphics and instructions for entering. ¶¶13-14.  The instructions made no mention of any trade-free entry option, and thus misled reasonable consumers to believe that a DOGE purchase or sale was necessary for entry.  *Id.*

(4) The text of Coinbase's faint, inconspicuous footnote-disclaimer did not objectively alter the literal meaning of the ads' prominent text, which made clear that a Dogecoin purchase *or* sale was necessary for entry.  Indeed, "readers could reasonably understand [the footnote] to be consistent with Defendants' more prominent entry instructions."  ¶¶69-72.

(5) The ads also stated that entrants must buy or sell "$100 in Dogecoin" or "$100 in DOGE." ¶¶40-48.  That representation was misleading, especially in the context of Coinbase's trading interface, as it suggested that users would have to buy or sell *Dogecoins priced at $100 or more*. *Id.*  The truth, however, was that buying Dogecoins at a "Purchase" price of marginally less than $100 sufficed for entry.  *Id.*

Coinbase's only argument in response to those allegations is that consumers could have learned the truth by reviewing Coinbase's "Official Rules" before entering the Sweepstakes.  Dkt. 33 at 20-21, 25.  Those "Official Rules," however, did not appear on the ads themselves; they appeared only on a separate web or mobile-app page.  ¶¶16, 51.  *But see Cheslow*, 445 F.Supp.3d at 20 ("*Williams* stands for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception.").  Moreover, Coinbase knew and intended that the structure and function of its digital ads would cause most consumers to enter based on the ads' misleading entry instructions, before seeing all of the Official Rules. ¶¶49-56.[11]

For avoidance of doubt, Coinbase's ads deceived even members of the media, as several of them asserted based on Coinbase's ads that: (1) entrants "must" trade "$100 in DOGE" (¶58); (2) entrants "need to" trade "$100 in DOGE'" (¶59); (3) entrants "have to" trade "$100 worth of the meme-inspired cryptocurrency" in order "[t]o be eligible" (¶61); and (4) entrants "needed to . . . complete[] a $100 trade of Dogecoin to be eligible." ¶62.  Given that members of the media were misled by these ads, the ads clearly had the capacity to mislead or confuse layperson-consumers.

---

[11] Even if reasonable consumers happened to navigate to and review the Official Rules before entering, Official Rules ¶3 was itself misleading and confusing: insofar as it stated that "[e]xisting account holders and new* account holders ***must*** opt-in to participate and ***must*** complete [a $100 DOGE transaction on Coinbase]."  *See supra*, at 18 & n.9.

Coinbase's heavy reliance on *Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995) is futile.  In *Freeman*, the sweepstakes ads displayed qualifying "if" statements *in the same sentences* as the misleading statements.  *Id.* at 287.  The only way consumers could be deceived was if consumers failed to read the complete sentences on the faces of the ads.  *Id.* at 289-90.  Reading only part of a sentence, instead of an entire sentence, is unreasonable.  *Id.*  By contrast, here, even careful readers of Coinbase's ads, including the ads' footnote-disclaimer, could and did reasonably conclude that buying *or* selling "$100 in Dogecoin" was necessary for entry.  There is simply no logical similarity between the *Freeman* sweepstakes ads and Coinbase's Sweepstakes ads.

Likewise, Coinbase's cited cases involving asterisks and footnotes are inapplicable because: (1) the footnote in Coinbase's ads was itself misleading, and could be understood as consistent with the ads' deceptive entry instructions; and (2) Coinbase placed no asterisk or other qualifier next to its false and misleading statements.  Advertising flat out lies and omitting material facts, while leaving consumers to somehow figure out the truth for themselves, does not constitute compliance with California's consumer protection statutes.  *See Cheslow*, 445 F.Supp.3d at 20 ("As stated in *Ebner*, 838 F.3d at 966, '*Williams* stands for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception.'") (citing *Ebner v. Fresh, Inc.*, 838 F.3d 958 (9th Cir. 2016), and *Williams*, 552 F.3d at 939-40).  The Court should sustain Plaintiffs' FAL and CLRA claims, and their UCL claims predicated thereon.

**E.  Coinbase's Sweepstakes solicitations were "unfair" under the UCL.**

Coinbase's motion argues that the SAC fails to satisfy any of the three standards for claims of "unfair" conduct under the UCL.  Dkt. 33 at 22-23.  Those arguments are meritless.  First, Coinbase says that Plaintiffs' allegations of "unfair" conduct "fail to tether the UCL claim to any specific California policy" or law.  *Id.* at 22.  That is untrue, as Plaintiffs' allege that Coinbase "violate[d] the laws and public policies of California, *as set out in the preceding paragraphs of this complaint*."  ¶¶120-121.  Plaintiffs incorporated California's specific laws and policies against lotteries, against false advertising, and in favor of adequate "sweepstakes" disclosures, into their claims under the UCL's "unfair" prong.  *Id.*; ¶¶86-116.  There is nothing conclusory about Plaintiffs' allegations.

Second, Coinbase argues that the public benefit of its Sweepstakes ads somehow outweighed the alleged harm to consumers.  Dkt. 33 at 22-23.  Coinbase asserts that because Plaintiffs "created accounts on Coinbase's platform well before the Dogecoin Sweepstakes occurred," they somehow suffered no "substantial injury" from the Dogecoin Sweepstakes.  *Id.* at 23.  That makes no sense.  Creating a Coinbase account for free, and paying $100-plus to lose a cryptocurrency "Sweepstakes," are different acts with different results.  The latter act results in a financial injury, while the former act results in no financial injury.  Moreover, there is no public benefit in creating "liquid" markets (*i.e.,* consumer frenzies) for digital joke-tokens, particularly where such frenzies are created by a single company that disseminates abject lies to consumers for its own private (not public) gain.

Third, Coinbase argues that consumers could have "reasonably avoided" their financial losses by reading the ads' footnote-disclaimer.  *Id.* at 23.  But as Plaintiffs have shown, nothing in Coinbase's footnote-disclaimer revealed that there was a purchase-free *and* sale-free method for entering the Sweepstakes.  Coinbase's conduct in this Sweepstakes was fundamentally "unfair."

## V.   CONCLUSION

Legal rules of decision can be extremely nuanced at times.  Such nuances, however, exist to ensure that justice gets done in any given "controversy." Dkt. 22-1, ¶10.  Here, Coinbase expressly demanded that Plaintiffs bring any Sweepstakes-related claims in a "California court" like this one. *Id.*  Justice would find that fact dispositive of Coinbase's double-talking motion to compel.

Coinbase also told Plaintiffs that they "needed" to pay, and that they "must" pay, for a chance to win.  Consequently, Plaintiffs paid for their chances to win.  Justice would find those facts sufficient to establish the consideration element of a lottery.  Justice would also find that Coinbase's Sweepstakes ads were objectively false and misleading, or at best, likely to confuse many consumers.

As established herein, the law's nuanced rules of decision require justice in this case. Therefore, as a matter of law and justice, Plaintiffs respectfully request that this Court deny Coinbase's motion to compel and to dismiss (Dkt. 33).[12]

---

[12] If the Court grants Coinbase's motion to compel arbitration, Plaintiffs respectfully request that the Court dismiss, rather than stay, Plaintiffs' claims against Coinbase.  *Accord* Dkt. 33 at 14.  Even in that event, however, the Court should not dismiss or stay this entire action because Defendant Marden-Kane, Inc. has never had any arbitration agreement with Plaintiffs or any Class member.

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL OR DISMISS

1

Dated: November 16, 2021

Respectfully submitted,

2

FINKELSTEIN & KRINSK LLP

3

By:   _s/ David J. Harris, Jr._

4

David J. Harris, Jr., Esq.

5

djh@classactionlaw.com
501 West Broadway, Suite 1260

6

San Diego, California 92101
Telephone: (619) 238-1333

7

Facsimile:  (619) 238-5425

8

*Counsel for Plaintiffs and the Putative Class*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL OR DISMISS