Pages 1-37

<pre>
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                      SAN FRANCISCO DIVISION

 3

 4  DAVID SUSKI, JAIMEE MARTIN,  )  Case No.  21-cv-04539-SK
    JONAS CALSBEEK, and THOMAS   )
 5  MAHER, Individually and On   )  San Francisco, California
    Behalf of All Others         )  Zoom Videoconference
 6  Similarly Situated,          )  Monday, January 10, 2022
                                 )
 7               Plaintiffs,     )
                                 )
 8       vs.                     )
                                 )
 9  COINBASE GLOBAL, INC. and    )
    MARDEN-KANE, INC.,           )
10                               )
                 Defendants.     )
11  _____)

12

13                 TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE SALLIE KIM
14               UNITED STATES MAGISTRATE JUDGE

15

16  APPEARANCES:   (Via Zoom Webinar)

17  For Plaintiffs:            DAVID J. HARRIS, JR., ESQ.
                               Finkelstein & Krinsk LLP
18                             550 West C Street, Suite 1760
                               San Diego, California 92101
19                             (619) 540-5570

20  For Defendants Coinbase    MICHAEL G. RHODES, ESQ.
    Global, Inc. and Coinbase, JOSEPH D. MORNIN, ESQ.
21  Inc.:                      Cooley LLP
                               3 Embarcadero Center, 20th Floor
22                             San Francisco, California 94111-4004
                               (415) 693-2222
23

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
</pre>

2

```
 1  APPEARANCES:  (Cont'd.)

 2  For Defendant             LAURA ANN WYTSMA, ESQ.
    Marden-Kane, Inc.:        Venable LLP
 3                            2049 Century Park East, Suite 2300
                              Los Angeles, California 90067
 4                            (310) 229-9900

 5  Transcription Service:    Peggy Schuerger
                              Ad Hoc Reporting
 6                            2220 Otay Lakes Road, Suite 502-85
                              Chula Vista, California 91915
 7                            (619) 236-9325

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SAN FRANCISCO, CALIFORNIA  MONDAY, JANUARY 10, 2022  9:43 A.M.

2                          --oOo--

3           THE CLERK:  Calling Civil Case 21-4539, Suski v.

4    Coinbase Global, Inc., et al.  Counsel, please state your

5    appearances for the record, beginning with the Plaintiff.

6           MR. HARRIS:  Good morning, Your Honor.  This is David

7    Harris with the law firm of Finkelstein & Krinsk on behalf of the

8    Plaintiffs.

9           THE COURT:  Good morning.

10          MR. RHODES:  Good morning, Your Honor.  Michael Rhodes

11   and Joe Mornin of Cooley on behalf of Defendant Coinbase.  And

12   with the Court's leave, I will address the motion to compel

13   arbitration and, pursuant to your standing order, we'd like to

14   have our associate, Mr. Mornin, address any argument relating to

15   the motion to dismiss the complaint.

16          THE COURT:  Okay.

17          MS. WYTSMA:  Good morning.  This is Laura Wytsma of

18   Venable on behalf of Defendant Marden-Kane.

19          THE COURT:  Good morning.  So I got the motion for -- to

20   compel arbitration, and let me hear first from Mr. Rhodes and then

21   I'll hear from Mr. Harris.  I did get a chance to read the

22   pleadings, but if there's anything you want to add, go ahead and

23   then I might have some questions as well.

24          MR. RHODES:  Okay.  Thank you, Your Honor.  Mindful that

25   you've read the record, I'll be brief.  It's a two-part test,

1    obviously:  Is there an arbitration clause?  And, if so, is it --

2    is the dispute at hand within the ambit of the clause?

3        The parties seem to be in agreement on point one.  And if you

4    need a record cite, if you can look at the opposition, ECF No. 40,

5    at page 11 and 12 where Plaintiff seems to have conceded there was

6    a valid arbitration clause and, thus, it does seem like kind of

7    the sole issue presented for the Court to resolve is whether the

8    promotion rules trump the prior agreement, the user agreement

9    arbitration rule.

10       And as you know, the promotion here included a broader

11   population of people than just registered users.  There were two

12   ways to get into a promotion.  You traded Dogecoin and, by virtue

13   of doing that, you had a Coinbase user agreement, user account,

14   registered user to which there was an arbitration clause.  And

15   then anybody over the age of 18 in the United States could then

16   freely participate in the promotion.  And the promotion rules,

17   which I believed are annexed to the first amended complaint as

18   Exhibit 1, do not purport to be integrated or merged, do not

19   purport to novate or supplant the prior arbitration agreement.

20       So the dispute between the parties is really how does the

21   Court reconcile and harmonize these two instruments under the laws

22   of arbitration.  And in that regard, Your Honor, I think the case

23   law surveyed at pages 3 and 4 of our reply brief probably lay out

24   the best articulation but, if I may, with the Court's indulgence.

25   The 2nd Circuit case in *Waxfield* and the 9th Circuit case of

1    *Peterson* which we cite at page 2, line 16 of our reply brief, they

2    both say kind of the standard proposition is this:

3        Under the case law, if there's a reading of the various

4    agreements that permits the arbitration clause to remain in

5    effect, the Court must choose it.  And I think there are sort of

6    four lines of judicial thinking here.

7        And, briefly, the *Goldman* case out of the 9th Circuit, there

8    was a direct conflict between the two instruments.  The *Morrow*

9    case talked about a confusing set of agreements to try to figure

10   out which was the contract itself.  *Motorola* stands for the

11   unremarkable proposition if yo have a kind of unitary transaction

12   that has multiple contracts as part of it and one of them includes

13   an arbitration clause, you can treat them as subject matter (ph)

14   of the entirety.  And then the move line of cases says that

15   there's no intrinsic conflict because you have an arbitration

16   clause and then a subsequent agreement with a jurisdictional

17   reference.

18       Here, the easiest thing to think about is the parties

19   actually delegated to the arbitrator the issue of arbitrability,

20   so I think that's the gating item.  The Court has to kick this

21   thing to the arbitrator to decide any fact questions or issues

22   pertaining to whether this is within the scope of the arbitration

23   clause because, by contract, we did delegate that issue to the

24   arbitrator.  But even if the Court wants to go further in the

25   analysis, I would submit that because there was a distinct

1    population of people that were not bound by the arbitration clause

2    who could enter the contest -- or the promotion -- excuse me --

3    through the submission of a card that you mail in, that's the way

4    to harmonize these two instruments.   There's a group of people

5    that would be subject to the jurisdictional clause.

6         And then I would just leave you with the note that if you

7    look at the move line of cases, where they say that you can also

8    have arbitration and collateral judicial proceedings as a matter

9    of course, whether it's to enforce the prior arbitration award --

10   might be a 1281.(a) type of injunction that's going alongside an

11   arbitration or other people that are not bound by the arbitration

12   who are then involved in the same subject matter would go to

13   court.

14        So we think there's no conflict but, in the first instance,

15   you would have to kick this to the arbitrator to decide any issues

16   about the scope, enforceability, revocability of the arbitration

17   clause.

18        Thank you, Your Honor.

19            THE COURT:   So I have a question about -- a factual

20   question about the users who actually signed up for this contest.

21   So was it the case that the Plaintiffs in this situation were

22   already customers of Coinbase and then they entered the contest?

23   Or was it that --

24            MR. RHODES:   Yes, they --

25            THE COURT:   Yes.   All of these Plaintiffs were?

1          MR. RHODES:  Yeah.  All four of the named representative

2    Plaintiffs, Your Honor, were -- were registered users of Coinbase.

3    There was a --

4          THE COURT:  Before they entered the contest.

5          MR. RHODES:  Yes.

6          THE COURT:  Okay.  Okay.

7          MR. RHODES:  And there was -- to the content, you enter

8    the contest by trading the Dogecoin.  To do that, you have to have

9    a Coinbase account.  I would note that even the promotion says if

10   you win, you're gonna have to register an account at that point,

11   too, to receive the winnings, which are in the form of some kind

12   of cryptocurrency.

13         THE COURT:  Okay.

14         MR. RHODES:  There was another population of people who

15   did send in -- I think there were thousands of them -- who sent in

16   cards who did not have an account with Coinbase and, therefore,

17   would not have been a contract party to the user agreement.

18         THE COURT:  What if someone actually won, sent in the

19   card -- like didn't actually open an account, didn't trade -- but

20   sent in the index card and that person won and then -- and then

21   signed up for Coinbase -- with Coinbase to get the prize?  Would

22   that person then be bound by the user agreement with Coinbase?

23         MR. RHODES:  That's a great question.  I think the

24   answer is yes, but I also would say to you that issue is not

25   before the Court, but I do think it reflects something.  Because

1    one of the arguments that I think Mr. Harris seems to be making is

2    the idea that the subsequent body of rules specific to the

3    promotion were kind of intending to novate or to override or

4    supersede the prior user agreement.  And I would say the case that

5    you just outlined suggests otherwise because Coinbase seems to be

6    thinking that if you are not a currently registered user, you've

7    entered the promotion, you win, and in order to receive the

8    winnings, you have to then now register for a Coinbase account and

9    that has an arbitration clause in it, it sure looks like they

10    expect people that are going to be trading in Dogecoin on their

11    platform have the arbitration agreement.

12       There are claims you could envision that might arise for

13    people that never are registered either before or after the

14    promotion.

15         THE COURT:  Okay.  So what if a person actually went on

16    the website, saw the information about the contest, wasn't a

17    previous Dogecoin -- customer of Coinbase, but then signed up for

18    an account right then and there on the spot in order to enter the

19    contest, understanding full well that he or she didn't have to,

20    you know, send in the card.  But let's say that that person signed

21    up for the account as a result of seeing that contest.  That

22    person -- under your theory, that person would still be bound by

23    the user agreement with Coinbase?

24         MR. RHODES:  Yeah.  I think they would be, Your Honor,

25    and I don't think we're kind of dovetailing into the rule of

1   unconscionability, which you often see in the -- I know you see

2   these a lot in motion to compel litigation.  But the parties here

3   concede that there's a valid agreement for all of these.  But the

4   fact pattern of these four -- that's what we've got in this record

5   -- is they were in fact registered users before we got into that.

6        And I agree we can spin out some interesting, you know,

7   hypotheticals about what might be the case.  That is the current

8   state of play in this record.  We don't have anybody who was not

9   a user when they entered the promotion.  The thing I note for you

10  is that to receive the winnings, if you will, you would have to

11  become a registered user and that would have entailed an

12  arbitration clause.

13       Actually, in your hypothetical, I would also submit to you

14  that that issue would go to the arbitrator to decide because

15  issues of arbitrability have been designated -- or delegated, I

16  should say -- in these user agreements to the arbitrator in the

17  first instance.

18       THE COURT:  Okay.  What about the person who doesn't --

19  who doesn't sign up for an account with Coinbase and who sends in

20  the index card, is upset and sues.  Then that -- you concede that

21  that person doesn't have to go to arbitration?

22       MR. RHODES:  Correct, Your Honor.  So the one I came up

23  with is that I sent in my card.  I'm not a registered user.  And

24  let's say they -- for whatever reason, I find out they don't

25  consider me because it arrived a day late or something and I'm

1    upset about that.   I could file a judicial action.   And then the

2    jurisdictional delegation tells us where I do that.

3              THE COURT:  Okay.   Okay.

4              MS. WYTSMA:   Your  Honor,  to  that  --  to  that  last

5    hypothetical, may I --

6              THE COURT:  Yeah.   Sure.

7              MS. WYTSMA:  -- add  just  one  point?   If  there  was  an

8    individual who participated via a postcard and then, you know, for

9    whatever reason they thought they had a legal claim, that -- the

10   nature  of  the  injury  that  has  been  alleged  in  the  amended

11   complaint -- and the complaints were specifically amended to deal

12   with  the  fact  that  there  was  no  injury  in  fact  pled  in  the

13   original  complaint  --  is  that  there  was  a  fee  associated  with

14   trading the Dogecoin and that fee would not have been incurred if

15   they hadn't relied on this sweepstakes.

16             THE COURT:  I see.

17             MS. WYTSMA:  And so our position would be that anybody

18   that actually read the rules and figured out that they could send

19   a free card in to win the sweepstakes would have -- would not have

20   suffered the injury that's alleged in the complaint at this point

21   in time.

22             THE  COURT:   They  would  have  a  different  injury  from

23   what's alleged.  I understand.  And I -- I just want to understand

24   the  lay  of  the  land  even  though  I  do  have  a  clear  picture  of

25   what's actually alleged here and who the Plaintiffs are.   But I'm

1  just curious to know what would happen in these other situations

2  because it helps me to understand sort of the context of the

3  situation.

4      So -- okay. Mr. Harris, do you concede that there's a valid

5  arbitration agreement between the Plaintiffs and the Defendant

6  here?

7          MR. HARRIS:  Your Honor, yes.  We concede that at the

8  time the user agreements were formed, before this new agreement

9  was entered into, that there was a valid binding arbitration

10 agreement.  And, you know, our position under the *Goldman Sachs*

11 line of cases is that when the parties entered into what we all

12 agree was a binding and enforceable official rules agreement for

13 this sweepstakes, that the arbitration agreement ceased to exist

14 as to sweepstakes-related claims only.

15          THE COURT:  Okay.  And why -- if you just look at basic

16 contract principles, what the Defendant says is that because the

17 original arbitration agreement, the binding contract says that you

18 can only amend it or supersede it by -- under certain

19 circumstances, why is it that you think that they've met that --

20 that the Plaintiffs have met that burden here in terms of the

21 amendment or superseding for your prior agreement?

22          MR. HARRIS:  Sure, Your Honor, and that's a great

23 question.  The first thing I would say to that is that in their

24 original motion, they essentially conceded that the official rules

25 agreement was valid.  That was only -- that modification issue was

1   only raised for the first time on reply, so our papers didn't get

2   a chance to address it.  But I'll address it now that Your Honor's

3   raised it.

4        You know, first we would say it's waived because it wasn't --

5   the argument's waived because it wasn't -- the argument's waived

6   because it wasn't raised in the opening motion.

7              THE COURT:  Wait.  Can you go back.  I'm confused by

8   this.  Can you say that again?  I don't understand your argument.

9   I just want to make sure I understand it.

10             MR. HARRIS:  So the argument about the modification

11  clause in the original user agreement that Coinbase has raised,

12  they basically say, Look, the modification clause in the user

13  agreement set forth a procedure for modifying the user agreement

14  and this didn't meet that.  You know, our first position is that's

15  a new argument raised for the first time in their reply.

16             THE COURT:  Oh, that was in the original -- that was in

17  the original motion.

18             MR. HARRIS:  Okay.  Well, I --

19             THE COURT:  I saw that.

20             MR. HARRIS:  -- I must be mis-remembering that then,

21  Your Honor.

22             THE COURT:  Maybe I'm mis-remembering it but let me go

23  back and look at it because I remember seeing that in the original

24  argument.

25             MR. RHODES:  I'm looking for a cite for Your Honor.

1          THE COURT:  Sure.

2          MR. RHODES:  I'll try to find something here.  Joe, if

3    you find it quicker --

4          THE COURT:  Hang on.  I'm just looking.  So -- let me

5    just tell you where I thought I saw it.  I'm just scrolling

6    through.

7          MR. RHODES:  Our opening motion, Your Honor, is Document

8    33, I believe.

9          THE COURT:  Yeah.  I'm looking at it now.

10          MR. RHODES:  I'm not actually seeing it, Your Honor, to

11    fair to the Court.

12          THE COURT:  Okay.  Then I must be mistaken because I

13    thought I saw it.  I'll go back and look at it.  But thank you,

14    Mr. Harris.  Okay.

15          MR. HARRIS:  And then, you know, to address it on the

16    merits, Your Honor.  The modification clause in the original

17    agreement does say we may amend this agreement by "posting to the

18    website" or something to that effect.

19          THE COURT:  Uh-huh.

20          MR. HARRIS:  There's no dispute here that these official

21    rules were more than posted to the Coinbase website.  It links to

22    the more directed email to Coinbase users.  Coinbase requested new

23    consideration from Coinbase users in order to enter these -- this

24    sweepstakes and accept these official rules.

25          So we believe even if the Court were to isolate the

1    modification clause in the user agreements, that by posting the

2    official rules to the website and by emailing them directly to all

3    Coinbase -- to Coinbase users who entered the sweepstakes, you

4    know, that that satisfied the modification clause, number one.

5           Number two, even if this more recent official rules agreement

6    wasn't specifically intended as a replacement or specifically

7    intended by Coinbase as a modification of the user agreement, it's

8    still an enforceable contract that's separate from the user

9    agreement, we all agree. And it conflicts. The term -- the terms

10   conflict.  The terms in paragraph 10 conflict with the user

11   agreement.

12          So it's -- whether the official rules were intended to modify

13   or replace -- and we don't argue they were intended to replace the

14   user agreement.  We just argue that this is a separate agreement

15   entered into at a later point in time on a more specific issue.

16   So our position is just that, look, this is the most recent, most

17   specific agreement for dispute resolution between the parties on

18   this subject.

19               THE COURT:  Uh-huh.

20               MR. HARRIS:  And, you know, we cite one case that

21   Coinbase tries to distinguish.  It's the *Capili v. Finish Line*

22   case that basically says, Look, when the parties enter into two

23   different agreements that cover the same subject matter and

24   there's a conflict, the latter agreement controls.  And Coinbase

25   tries to distinguish that *Capili* case, but there are other cases

1   that say the same thing.  It's a well-settled principle of

2   contract interpretation.  I can give the Court a couple of cites

3   that are in our papers because we didn't see the distinguishing

4   argument until reply.

5           THE COURT:  So you know what I'm going to do on this is

6   that why don't you give me that in writing because it's just hard

7   to do it on the fly.

8           MR. HARRIS:  Sure.

9           THE COURT:  Just send it to me tomorrow, you know, in

10  writing and just make sure you send it to the other side as well

11  just with the citations.

12          MR. HARRIS:  Sure.

13          THE COURT:  *Capili* is in your brief.  But if you want to

14  have additional citations.

15          MR. HARRIS:  Sure.  Would Your Honor like me to file a

16  short brief or do you want me to just email case citations to

17  everyone?

18          THE COURT:  Just email case citations.

19          MR. HARRIS:  Okay.

20          THE COURT:  Send it to the skpo address.

21          MR. HARRIS:  Okay.  Thank you, Your Honor.  Sure.  And,

22  you know, really all the parties agree here that, you know, the

23  normal presumption in favor of arbitration does not apply, right,

24  and that we have to decide, you know, how to -- how to resolve

25  these disputes using normal principles of contract interpretation.

1        And I would give the Court three settled canons of contract
2   interpretation that all cut in our direction.   One is that
3   specific provisions govern over more general provisions.  Here, we
4   had a hypergeneralized, all-encompassing arbitration agreement,
5   and then later in time we had a very specific dispute resolution
6   agreement about the Dogecoin sweepstakes only.   And all the
7   parties agree here we're dealing only with claims regarding the
8   sweepstakes, controversies regarding the sweepstakes.   So the
9   specific traditionally controls over the general.

10       Number two is the canon we were just talking about where you
11   have two separate contracts, the latter controls the older
12   agreement.

13       And, third, you know, we all agree these were adhesive
14   agreements, and generally under state contract law, ambiguities in
15   adhesive consumer contracts are construed against the drafter.  We
16   all agree that Defendants were the drafters of this official rules
17   agreement and of the user agreement.

18            THE COURT:  Okay.  Mr. Rhodes, do you want to comment
19   and then we'll move on to the next -- the other portion.

20            MR. HARRIS:  I --

21            THE COURT:  Oh, I'm sorry.  Go ahead.

22            MR. HARRIS:  Actually, Your Honor -- sorry.  I just
23   wanted to touch on the threshold issue that Mr. Rhodes raised
24   which is --

25            THE COURT:  Arbitrability?

1          MR. HARRIS:  Exactly -- who decides the arbitrability

2     question.  And with respect to that, the Supreme Court has been --

3     repeatedly said that it has to be clear and unmistakable that the

4     parties intended to delegate the arbitrability question to an

5     arbitrator; right?  It has to be clear and unmistakable.

6          And the question of arbitrability is really a question of

7     jurisdiction.  It's who has jurisdiction to decide the merits.  So

8     it has to be clear and unmistakable that the parties intended to

9     delegate the jurisdictional question away from the Court to the

10    arbitrator.

11         Now, Coinbase would be correct if the user agreement were the

12    only agreement in play here.  But, again, we have to look to the

13    official rules agreement and say do the official rules arguably

14    speak to the jurisdictional question.  And the answer is, yes, it

15    arguably does.  It's not unreasonable to say that our controversy

16    over the proper forum for resolving sweepstakes disputes is a

17    controversy regarding the sweepstakes within the meaning of the

18    official rules.  If you look at the parties' arguments on page 5

19    of Coinbase's reply brief, you know, they're arguing this point.

20    You know, this jurisdictional question they say is not a

21    "controversy" regarding the sweepstakes.  It's a controversy

22    regarding the user agreement is what they say.

23         And then, you know, our position is, no, the jurisdictional

24    question about the sweepstakes is arguably controversy.  So what

25    are we disputing?  We're disputing the meaning of paragraph 10.

1  We're disputing the meaning of the official rules, and the dispute
2  about the meaning of the official rules is arguably a controversy
3  regarding the sweepstakes.

4      So because -- because there's some nonfrivolus argument that
5  you can make here that the parties just intended to have the Court
6  resolve everything sweepstakes-related, it's not clear and
7  unmistakable that the Court can't decide jurisdiction.

8      You know, in the *Goldman* case, the 9th Circuit said that,
9  "Because the presumption in favor of arbitrability does not apply
10 here, the forum selection clauses need only be sufficiently
11 specific to impute to the parties the reasonable expectation that
12 they would litigate any disputes in federal court."

13     And we really have that reasonable expectation here based on
14 the plain language.  And the arbitration clause -- arbitration
15 agreement, user agreement may not be unconscionable, but
16 Coinbase's interpretation of the official rules agreement would
17 actually render the official rules agreement unconscionable.

18     And why do I say that?  It's because any -- any layperson
19 reading the disputes clause of paragraph ten in the official rules
20 would understand that you have to bring your sweepstakes claims in
21 a California court, state or federal.  And they would also
22 understand when the official rules say if you break any provision
23 of these official rules, you're out of the sweepstakes.

24     What Coinbase is basically saying is that sweepstakes
25 participants who read those rules and very reasonably bring their

1 claims in court as required by the rules, under threat of

2 disqualification, they should have somehow brought their claims in

3 an arbitration forum.  The problem is if they did that, then under

4 the official rules, they could have been disqualified.  But --

5 under the plain -- under the plain language of the official rules.

6 I mean, they don't deal with the plain language of the official

7 rules which uses -- which uses the words "participant" and

8 "entrant."  Each participant, each entrant, everyone is bound by

9 this.  When the officials rules intend to isolate mail-in entrants

10 -- the official rules do that expressly in another part of the

11 rules agreement -- so we just really think there's no common sense

12 basis and there's no technical basis here for compelling

13 arbitration.

14          THE COURT:  Okay.  Understood.  Thank you.  Mr. Rhodes.

15          MR. RHODES:  I'll be very brief.  I'll be very brief.

16 First, I think he's making this way too complicated.  There's a

17 valid arbitration agreement.  Disputes over scope, enforceability,

18 revocability, by the terms -- this is Exhibit 6, 7, 8, and 9 I

19 believe to the -- to the declaration filed say it goes to the --

20 it goes to the arbitrator to decide issues of arbitrability, and

21 he just gave you a whole bunch of fact questions that are gating

22 items to arbitrability and he's trying to compress them into the

23 merits of the case.

24     I would also say -- it's interesting -- talked a lot about

25 intent.  There's nothing in the promotion terms that purports to

1    novate, merge and integrate, supersede anything in the prior
2    agreement.  And there is a body of case law which we cited to you,
3    and now it will entreat you to go look at that case law, that
4    deals with the circumstance when you have multiple agreements
5    touching on the subject matter, the overall standard is to try to
6    enforce the arbitration clause if there is a reading that permits
7    it.  And here, there is a logical framework to understand why this
8    is not a conflict.

9        There's a group of people that are not bound by the user
10   agreement and the arbitration clause that might create a lawsuit.
11   Under the rules of the promotion, they go to court.  And those who
12   have previously agreed to an arbitration clause, they have to have
13   their issue decided in arbitration or at least the gating issue of
14   scope of their claim and whether it maps to the arbitration clause
15   has to be decided by the arbitrator.

16       Now -- and there is no conflict in the way that he's
17   describing it because there is a distinct group of populations
18   that are affected by these things.

19       Think of it this way.  If I said to you, I want to form a
20   relationship with you.  We're going to have a service relationship
21   or a product buy-in relationship and everything about our
22   dispute's going to be arbitrated, and then I come up with a
23   specific product or feature and I say, Oh, these are the unique
24   rules that pertain to this product or feature and I don't purport
25   to novate or supersede or merge out and integrate the prior

1  agreement, why wouldn't you be bound by the arbitration clause?

2  This is just a smaller subset of things relative to registered

3  users.

4       The jurisdictional clause is not in conflict because there's

5  a whole identified population of people who could bring a lawsuit

6  if they never agreed to the arbitration clause.  So from that

7  standpoint, the first job is to try to harmonize the instruments

8  under the prevailing case law to say, Is there a way to make the

9  arbitration clause survive -- because that's the Court's mandate.

10      So I think you get it.  I've probably exceeded my observation

11  of short commentary, so I'll -- I'll submit to that.

12           THE COURT:  I will go back and read everything again.

13  It's been very helpful.  Sorry.  Ms. Wytsma.

14           MS. WYTSMA:  I just have a very brief point, but I think

15  it's an important point that hasn't really been discussed today.

16  There's a very simple way and very, as Mr. Harris says, common

17  sense way to harmonize these two agreements.  Paragraph 8.3, which

18  is the arbitration provision, compels claims to arbitration but

19  also allows individuals to pursue claims in small claims courts on

20  an individual basis.

21      And that's exactly what the dispute resolution provision

22  provides in the sweepstakes rules -- that claims cannot be

23  resolved on a class action basis.  They have to be resolved on an

24  individual basis.

25      What that dispute resolution provision does is provide a

1   location for where those disputes are going to be resolved, and

2   that location is California.   But there's nothing inconsistent

3   between a dispute resolution provision of general application

4   which allows individuals to pursue individual claims in small

5   claims court with a sweepstakes provision which provides

6   essentially the same opportunity but in a specific location of

7   California.

8        And so, you know, if we want to look at sort of a common

9   sense way to harmonize these two agreements, I don't think there

10  is really any inconsistency in the two.   One is just simply

11  pointing people to the location where they have to file their

12  individual claim, not a class action claim.   And that's how any

13  layperson reading paragraph 10 of the dispute resolution of the

14  sweepstakes rules would understand it.   Claims may not be resolved

15  through any form of class action.

16       And so I think that we're creating inconsistencies where

17  there really is none.   So I just wanted to emphasize that point --

18  that there is a consistency between the two that we haven't really

19  talked about today.

20            THE COURT:   Okay.   Thank you.   Okay.

21            MR. HARRIS:   Your Honor, may -- may I just address that

22  in under one minute?

23            THE COURT:   One minute.   Then we want to move on to the

24  motion to dismiss.

25            MR. HARRIS:   I would just point out, Your Honor, that

1   Defendant Marden-Kane has not filed the motion.  That's the first

2   time I've heard that argument.  Coinbase in their -- in their

3   motion, in Footnote 7 of their opening motion, they said that

4   Plaintiffs' claims wouldn't be allowed in small claims court.  So

5   the small claims court provision, that's a brand new thing.

6   Nobody has raised that before Defendant Marden-Kane, who has not

7   even answered the complaint yet.  So I don't believe that's a

8   proper argument at this time.

9          THE COURT:  Thank you.  Okay.  Mr. Mornin, would you

10  like to address the motion to dismiss?

11         MR. MORNIN:  Sure, Your Honor.  Our arguments are laid

12  out in the briefing and, in the interest of efficiency, I want to

13  start by asking if the Court had any specific questions you would

14  like to raise?

15         THE COURT:  No.  I'd just like to hear from you.

16         MR. MORNIN:  Okay.  So first I'd like to address the

17  Plaintiffs' lottery claim.  Under California law, an illegal

18  lottery has three elements -- prize, distribution by chance, and

19  consideration.

20     So it's black letter law that a contest is not a lottery

21  where participants can enter for free.  That's what separates a

22  lawful sweepstakes from an illegal lottery.  In the sweepstakes at

23  issue here, the Plaintiffs could have entered in two different

24  ways.  First, they could have bought or sold Dogecoin on

25  Coinbase's platform and, second, they could have entered for free

1    by mailing an index card with their contact information.

2         Here, there is no dispute that a free alternative method of

3    entry was available.  That should end this fee analysis.  And the

4    Plaintiffs concede consideration was not required here and,

5    therefore, under California lottery law, the Dogecoin sweepstakes

6    was a lawful sweepstakes and not an illegal lottery.

7         So despite that, the Plaintiffs claim that the sweepstakes

8    was unlawful because they were subjectively unaware of the free

9    alternative method of entry, but that is not the law in

10   California.  Under the Plaintiffs' theory, anybody could file a

11   lawsuit over any sweepstakes and survive a motion to dismiss on

12   the theory that they didn't know how to enter for free.  That is

13   simply not the law in California and the Plaintiffs' lottery claim

14   should be dismissed.

15        THE COURT:  Let me hear from Mr. Harris and then I'll

16   come back to you on the next claim.  Mr. Harris.

17        MR. HARRIS:  Thank you, Your Honor.  So I would say that

18   Coinbase has slightly but materially misrepresented our position

19   on this issue.  Our position on the consideration issue is not

20   that this was a lottery because our clients were -- my clients

21   were unaware of the free entry option.  Our position is -- and

22   this has never been decided before anywhere, as far as I can tell

23   -- our position is that this became a lottery because Coinbase

24   objectively represented -- and Marden-Kane objectively represented

25   -- to entrants that consideration was necessary.  Therefore, they

1  paid.

2      It wasn't that a free entry method was disclosed and we just

3  didn't know about it, it wasn't disclosed well enough.   This

4  was -- they actually came out and stated, You must do this to

5  enter and, therefore, we did that to enter, and that's -- that's

6  what transforms this into consideration.

7      And --

8          THE COURT:  But you also -- but you also concede that

9  there are portions of the -- of the website that also said it's a

10  free entry.  All you have to do is fill out this entrance card and

11  mail it in.  Right?

12          MR. HARRIS:   Yes, Your Honor.   That is what the

13  complaint says.  And I have to admit -- I messed up the pleading

14  on this a little bit.  And the way I messed it up, I tried to

15  correct in our brief.  And when I read -- during the briefing

16  period and not during the pleading period -- when I read the

17  official rules for a second time, I realized that method number --

18  it set forth two methods, right, and I glossed over this,

19  unfortunately, when I first approached the rules.   But method

20  number one says, "New and existing Coinbase users must make a

21  trade to enter."  And then method two says you can enter by means

22  of --

23          THE COURT:  Can you give me the docket number citation

24  to that so I can see it here?

25          MR. HARRIS:  Yes, Your Honor.  It's Docket 22-1 --

1          THE COURT:  Okay.

2          MR. HARRIS:   And it's paragraph 3 which is a long

3   paragraph or -- is it paragraph 3 or paragraph 2?  It's a long

4   paragraph 3, I believe.  It looks like -- let's see --

5          THE COURT:  Part of the first amended complaint?

6          MR. HARRIS:  No.  I'm pointing to the official rules

7   which are docketed at Docket No. -- ECF No. 22-1.

8          THE COURT:  Right.  It is part of your -- it's Exhibit

9   A to the first amended complaint.

10          MR. HARRIS:  Yes, Your Honor.  Yes, Your Honor.

11          THE  COURT:   All  right.   Method  one,  "Existing

12   accountholders and new accountholders must opt in to participate

13   in the sweepstakes and must complete 100 dollar USD to trade, buy,

14   sell."

15          MR. HARRIS:  Right.

16          THE COURT:  Okay.

17          MR. HARRIS:  And then method two says, "To enter via

18   mail, handwrite ..." blah, blah, blah.

19          THE COURT:  Uh-huh.

20          MR. HARRIS:  So if we were to read method two as being

21   available to exist accountholders and new accountholders, that

22   would render the first sentence of method one false.  And Coinbase

23   is doing a lot of talking about reconciling agreements.  The only

24   way to reconcile these agreements is to make the mail-in method

25   available to non-Coinbase users.

1          THE COURT:  So you're asking for leave to amend.

2          MR. HARRIS:  Yeah, yeah.  I guess I am, Your Honor.

3          THE COURT:  All right.  Okay.  Mr. Mornin, why don't you

4     go on to the next claim.

5          MR. MORNIN:  So, again, I think here there's no dispute

6     that consideration was not required to enter.  I think the

7     allegations that Coinbase somehow misrepresented or concealed the

8     free method of entry, those might be relevant to the advertising

9     claims under the UCL, FAL, and CLRA.  But I think as to the

10    lottery claim, there is no dispute that consideration was not

11    required, that anybody could have mailed in an index card, and

12    that ends the analysis as to whether this was an unlawful lottery.

13         THE COURT:  I think that what Mr. Harris is saying is

14    that -- and I'm looking at the agreement in front of me right --

15    I'm looking at the Exhibit A in front of me.  It makes it look

16    like if you are an existing accountholder or a new accountholder,

17    you have to complete the $100 transaction.  If you're not an

18    existing accountholder or a new accountholder, you can enter for

19    free.  That's what Mr. Harris' argument is, which he wants to have

20    leave to amend so he can make the argument.  In other words, it's

21    not only misleading; it could be objectively read to mean that if

22    you actually currently are a Coinbase accountholder, you must have

23    this $100 transaction.  Everybody else can just mail in this

24    little card.

25         MR. MORNIN:  I read the official rules differently, so

1   the word "must" appears under method one.

2          THE COURT:  Uh-huh.

3          MR. MORNIN:   The word "must" does not appear under

4   method two, so I read that to mean that to enter via method one,

5   which is by buying or selling Dogecoin, you must opt in.  But if

6   you want to enter via method two, the index card, there's no

7   requirement to opt in.

8          THE COURT:  I have to say it is confusing.  I mean, if

9   I were entering this contest, I would be confused by this.  I want

10  to read the whole thing again, but I see what Mr. Harris' argument

11  is, so let me think about it.  Okay.

12         MR. MORNIN:  Fair enough, Your Honor.

13         THE COURT:  Mr. Mornin, why don't you move on to the

14  next claim.

15         MR. MORNIN:  Yeah.  So the next claim is under Business

16  & Professions Code 17539.  Under that section, sweepstakes

17  marketing materials must include a "no purchase or payment

18  necessary message," readily understandable terms, and the message

19  must be "substantially similar to the following statement:  'No

20  purchase or payment of any kind is necessary to enter or win this

21  sweepstakes.'"

22      So Coinbase included the phrase "No purchase necessary to

23  enter or win" throughout its marketing materials -- including in

24  the sweepstakes emails, in its website, in its mobile ads, and

25  Plaintiffs concede this throughout their second amended complaint.

1  For instance, paragraphs 66, 69, 72, 73, 74.

2              THE COURT:  Okay.  Mr. Harris.

3              MR. MORNIN:  This language is easily understandable.

4              THE COURT:  Okay.

5              MR. MORNIN:  It was presented clearly and conspicuously.

6  It's clear that this language doesn't literally match the text

7  that appears in Section 17539, but the statute doesn't require

8  that language to appear verbatim.  Instead, it requires a

9  statement that is "substantially similar" to the statutory

10 language presented in "readily understandable terms."

11     And, here, I think there's no reasonable dispute that

12 Coinbase's version satisfies that requirement, and Plaintiffs'

13 claim under that section should be dismissed.

14             THE COURT:  Okay.  Mr. Harris.

15             MR. HARRIS:  Sure, Your Honor.  So this is the first

16 time Coinbase has actually argued that that disclosure was

17 conspicuous within the meaning of the statute.  We disagree with

18 that fundamentally.  It was a light-fonted fine print footnote at

19 the bottom of each email and ad webpage or mobile ad page.  We

20 don't believe that meets the "conspicuous" requirement.

21     And as far as clarity, you know, we -- in our papers, we list

22 several independent reasons why we think it's reasonable to say

23 that this footnote disclaimer was ambiguous in the context of the

24 whole ads.  You can't read it in isolation.  We have an ad that

25 has bright flashing lights that says "Buy or sell Dogecoin.  To

1    enter ..." and then a footnote that says you don't have to buy
2    anything.  Okay.  So you still have to buy or sell something.  And
3    so we think that there's case law that says, Look, if it's
4    ambiguous, it's not clear.  And, you know, the statute says "no
5    purchase or payment of any kind" for a reason, and it's because
6    the legislature understood that, look, there's more than one way
7    to squeeze consideration out of a person than buying a product or
8    a service.  And so we need to make clear that not just is a
9    purchase unnecessary, but we want to make sure sweepstakes
10   operators make clear that purchase or payment of any kind, any
11   kind of consideration, any kind of financial benefit, and they
12   just didn't put that language in the disclaimer which, again, was
13   buried.  It wasn't anywhere near the entry order device within the
14   meaning of the statute.  The entry order devices were the big
15   bright "Click" buttons that said, "Opt in," "Make a trade," and
16   then there was the trading interface which we say was also an
17   entry order device because it's where you made your cryptocurrency
18   order that completed your entry.
19        Unfortunately, there's not a lot of case law on this because
20   it's a rather scarce statute and, you know, must people comply, I
21   think, rather than --
22            THE COURT:  Can I just say also that if this case were
23   to go forward, one thing that I would want to see is what it looks
24   like -- a tutorial that kind of walks through what the website
25   looked like.  In other words, if I went to the ad, what would I

1   see at what point in time.  Because I think those kinds of timing

2   issues are what -- sort of like when things pop up actually make

3   a difference -- or could make a difference.  I don't know for sure

4   if it would make a difference, but it might, potentially.

5        Now we're talking in sort of an abstract term and it's hard

6   for me to visualize.

7              MR. HARRIS:  Right.

8              THE COURT:  I can imagine the fact-finder would have --

9   any kind of fact-finder, arbitrator, or jury, whoever, is going to

10  have the same problem.

11             MR. RHODES:   Your Honor, we'd be happy to provide

12  something like that.  I would just note for the record and for

13  Your Honor's benefit -- and I know you know this -- if the Court

14  were to deny arbitration, we would probably put in an immediate

15  appeal and, you know, the case would be -- go over for some period

16  of time.

17             THE COURT:  Correct.  Okay.  Mr. Mornin, your next

18  argument.

19             MR. MORNIN:  Yeah.  So, again, there is no case law on

20  Section 17539, so we just have the plain language of the statute

21  to go on.

22             THE COURT:  Interesting.

23             MR. MORNIN:  The statute says that you need language

24  substantially similar to this:  "No purchase or payment of any

25  kind is necessary."  All of Coinbase's materials -- the website,

1    the emails, the mobile ads said "No purchase necessary to enter or

2    win."

3              THE COURT:  Okay.

4              MR. MORNIN:  So I'll leave it at that.

5              THE COURT:  Okay.

6              MR. MORNIN:  With respect to the UCL, FAL, and CLRA

7    claims, each of those claims depends on whether a reasonable

8    consumer would have been misled by Coinbase's statements.  And

9    this is an objective standard.  The standard is whether an

10   objectively reasonable consumer would have been deceived.

11        And if a court determines that no reasonable consumer would

12   have been deceived, it should dismiss deceptive advertising claims

13   as a matter of law under Rule 12(b)(6).

14        Here, the Plaintiffs have identified five statements that

15   they believe are deceptive.  Coinbase's reply brief explains why

16   each of those statements was not deceptive.  I won't walk through

17   each of them here, but I just want to make the point that all of

18   Coinbase's marketing materials, as well as the official rules of

19   the sweepstakes, did make it abundantly clear that any participant

20   could enter for free.

21        And, indeed, in their opposition brief, the Plaintiffs

22   concede that Coinbase's sweepstakes materials contain "conspicuous

23   statements that terms and conditions applied."  Plaintiffs also

24   concede that these statements were "coupled with reasonably

25   conspicuous hyperlinks" to the official rules.  That's at the

1    opposition brief at page 7.

2           THE COURT:  I think Mr. Harris' argument that he brought

3    up today, as he says for the first time, is that the reason that

4    the advertising was deceptive is that an existing Coinbase user

5    would think that he or she would have to actually make this

6    transaction and that the free method applies to a non-existing

7    Coinbase user.  If I understand Mr. Harris' argument correctly

8    today, that's the theory on which they're hanging their hat.  And

9    I agree that it's a new theory, but he's asking for leave to

10   amend.

11          MR. MORNIN:  I have a hard time understanding that

12   theory because that assumes that each of those entrants is already

13   aware of both methods of entry.  And if they're aware of that

14   method of entry, then they've seen the statement, and I can't

15   understand how they -- how Coinbase could have hidden the

16   statement in a way that left them unaware of it.

17          THE COURT:  Okay.  Okay.  Mr. Harris.

18          MR. HARRIS:  Yeah.  So, Your Honor, our -- our theory of

19   the sweepstakes solicitations being false or misleading under the

20   Consumer Protection laws, it doesn't hinge on the official

21   rules -- it doesn't necessarily hinge on the official rules

22   themselves being misleading.  What we have here -- and we tried to

23   lay it out as best we could.  I agree with Your Honor it would be

24   nice to have like a video showing -- showing how the webpages

25   moved and all that.  We tried to present that in screenshot form

1   in our complaint.   And between the screenshots and our verbal
2   descriptions, tried to be able to paint a mental picture of -- of
3   how this actually worked in practice.   But -- what were we talking
4   about?

5          We were talking about -- oh, whether it's false and
6   misleading.   So what we had was -- the way the ads were
7   structured, as we laid out in the complaint, most people were
8   going to click the "See How to Enter" button before navigating to
9   the official rules because of the way it was presented.   And when
10  you click the "See How to Enter" button, then you would see an
11  "Opt In" button with instructions to buy or sell.   Once you click
12  "Opt In," then the big bright ad would say, Remember, you still
13  need to do this to enter.   And it would say that to everybody,
14  whether you were a Coinbase user or not.   You still need to make
15  a trade to enter.   And then it had a big flashy "Make a Trade"
16  button.

17      So -- so there's case law that we cite in our papers -- and
18  I think we briefed this pretty well, so I'd refer the Court to our
19  papers -- but there's case law that we cite in our papers that we
20  analogize that says, Look, you can't make big bright false
21  statements and then have some fine print somewhere in the back or
22  ten pages later that contradicts your big bright statements on the
23  front of the box because, at the very least, that could be
24  confusing.   It doesn't have to be false.   It can be true and
25  misleading to a reasonable person.   It can even be confusing to a

1    substantial portion of the public.  And I think that the ads

2    standing alone, you know, before you click to the official rules,

3    the ads standing alone were confusing and misleading, and Coinbase

4    even says that part of it was objectively false.  They say that

5    anyone could enter for free; that's their position.  But the ad

6    undisputably said, you -- everybody -- you still need to trade to

7    enter.  So that statement was false according to them and that was

8    the most prominent statement on the ads.

9          THE COURT:  Okay.  All right.  I want to talk about the

10   CMC because I'm not going to set any dates now.  No matter how I

11   rule on the motion to compel arbitration, one side is going to

12   appeal.  And so I want to -- what I want to do is go ahead and --

13   and also I got the dates that you suggested and they make no

14   sense.  I need to have actual dates.  I can't tie it to something

15   -- but I realize the dilemma you were in, is that you also see

16   that this is going to be an issue -- the threshold issue of

17   arbitrability, where it's going to go, whether it's going to be an

18   arbitrator or not makes it impossible to figure out a schedule.

19   So I appreciate that.

20         So here's what I'm going to do.  I'm going to go ahead and

21   set another CMC and at that point -- and I'll do it in two months

22   because by then you'll for sure have an order from me on this.

23   And then we'll decide what we're going to do about the dates.  If

24   I say -- if I grant the motion to stay because I think that the

25   arbitrator has to decide the issue of arbitrability, then I'll

1   call off the CMC. But if I decide that I'm going to decide it,

2   I'm going to make a decision and the case stays here, then we'll

3   meet and then we'll talk about dates.

4      So let's look at the calendar and pick a date about two

5   months from now that we can have a CMC. And that would take us to

6   February. And I'm looking at February 28th.

7          MR. RHODES: Fine here, Your Honor.

8          THE COURT: I'm sorry?

9          MR. RHODES: Fine here, Your Honor.

10         THE COURT: Okay. At 1:30 p.m.

11         THE CLERK: You're actually marked unavailable that day.

12         THE COURT: It's okay, Melinda. I'm going to take the

13   CMCs that day.

14         THE CLERK: Okay. All right. That sounds good.

15         MR. HARRIS: Your Honor, I'm sorry. I don't have my

16   calendar and I should, but I believe I'm actually on a preplanned

17   vacation that day.

18         THE COURT: Okay. How about March 7th at 1:30 p.m.?

19         MR. HARRIS: That would be perfect for me.

20         THE COURT: Okay.

21         MR. RHODES: That's fine, Your Honor.

22         THE COURT: Okay. March 7th. And so by then, we'll

23   know where you're going to be or what you're going to be feeling

24   or what your status is.

25      Is there anything else people want to talk about for the CMC?

37

1          MS. WYTSMA:   Not on behalf of Marden-Kane.   Thank you,
2   Your Honor.
3          THE COURT:   Okay.   All right.
4          MR. RHODES:   Thank you, and good morning, Your Honor.
5          THE COURT:   Okay.
6          MR. MORNIN:   Thank you, Your Honor.
7      (Proceedings adjourned at 10:28 a.m.)

8

9      I, Peggy Schuerger, certify that the foregoing is a correct
10  transcript from the official electronic sound recording provided
11  to me of the proceedings in the above-entitled matter.

12

13  _____        February 16, 2022
    Signature of Approved Transcriber      Date
14

15  Peggy Schuerger
    **Ad Hoc Reporting**
16  Approved Transcription Provider
    for the U.S. District Court,
17  Northern District of California

18

19

20

21

22

23

24

25