Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
David J. Harris, Jr. (SBN 286204)
djh@classactionlaw.com
FINKELSTEIN & KRINSK LLP
501 West Broadway, Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Counsel for Plaintiffs and*
*the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SUSKI, JAIMEE MARTIN, JONAS CALSBEEK, and THOMAS MAHER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COINBASE, INC. and MARDEN-KANE, INC.,<br><br>Defendants. | Case No. 3:21-cv-04539-SK<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MARDEN-KANE, INC.'S MOTION TO COMPEL ARBITRATION AND TO DISMISS**<br><br>Hearing:    August 22, 2022<br>Time:        9:30 a.m.<br>Courtroom:    C |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    SUMMARY OF FACTS ...................................................................................... 3

III.   MARDEN-KANE LACKS, AND ALWAYS LACKED, ANY CONTRACTUAL RIGHT TO COMPEL PLAINTIFFS TO ARBITRATE OR TO COMPLAIN TO COINBASE ........ 7

IV.    MARDEN-KANE'S CLASS LITIGATION WAIVER IS UNENFORCEABLE PURSUANT TO UN-PREEMPTED STATE LAW .................................................... 8

       A.     The Official Rules' class action waiver satisfies the unconscionability standards established in *Discover Bank* and *Gentry*, and in California law generally. ................. 8

       B.     Absent any agreement to arbitrate, the FAA and all judicial precedents thereunder lack the constitutional power to preempt *Discover Bank*, *Gentry*, and California unconscionability law in general. ............................................................... 11

V.     DEFENDANTS' CLRA ARGUMENTS ARE MERITLESS ................................. 14

       A.     Defendants specifically intended that their Sweepstakes "transactions" with Plaintiffs would result in the "sale" of Coinbase's "services" to Plaintiffs. ............. 14

       B.     Marden- Kane's arguments that it made no "representations," and engaged in no "transactions," are clearly incorrect. ..........................................................20

       C.     Plaintiffs clearly complied with the CLRA's notice and demand requirement..........23

VI.    CONCLUSION ................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                        **Page(s)**

3

4
*Aguayo v. U.S. Bank*
    653 F.3d 912 (9th Cir. 2011) ................................................. 12, 13

5
*AT&T Mobility LLC v. Concepcion*

6
    563 U.S. 333 (2011) ........................................................ 1, 13, 14

7
*Bakersfield Coll. v. Cal. Cmty. Coll. Athletic Ass'n*

8
    41 Cal.App.5th 753 (Cal. Ct. App. 2019) ....................................... 9

9
*Bielski v. Coinbase, Inc.*
    No. C 21-07478, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022) .................. 10, 11

10
*Chamber of Commerce of U.S. v. Bonta*

11
    13 F.4th 766 (9th Cir. 2021) ................................................. 13, 14

12
*Chamberlan v. Ford Motor Co.*
    314 F.Supp.2d 953 (N.D. Cal. 2004) ............................................ 12

13

14
*Corra v. Energizer Holdings, Inc.*
    962 F. Supp. 2d 1207 (E.D. Cal. 2013) ........................................ 25

15
*Discover Bank v. Superior Court*

16
    36 Cal.4th 148 (2005) ................................................. 9, 10, 11, 13

17
*Doe 1 v. Successfulmatch.Com*
    70 F. Supp. 3d 1066 (N.D. Cal. 2014) ......................................... 19

18

19
*Estakhrian v. Obenstine*
    233 F. Supp. 3d 824 (C.D. Cal. 2017) ......................................... 24

20
*Fairbanks v. Superior Court*

21
    46 Cal.4th 56 (2009) ................................................... 16, 18, 21

22
*Geernaert v. Mitchell*
    31 Cal.App.4th 601 (1995) .................................................... 22

23

24
*Gentry v. Superior Court*
    42 Cal.4th 443 (2007) ..................................................... 10, 13

25
*Hawthorne v. Umpqua Bank*

26
    No. 11-cv-06700-JST, 2013 WL 5781608 (N.D. Cal. Oct. 25, 2013) .............. 18

27
*Henderson v. Gruma Corporation*
    No. CV 10-04173 AHM (AJWx), 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) ....... 24

28

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*
  313 F. Supp. 3d 1113 (N.D. Cal. 2018)..................................................................... 18

*Jeong v. Nexo Financial LLC*
  No. 21-cv-02392-BLF, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022)..................................... 19, 20

*Kennedy v. Natural Balance Pet Foods, Inc.*
  No. 07-CV-1082 H (RBB), 2007 WL 2300746 (S.D. Cal. Aug. 7, 2007) ................................. 24

*Leon v. Pinnacle Prop. Mgmt. Servs.*
  72 Cal.App.5th 476 (2021) ........................................................................................... 9

*Marler v. Johansing*
  199 Cal.App.4th 1450 (2011) ..................................................................................... 22

*Martinez v. Socoma Companies, Inc.*
  11 Cal.3d 394 (1974) ................................................................................................... 8

*Mohamed v. Uber Technologies, Inc.*
  848 F.3d 1201 (2016) ................................................................................................... 8

*Nelson v. Anderson*
  72 Cal.App.4th 111 (1999) ........................................................................................... 8

*Reeves v. Nianic, Inc.*
  No. 21-cv-05883-VC, 2022 WL 1769119 (N.D. Cal. May 31, 2022) ................................... 20

*Shapiro v. Sutherland*
  64 Cal.App.4th 1534 (1998) ....................................................................................... 22

*Sonoda v. Amerisave Mortg. Corp.*
  No. C-11-1803 EMC, 2011 WL 2690451 (N.D. Cal. July 8, 2011) ......................... 17, 18, 21

*Watson v. Aced*
  156 Cal.App.2d 87 (1957) ............................................................................................. 8

*Wilens v. TD Waterhouse Group, Inc.*
  120 Cal.App.4th 746 (Cal. Ct. App. 2003)................................................................... 11

**<u>Statutes</u>**

9 U.S.C. § 2 ...................................................................................................... 12, 13

Cal. Bus. & Prof. Code § 17539.15(b) ............................................................................. 3

Cal. Bus. & Prof. Code § 17539.15(l)(2)(A)(i) ................................................................. 3

Cal. Civ. Code § 1760 ...................................................................................... 15, 17, 21

Cal. Civ. Code § 1770 ....................................................................................... *passim*

Cal. Civ. Code § 1782 ........................................................................................................... 23, 24, 26

California Penal Code §§ 319 and 320 .................................................................................... 2, 15

U.S. Const., Art. VI ............................................................................................................................ 12

1    Plaintiffs David Suski, Jaimee Martin, Jonas Calsbeek, and Thomas Maher submit this

2    Memorandum of Law in Opposition to Defendant Marden-Kane, Inc.'s ("Marden-Kane") Motion to

3    Compel Arbitration or to Dismiss (Dkt. 87) ("Motion") Plaintiffs' Third Amended Class Action

4    Complaint (Dkt. 83) ("TAC").

5    ## I.   __INTRODUCTION__

6    The only arbitration agreements that ever existed in this case were in Coinbase, Inc.'s

7    ("Coinbase") User Agreements with Plaintiffs.  Marden-Kane was never a party to any User

8    Agreements with Plaintiffs.  Thus, Marden-Kane was never a party to any arbitration agreement with

9    Plaintiffs.  Marden-Kane's Motion fails to explain why Marden-Kane should have any contractual

10   right to compel arbitration, as a non-party to the only arbitration agreements that ever existed.

11   Marden-Kane asserts no third-party beneficiary argument, or any other legal basis, for its own (as

12   opposed to Coinbase's) purported right to arbitrate.   For this reason alone—and every other,

13   independent reason set forth in Plaintiffs' Opposition to Coinbase's Motion to Compel arbitration—

14   the Court should deny Marden-Kane's separate Motion to Compel.  *Accord* Order (Dkt. 76) at 2

15   (finding that Marden-Kane was never "subject to an arbitration agreement").

16   Marden-Kane also seeks to enforce the class action waiver contained in the parties' Official

17   Rules agreements, but Marden-Kane's arguments in this regard are erroneous.  Marden-Kane relies

18   primarily on *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011) to contend that class

19   action waivers are generally enforceable, but that is not what *Concepcion* said.  Instead, *Concepcion*

20   said that the Federal Arbitration Act ("FAA") preempts California unconscionability laws to the

21   extent they "[r]equir[e] the availability of classwide *arbitration*."  *Id.* at 344.[1]  Where, as here, there

22   is no arbitration agreement between the parties, the FAA simply does not apply; a federal statute

23   cannot possibly preempt State law in cases where the federal statute does not even apply.

24   Marden-Kane argues, in the alternative, that California's unconscionability laws do not apply

25   on their face, because Plaintiffs' claims for "hundreds of dollars" are (somehow) "sufficient" to

26   justify the risks and costs of individual litigation.  Motion at 9.  That argument is meritless.  No

27   reasonable person would assume the risks and costs of a lawsuit, including attorneys' fees and

28   ─────────────────────
[1] All emphasis herein is added unless otherwise indicated.

1

expenses, in hopes of (maybe) recovering "hundreds of dollars." *Id.* Their entire potential recovery would effectively be gone before they might obtain it. Absent an arbitration agreement, the Official Rules' standalone class-*litigation* waiver is clearly unconscionable under *un-preempted* State law.

Moreover, California's Consumer Legal Remedies Act ("CLRA") expressly precludes contractual waivers of the right to bring a class action. Cal. Civ. Code §§ 1751-1752, 1781. Since the FAA cannot possibly conflict-preempt the CLRA here (due to the absence of an agreement to arbitrate), the CLRA's statutory preservation of the class mechanism remains in full force. Marden-Kane raises multiple, creative arguments for why it should not be liable under the CLRA, but its arguments miss the mark.

Lastly, Marden-Kane complains that the TAC's allegations are insufficiently specific, and then, generally points the finger at Coinbase to evade liability for its own conduct. *See* Motion at 10-13. These arguments fail for several reasons, including the fact that California's sweepstakes statute imposes affirmative duties on sweepstakes "administrators" to "clearly and conspicuously" disclose any free-entry method. *See* Order (Dkt. 53) at 13 ("California law requires sweepstakes sponsors to include a 'clear and conspicuous statement of the no-purchase-or-payment-necessary message' . . . .") (quoting Cal. Bus. & Prof. Code § 17539.15(b)); *see also* Cal. Bus. & Prof. Code § 17539.15(l)(2)(A)(i) ("defining "sweepstakes sponsor" to include any "person or entity that operates or administers a sweepstakes"). Marden-Kane cannot properly blame Coinbase for failing to do something that the statute also required Marden-Kane to do as Sweepstakes "Administrator." *Id.* And for Plaintiffs' other claims, it makes no difference whether Defendants' misleading ads were physically disseminated from Coinbase's website or Marden-Kane's website; what matters is that both Defendants specifically intended and caused the misrepresentations at issue to be disseminated to millions of Coinbase users and the public at large, including Plaintiffs and the putative Class.[2]

At bottom, Marden-Kane cannot piggyback on Coinbase's original arbitration clauses to avoid litigation, nor can it finger-point at Coinbase's separate conduct to avoid liability. As further detailed herein, Marden-Kane's Motion to compel arbitration or to dismiss must be denied.

---

[2] Plaintiffs have addressed Marden-Kane's "lottery" arguments, which are similar to Coinbase's, in their Opposition to Coinbase's Motion to compel arbitration or dismiss. Plaintiffs request that the Court apply their "lottery" argument therein similarly to both Defendants' instant Motions.

## II.   **SUMMARY OF FACTS**

Defendant Marden-Kane is a company that specializes in planning and executing consumer "sweepstakes" promotions nationwide.   ¶23.[3]   Defendant Coinbase is one of the largest online cryptocurrency exchanges in the world, with approximately 60 million active users. ¶1.

Shortly before June 2021, Coinbase decided to add a new cryptocurrency, called "Dogecoin" (or "DOGE"), to the list of tradable cryptocurrencies on its exchange.  ¶¶3-5.  Coinbase, however, had certain supply and demand conditions—or "liquidity conditions"—that needed to be satisfied before it allowed its customers to trade DOGE via Coinbase.  ¶6.  Coinbase planned to have DOGE begin trading on June 3, 2021, but did not know if "natural consumer sentiment" would be enough to create the supply and demand needed to create "liquid" DOGE trading on its exchange.  *Id.*  Because Coinbase earns revenue by charging fees to consumers when they buy or sell cryptocurrencies, any shortfall in DOGE liquidity would have been a shortfall in Coinbase's revenue.  ¶¶2, 6.

To solve the Dogecoin "liquidity" problem, Coinbase decided to run a Dogecoin "Sweepstakes" promotion during the first week of trading.  *Id.*  The idea was that, by offering Coinbase users the chance to win prizes for trading, Defendants could incentivize many *prize*-coveting users to trade DOGE, via Coinbase, on particular days: even absent their pre-existing intent to trade DOGE, via Coinbase, on particular days.  In this way, Coinbase could ensure that its "liquidity conditions" would be met, and thereby maximize its fee-based revenues from prize-seeking users who might execute DOGE transactions immediately, and via Coinbase (instead of some other exchange platform).  *Id.*

Coinbase lacked experience in executing sweepstakes promotions (as opposed to cryptocurrency trades), so Coinbase hired Marden-Kane to help plan, execute, and "administer" the DOGE Sweepstakes. *Id.*  Marden-Kane's responsibilities as Sweepstakes "Administrator" included "collaborat[ing]" with Coinbase in the "draft[ing], structur[ing] and design[]" of Coinbase's digital Sweepstakes ads, direct-to-user email solicitations, and Official Sweepstakes Rules (Dkt. 83-1).  ¶¶7, 107.  Marden-Kane also processed entry requests, made eligibility determinations, and conducted random prize drawings.  *Id.*; *see also* Official Rules (Dkt. 83-1) (explaining some of the

---

[3] References to ¶_ or ¶¶___ are to Plaintiffs' TAC, unless otherwise indicated.

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

"Administrator's" role).   Additionally, Marden-Kane provided Coinbase with "Tracking and Reporting" data, which allowed both companies to analyze the efficacy of their ad campaign in converting ad recipients into Sweepstakes entrants and DOGE traders.   ¶¶52-59.  While Defendants' Sweepstakes ads and Official Rules were physically transmitted to users via Coinbase's website, mobile app, and email system, Marden-Kane performed all of its above responsibilities "with the full knowledge and intent" that the Sweepstakes ads and Official Rules would be disseminated electronically by Coinbase to its millions of existing customers.  ¶129.

As the Court previously held, Plaintiffs have sufficiently pleaded that Defendants' Sweepstakes solicitations violated California's sweepstakes-disclosure statute, and were otherwise misleading to the reasonable consumer.  Order (Dkt. 53) at 13-14.  Specifically, on June 3, 2021, Coinbase emailed and otherwise solicited Plaintiffs, and millions of other Coinbase users, to enter the DOGE Sweepstakes.  Coinbase's mass emailing and digital advertising displayed large, colorful graphics and language stating:

> Trade DOGE. Win DOGE. Starting today, you can trade, send, and receive Dogecoin on Coinbase.com and with the Coinbase Android and iOS apps. To celebrate, we're giving away $1.2 million in Dogecoin. Opt in and then buy or sell $100 in DOGE on Coinbase by 6/10/2021 for your chance to win. Terms and conditions apply.

*Id.*   Below that text was a link to the Sweepstakes' Official Rules, as well as a larger and bolder action button stating, "See how to enter." *Id.*    Upon clicking "See how to enter," Plaintiffs were taken to an "Opt-in" page.  ¶¶28-39.  The Opt in page similarly stated:

> Trade DOGE.  Win DOGE.  Dogecoin is now on Coinbase, and we're giving away $1.2 million in prizes to celebrate.  Opt in and then buy or sell $100 in DOGE on Coinbase by 6/10/2021 for your chance to win.

¶10.  Upon clicking the "Opt in" button, the "Opt in" page changed slightly, and stated:

> You're one step closer to winning. You've successfully opted in to our Dogecoin Sweepstakes. *Remember, you'll still need to buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win*.

¶¶10-11.  This emphasized statement was materially false and misleading, because the true fact was that "Defendants had privately agreed, only among themselves, to accept free entry requests (if any) from Coinbase users." ¶106;  *accord* TAC at 1 (opening paragraph); ¶¶68-69, 126, 128, 147.

Plaintiffs relied on Defendants' affirmative statement that they would "need to" trade Dogecoins on Coinbase, and pay Coinbase's associated transaction fees, "for a chance to win." ¶¶27-42. Each Plaintiff thus spent $100 or more buying Dogecoin on Coinbase, and paying Coinbase's associated transaction fees, to earn a chance to win. *Id.*

As an express condition of entry, Defendants required Plaintiffs to agree and adhere to the terms and conditions provided in the "Official Rules" contract for the Sweepstakes.  The Official Rules provided that any legal resident of the continental United States, who was at least 18 years old, was eligible to enter.  The Official Rules provided the following terms and conditions for entry.

**3.     How to Enter:**

Two methods of entry:

Method 1:  *Existing account holders and new\* account holders must* opt-in to participate in the Sweepstakes *and must* complete $100usd (cumulative the transaction fee)) in trade (buy/sell) of Dogecoin on Coinbase.com (.com and/or Coinbase app) during the Promotion Period to earn one (1) entry into the Sweepstakes.

[omitted text irrelevant to the Motion]

Method 2:  To enter via email, hand write the following on the front of a 3x5 card, your name, address, city, state, zip, e-mail address, telephone number and date of birth.  Insert single card in an envelope and mail with sufficient postage to: Coinbase Dogecoin Sweepstakes, PO Box 738, Syosset, NY 11791-0738 — return address and mailing address on envelope must be handwritten.

[omitted text irrelevant to the Motion]

**Participants must comply with these Official Rules and the Conditions of Entry.** Determination of compliance will be in the sole discretion of the Sponsor/Administrator [*i.e.,* Coinbase and Marden-Kane].

Official Rules (Dkt. 83-1) at 3-5, ¶3.  As the Court previously recognized, these "Official" entry "Rules"—much like Defendants' digital ads—objectively suggested that Coinbase "account holders" "must" trade to obtain entry, even if **non-"account holders"** could enter by mail.  Dkt. 62 (Hearing Transcript) at 27:15 - 28:9.

Indeed, to interpret "Method 2" as being available to Coinbase "account holders" (like Plaintiffs and the Class) would be to interpret the first sentence of "Method 1" as objectively false. For this reason—and based on the unambiguous text of Method 1—the best, **objective** reading of these Official Rules was that Coinbase "account holders" were obligated to trade DOGE and to pay

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

"the transaction fee" to "earn one (1) entry into the Sweepstakes."  That interpretation is particularly salient in light of Defendants' corroborating statement to Coinbase users, via the Sweepstakes ads: "Remember, *you'll* still *need to* buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win."  Thus, these Official Sweepstakes Rules affirmatively stated that Coinbase "account holders must" pay to enter, even if the truth was that Defendants had privately agreed—only among themselves—to accept free-entry requests from Coinbase users, if any happened to be submitted.

Each Plaintiff bought DOGE via Coinbase as instructed, and paid all associated transaction fees, to obtain their chance to win a prize.  ¶¶27-42.  If Defendants had not affirmatively and objectively made Plaintiffs' entries contingent on their DOGE trades, Plaintiffs would not have traded DOGE via Coinbase as instructed, or paid Coinbase any fees.  *Id.*  Plaintiffs paid for their chances to win, solely because that was what Defendants objectively required of them in writing.  *Id.*

As the Court has recognized, Defendants' Official Rules agreements with Plaintiffs contained no arbitration provisions whatsoever.  Quite the opposite, the Official Rules provided as follows.

> **Disputes:** All federal, state and local laws and regulations apply.  THE CALIFORNIA COURTS (STATE AND FEDERAL) SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THE PROMOTION[4] AND THE LAWS OF THE STATE OF CALIFORNIA SHALL GOVERN THE PROMOTION**.** EACH ENTRANT WAIVES ANY AND ALL OBJECTIONS TO JURISDICTION AND VENUE IN THOSE COURTS FOR ANY REASON AND HEREBY SUBMITS TO THE JURISDICTION OF THOSE COURTS.  Claims may not be resolved through any form of class action.  [***irrelevant text omitted***]  By entering and participating in the Promotion, Entrants hereby expressly agree and accept that for all that is related to the interpretation, performance, and enforcement of these Official Rules, each of them expressly submit themselves to the laws of the United States of America and the State of California, expressly waiving to any other jurisdiction that could correspond to them by virtue of their present or future domicile or by virtue of any other cause.

Dkt. 83-1, ¶10 (original emphasis).  The Official Rules conditioned Plaintiffs' entries and potential prizes upon their compliance with ¶10.  *See id.*, ¶9 ("[Coinbase] reserves the right to prohibit the participation of an individual . . . if the participant fails to comply . . . with any provision in these Official Rules."); *id.*, ¶1 ("Winning a prize is contingent upon fulfilling all requirements set forth herein.").  Thus, if Plaintiffs had filed suit outside of California, or filed an arbitration demand with

---

[4] The word "PROMOTION" here refers to the DOGE Sweepstakes.  *See* ECF No. 83-1, ¶1.

the AAA to resolve their Sweepstakes claims, then they would have violated ¶10's mandatory, exclusive jurisdiction clause and faced disqualification from the Sweepstakes.  *Id.*

Consequently, once Plaintiffs learned that they were deceived into paying to enter Defendants' DOGE "Sweepstakes," they complied with Official Rules ¶10, by invoking this Court's "JURISDICTION" to resolve their Sweepstakes "CONTROVERSIES."  Dkt. 1; Dkt. 22; Dkt. 36; Dkt. 83.  In response, Marden-Kane now seeks to disavow the parties' express litigation agreement, which Marden-Kane itself drafted and insisted upon as an express condition of administering the Sweepstakes.  Marden-Kane also seeks to disclaim its own clearcut violations of law, as Coinbase's Sweepstakes "Administrator."  Marden-Kane's arguments should be rejected as meritless.

## III.  MARDEN-KANE LACKS, AND ALWAYS LACKED, ANY CONTRACTUAL RIGHT TO COMPEL PLAINTIFFS TO ARBITRATE OR TO COMPLAIN TO COINBASE

"It is, of course, the general rule that one may not sue upon a contract unless he is a party to that contract."  *Watson v. Aced*, 156 Cal.App.2d 87, 91 (1957).  "One who is not a party to a contract has no right to enforce it unless he is an intended third-party beneficiary of the contract."  *Nelson v. Anderson*, 72 Cal.App.4th 111, 130 (1999) (citing *Martinez v. Socoma Companies, Inc.*, 11 Cal.3d 394, 400 (1974)).  There are certain exceptions to this rule, such as where: (1) an agency relationship exists between the non-party and a party having enforcement rights; (2) an extreme "identity of interest" exists between the non-party and a party; or (3) the causes of action alleged against the non-party are "intimately founded in and intertwined with" the underlying contractual (not statutory) obligations.  *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1214-16 (2016).

Here, Marden-Kane seeks to enforce Plaintiffs' original User Agreements with Coinbase, including the User Agreements' pre-dispute resolution provisions and arbitration provisions.  Motion at 4-6.  Marden-Kane, however, does not contend that it was ever a party to Coinbase's User Agreements with Plaintiffs.  *Id.*  Nor could it, as the User Agreements never even contemplated Marden-Kane's existence, much less contemplate Marden-Kane or any sweepstakes company as a beneficiary of the User Agreements.  *See generally* User Agreements (Dkt. Nos. 33-7 through 33-10).

Furthermore, Marden-Kane does not argue or explain how any of the above three exceptions from *Mohamed* might apply here.  In fact, Marden-Kane is identically situated to the third-party at

7

issue in *Mohamed*, who the Ninth Circuit found to have no right to enforce Uber's arbitration agreements. *See Mohamed*, 848 F.3d at 1214-16. In sum, Marden-Kane offers the Court no legal basis for finding that Marden-Kane can enforce any User Agreement.

Additionally, Plaintiffs oppose Marden-Kane's Motion to compel for each, independent reason explained in Plaintiffs' Opposition to Coinbase's (Renewed) Motion to Compel Arbitration. Plaintiffs will not restate all of those arguments here, but instead, respectfully incorporate them by reference in case the Court is inclined to reach those issues with respect to Marden-Kane. There should, however, be no need for the Court to reach those issues with respect to Marden-Kane, as Marden-Kane (admittedly) never had any contractual rights under any User Agreement.

## IV.   MARDEN-KANE'S CLASS LITIGATION WAIVER IS UNENFORCEABLE PURSUANT TO UN-PREEMPTED STATE LAW

### A.   The Official Rules' class action waiver satisfies the unconscionability standards established in *Discover Bank* and *Gentry*, and in California law generally.

In *Discover Bank v. Superior Court*, 36 Cal.4th 148 (2005), the California Supreme Court squarely addressed the unconscionability of class action waiver agreements in consumer contracts. The State Supreme Court "conclude[d] that, at least under some circumstances, the law of California is that class action waivers in consumer contracts of adhesion are unenforceable, whether the consumer is being asked to waive the right to class action litigation or the right to classwide arbitration." *Id.* at 153. The State Supreme Court was unambiguous as to the "circumstances" in which class action waivers are "unenforceable" under California law. *Id.* Specifically, it held that where a class action waiver "is [1] found in a consumer contract of adhesion [2] in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and [3] when it is alleged that a party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then, at least [4] to the extent the obligation at issue is governed by California law, the waiver becomes in practice the exemption of the party from responsibility for its own fraud, or willful injury to the person or property of another. Under these circumstances, such waivers are unconscionable under California

law and should not be enforced." *Id.* at 162-63.  Here, the class action waivers in Defendants'
Official Rules agreements clearly satisfy all four of these conditions.

**First**, the class action waivers in Defendants' Official Rules are indisputably "found in a
consumer contract of adhesion."  *Id.*  Defendants' presented Plaintiffs with the Official Rules on a
take-it-or-leave-it basis, with no opportunity whatsoever for Plaintiffs to negotiate, or to opt out of,
the class action waiver therein.  *See also Bakersfield Coll. v. Cal. Cmty. Coll. Athletic Ass'n*, 41
Cal.App.5th 753, 762-63 (2019) ("When the weaker party is presented the clause and told to 'take it
or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural
unconscionability, are present."); *Leon v. Pinnacle Prop. Mgmt. Servs.*, 72 Cal.App.5th 476, 485
(2021) ("Procedural unconscionability may be proven by showing oppression, which is present when
a party has no meaningful opportunity to negotiate terms or the contract is presented on a take-it-or-
leave-it basis.").  The Official Rules' class action waiver was procedurally unconscionable under
California contract law generally, and under *Discover Bank* specifically.  *See also Bielski v.
Coinbase, Inc.*, No. C 21-07478, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022) (applying California's
generalized standards for unconscionability to find Coinbase's User Agreements procedurally
unconscionable).

**Second**, each Plaintiff's individual claims in this case "predictably involve small amounts of
damages."  *Discover Bank*, 36 Cal.4th at 162-63.  Each Plaintiff alleges that he or she spent a grand
total of somewhere between $100 (Plaintiff Suski) and $220 (Plaintiff Martin) to enter the
Sweepstakes.  ¶¶27-42.  Given the real risk of losing one's individual claims on the merits, such
amounts are hardly sufficient to justify sinking an initial filing fee into individual litigation, much
less incurring attorneys' fees and expenses, and investing countless hours of one's personal time
seeking justice.  *See, e.g., Gentry v. Superior Court*, 42 Cal.4th 443, 457-58 (2007) (reasoning that
individual claims, even for an average of $6,000 each, still weighed against the enforcement of a
class action waiver).  The fact that Plaintiffs have asserted one fee-shifting claim, under the CLRA,
does not alter the analysis.  *Id.* at 458-59 (explaining that plaintiffs' "attorneys must weigh the
typically modest recovery, and the typically modest means of [their clients], with the risk of not
prevailing and being saddled with . . . substantial costs," and reasoning that even "the award of

9

'reasonable' fees and costs [is] at the discretion of the trial court").  Given the substantial risks of loss and/or non-payment, plaintiffs' lawyers are unlikely to spend contingency time on a $100, individual damages claim.  For this reason, the Official Rules' class action waiver is effectively an adhesive, "exculpatory clause" as a matter of State law.  *Discover Bank v*, 36 Cal.4th at 162-63.[5]

**Third**, Plaintiffs have sufficiently alleged that Defendants, the "part[ies] with the superior bargaining power[,] ha[ve] carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money."  *See generally* TAC (Dkt. 83); Order (Dkt. 53). Defendants allegedly misled Plaintiffs and millions of Coinbase users into believing that they needed to pay for a chance to win prizes, when the truth was that Defendants had privately agreed among themselves to give away such chances for free, *if* requested by consumers in direct contradiction of the Sweepstakes solicitations and Official Rules.  Thus, Defendants, allegedly, "deliberately cheat[ed]" millions of consumers out of "individually small sums of money."  *Discover Bank v*, 36 Cal.4th at 162-63.

**Fourth**, California contract law governs the Official Rules and Plaintiffs' claims regarding the Sweepstakes.  *See* Official Rules (Dkt. 83-1), ¶10.  Therefore, under California law, the Official Rules' class-action *litigation* waiver is unconscionable and unenforceable, as a practical "exculpatory clause" under *Discover Bank* and *Gentry*.

Even apart from *Discover Bank* and *Gentry*, the Official Rules' class litigation waiver is substantively unconscionable—in addition to being procedurally unconscionable[6]--because it is entirely one-sided.  *See, e.g., Wilens v. TD Waterhouse Group, Inc.*, 120 Cal.App.4th 746, 754 (Cal. Ct. App. 2003) ("An adhesion contract will be considered substantively unconscionable if it is

---

[5] Marden-Kane says that individual litigation would make economic sense in this case because the filing fees in **small claims court** are less than $100.  Motion at 9.  First of all, California has expressly rejected "small claims litigation" as a viable alternative to class litigation.  *Gentry*, 42 Cal.4th at 464 ("Nor do we agree . . . that small claims litigation, government prosecution, or informal resolution are adequate substitutes.").  Second, Marden-Kane's myopic focus on filing fees in small claims court ignores all other time and money costs, and risks of loss, associated even with small claims litigation.  Third, Marden-Kane's "small claims" argument ignores the practical inability of a plaintiff to find adequate counsel who might prosecute complex consumer claims in a small claims court.  Plaintiffs' individual claims involve fraud issues, contractual issues, gambling issues, preemption issues, and statutory interpretation issues: not exactly stuff for small claims court.

[6] *See supra* (citing *Bakersfield Coll.*, 41 Cal.App.5th at 762-63, and *Leon*, 72 Cal.App.5th at 485).

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

unduly one-sided in favor of the stronger party."); *Bielski*, 2022 WL 1062049 (applying California's general standards for unconscionability to find Coinbase's User Agreements substantively unconscionable).  The class waiver at issue here was "unduly one-sided," because Coinbase and Marden-Kane would never need to pursue their own class action against a ***defendant***-class of DOGE Sweepstakes entrants.  At bottom, the Official Rules' class litigation waiver was drafted entirely by Defendants, and entirely for Defendants: only to absolve themselves of substantially all civil liability for their relatively small, individual frauds against millions of consumers.

For each of the above reasons, the Official Rules' standalone, class-action litigation waiver was always unconscionable and unenforceable, as a matter of settled unconscionability law.

**B.**  **Absent any agreement to arbitrate, the FAA and all judicial precedents thereunder lack the constitutional power to preempt *Discover Bank*, *Gentry*, and California unconscionability law in general.**

The federal preemption of State law arises only under the Supremacy Clause of the U.S. Constitution, which provides that "[t]his Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State ***to the Contrary*** notwithstanding."  U.S. Const., Art. VI, § 2.  From this text, courts have discerned three ways in which federal law can constitutionally "preempt," or invalidate, State law.  Those are: (1) express preemption, where Congress enacts a statute stating that it displaces otherwise applicable State law; (2) field preemption, where Congress has so voluminously and completely regulated a particular "field," that it must have intended to displace ***all*** State law in that field; and (3) conflict preemption, where compliance with both State and federal law is impossible, or where State law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Aguayo v. U.S. Bank*, 653 F.3d 912, 917-18 (9th Cir. 2011).  In any preemption case, "the purpose of Congress is the ultimate touchstone," and courts begin by assuming that States retain "the[ir] historic police powers," especially when "Congress has legislated in a field which the States have traditionally occupied."  *Id.* (collecting cases).

In enacting the FAA, Congress did not expressly preempt State contract law; in fact, Congress expressly endorsed State contract law.  9 U.S.C. § 2 (providing for the invalidation of arbitration agreements based on any "grounds as exist at [State] law or in equity for the revocation of

11

any contract"). Nor does the FAA so voluminously and completely regulate the "field" of contracts that it displaces and invalidates State contract law. Thus, the only way that the FAA can possibly preempt, and thus invalidate, California unconscionability law is through the doctrine of ***conflict*** preemption. Conflict preemption cannot be based on "[s]peculative or hypothetical" conflicts between State and federal law. *Chamberlan v. Ford Motor Co.*, 314 F.Supp.2d 953, 957-58 (N.D. Cal. 2004). Instead, there must be an "actual conflict," and "clear evidence of such a conflict." *Id.* (collecting cases). The question presented, therefore, is whether the application of California unconscionability law to the Official Rules' class-action ***litigation*** waiver somehow "stands as an obstacle . . . to the purposes and objectives of Congress" in enacting the FAA. *Aguayo*, 653 F.3d at 917-18. Obviously, it does not.

Defendants rely on *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) and its progeny, to argue that the Court must deem the Official Rules' standalone, class-action ***litigation*** waiver enforceable ***under the FAA***. That argument is legally nonsensical. *Concepcion* and its progeny are conflict-preemption cases, and the FAA is a statute concerned only with enforcing agreements to ***arbitrate***. 9 U.S.C. § 2. Thus, the FAA, *Concepcion*, and its progeny have no constitutional force or applicability in cases where, as here, ***the parties have not agreed to arbitrate in the first place***. *Chamber of Commerce of U.S. v. Bonta*, 13 F.4th 766, 780 (9th Cir. 2021) ("Does the text of the FAA or the precedent interpreting it expand the preemptive scope of the statute to situations in which there is no agreement to arbitrate at issue? [T]he answer to that question is 'no.'").

The California Supreme Court has repeatedly held that class action ***litigation*** waivers exactly like the one in Official Rules ¶10 are "unlawfully exculpatory." *See generally Discover Bank*, 36 Cal.4th 148; *Gentry*, 42 Cal.4th 443. This State law applies "not specifically . . . to arbitration agreements, but to contracts generally." *Discover Bank*, 36 Cal.4th at 165-66; *see also id.* at 153 ("[U]nder some circumstances, the law of California is that class action waivers in consumer contracts of adhesion are unenforceable, ***whether the consumer is being asked to waive the right to class action litigation or the right to classwide arbitration***.").

Later, of course, the Supreme Court held that the FAA conflict-preempts the *Discover Bank* rule: in an arbitration context only. *See generally Concepcion*, 563 U.S. 333. This was expressly

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

1   and solely because "[r]equiring the availability of classwide *arbitration* [not litigation] interferes

2   with fundamental attributes of *arbitration* and thus creates a scheme inconsistent with the *FAA*." *Id.*

3   at 344.  The FAA concerns itself only with enforcing agreements to arbitrate, and with preserving the

4   "benefits" of agreed upon arbitration.  *Id.* at 351.  The FAA does not concern itself with enforcing

5   class action waivers where the parties have expressly agreed to *litigate* their disputes in a court of

6   law; such a statute might be called the "Federal Class-Action Waiver Act," but that statute doesn't

7   exist.  Where, as here, no agreement to arbitrate exists, it is constitutionally impossible for the FAA

8   to displace California law.

9         In short, both the *Discover Bank* rule—and California unconscionability law generally—

10  cannot possibly be conflict-preempted by the FAA *absent* an agreement to arbitrate in the first place.

11  *Bonta*, 13 F.4th at 780.  Because this Court has correctly found that the parties did not agree to

12  arbitrate any "CONTROVERSIES" regarding the Sweepstakes (Order (Dkt. 53) at 1-10), the Court is

13  constitutionally bound to apply *Discover Bank* and *Gentry*, California unconscionability law

14  generally, and the CLRA's statutory anti-waiver provisions, to the Official Rules' standalone, class

15  litigation waiver.

16        This is basic preemption law.  The FAA preempts California law to the extent, but *only* to the

17  extent, that California law's application to a contract disfavors arbitration or eliminates the "benefits"

18  of *agreed upon arbitration*.  *See generally Concepcion*, 563 U.S. 333.  Where—as here—there is no

19  agreement to arbitrate the dispute in question, there simply cannot be any "conflict" preemption of

20  State law.  California law stands pat.  To hold otherwise would violate "basic principles of

21  federalism."  *Bonta*, 13 F.4th at 780, n.4.  Coinbase itself continues to concede as much, with respect

22  to California statutory law.  *See* Coinbase's Motion (Dkt. 88) at n.5.  California decisional law is no

23  different.  State law is State law, and it stands entirely unaffected by the FAA absent an agreement to

24  arbitrate the claims at issue.

25        Therefore, the Official Rules' standalone, class-action litigation waiver is unconscionable and

26  unenforceable as a matter of settled State law and settled Constitutional preemption law.

27

28

## V.   DEFENDANTS' CLRA ARGUMENTS ARE MERITLESS

### A.   Defendants specifically intended that their Sweepstakes "transactions" with Plaintiffs would result in the "sale" of Coinbase's "services" to Plaintiffs.

The CLRA prohibits "any person"—"in a transaction intended to result or that results in the sale or lease of goods or services to any consumer"—from "[r]epresenting that [the] *transaction* confers or involves rights, remedies, or *obligations* that it does not have or involve, or that are prohibited by law." Cal. Civ. Code § 1770(a)(14). The statute liberally defines "transaction" to include "an[y] *agreement* between a consumer and another person, whether or not the *agreement* is a contract enforceable by action, and includes the making of, and the performance pursuant to, that *agreement*." Cal. Civ. Code § 1761(e).

Here, Plaintiffs allege that the relevant "transactions" were their entries into the DOGE Sweepstakes, pursuant to the parties' Official Rules "agreements." *Id.*; *see generally* Dkt. 83-1 (Official Rules agreement). Plaintiffs allege that Defendants' Sweepstakes ads and Official Rules objectively "represent[ed]" that Plaintiffs' entries "involve[d] . . . obligations that [they did] not have or involve," and "obligations" that were "prohibited by law." Specifically, Defendants' ads and Official Rules represented that Plaintiffs' had an "obligation" to buy or sell Dogecoins via Coinbase to obtain a chance to win. *Id.* Defendants represented this by (among other things) prominently asserting in their Sweepstakes-entry solicitations: *"Remember, you'll still need to buy or sell $100 in Dogecoin on Coinbase by 6/10/21 for a chance to win."* TAC, ¶¶11, 28-38. This statement represented to Plaintiffs that their Sweepstakes-entry "transactions" conferred upon them "obligations" that Plaintiffs did not have, those being to trade Dogecoins via Coinbase as instructed. Cal. Civ. Code § 1770(a)(14). The truth was that Defendants had "privately agreed among themselves" to waive Plaintiffs' "obligation" to trade DOGE, and to "grant free entry" to Plaintiffs only *if* Plaintiffs requested as much, *contrary to* the Sweepstakes solicitations and Official Rules.[7]

---

[7] Additionally, Plaintiffs allege that their purported "obligations" here—to patronize Coinbase in exchange for a chance to win a prize—were "prohibited by law," in Cal. Penal Code §§ 319 and 320. That allegation remains sufficient, even if the Court ultimately finds the DOGE Sweepstakes not to be a lottery. This is because Defendants, by *"representing"* that Plaintiffs had the "obligation" to pay for a chance to win a prize, in fact "represent[ed]" that Plaintiffs had an "obligation . . . prohibited by law." Cal. Civ. Code § 1770(a)(14). For CLRA purposes only, whether Plaintiffs objectively *had* the obligation doesn't even matter; what matters is that Defendants *represented* to Plaintiffs that Plaintiffs had an unlawful "obligation": to pay for their chances to win. *Id.*

14

The Court has already agreed that Defendants' Sweepstakes ads and Official Rules were "misleading" and "confusing" as to whether Coinbase "account holders" like Plaintiffs were obligated to trade DOGE to obtain entry.  Order (Dkt. 53) at 13-14 (finding sufficient Plaintiffs' allegations that the Sweepstakes solicitations "were likely to deceive a reasonable consumer that they needed to make a trade to participate in the sweepstakes").  At oral argument on Coinbase's prior motion to dismiss, the Court also recognized the deceptive nature of Defendants' entry Rules.

> [THE COURT:]  I'm looking at the [Official Rules] in front of me.  It makes it look like if you are an existing accountholder or a new accountholder, you have to complete the $100 transaction.  If you're not an existing account holder or a new accountholder, you can enter for free.  That's what Mr. Harris' argument is, which he wants to have leave to amend so he can make the argument.  In other words, it's not only misleading; it could be objectively read to mean that if you actually currently are a Coinbase accountholder, you must have this $100 transaction.  Everybody else can just mail in this little card.
>
> ***
>
> I have to say it is confusing; I mean, if I were entering this contest, I would be confused by this.

Dkt. 62 (Hearing Transcript) at 27:15 - 28:9.  If even the Court could be confused about a consumer's objective obligations in entering this Sweepstakes, how much more would layperson-consumers be given to deception and confusion from Defendants' misrepresentations?  *Id.*

Hence, the only remaining question here is whether the parties' Sweepstakes-entry "transactions" were transactions "intended to result" or "that result[ed]" in the "sale or lease of goods or services" to Plaintiffs.  Cal. Civ. Code § 1770.  Clearly, Plaintiffs' Sweepstakes entries were so intended, and they did so result.  Defendants specifically intended that Plaintiffs' Sweepstakes entries (CLRA "transactions") would "result in" Plaintiffs paying to use "the Coinbase Services."  Coinbase directly sold its cryptocurrency-exchange "services" and trade-execution "services" to Plaintiffs, in exchange for discrete "Coinbase fees," as a direct "result" of Plaintiffs opting into and entering the Sweepstakes.  TAC, ¶¶46-50, 147.  Thus, the parties' Sweepstakes-entry "transactions" were intended to result, and did result, in the sale of Coinbase's exchange "services" and trade-execution "services" to Plaintiffs.  Cal. Civ. Code § 1770.

Both Defendants, however, contend that if cryptocurrencies themselves are not "tangible goods" (and they're not), then any cryptocurrency-exchange or trade-execution "services" that

Coinbase sold to Plaintiffs were not **CLRA** "services."  Motion at 13, n.10; *see also* Coinbase's

Motion at 17-18.  This, Defendants say, is because Coinbase's "services" were merely "ancillary" to

Plaintiffs' purchases of non-"goods" (here, Dogecoins).  *Id.*  Defendants' argument in this regard

misconstrues the CLRA's "ancillary services" doctrine, which comes from *Fairbanks v. Superior*

*Court*, 46 Cal.4th 56 (2009).  In *Fairbanks*, the California Supreme Court made clear that "***sellers***"

of non-"goods" cannot be subjected to CLRA liability, just because they perform some ancillary

"work"  (*i.e.,* "services") in selling **their own** non-"goods."  *Id.*

The "ancillary services" doctrine, however, does not apply to companies whom consumers

pay to perform standalone "work," which only happens to be tangential to **someone else's** sale of

non-"goods" and non-"services."  *See Sonoda v. Amerisave Mortg. Corp.*, No. C-11-1803 EMC,

2011 WL 2690451, at *4 (N.D. Cal. July 8, 2011) ("To be sure, if Amerisave was not loaning money

but instead acted only as a broker for other third-party lenders, then arguably what Amerisave was

selling was its work or labor in finding a loan for Plaintiffs (rather than negotiating terms of its own

loans). Such brokerage services might well qualify as 'services' under the CLRA.").  In other words,

a financial lender is not selling "goods" or "services" because the lender is merely selling **cash**,

which is neither a "good" nor a "service."  *Id.*  At the same time, however, a third-party loan **broker**

who charges the consumer its own separate fee—not in exchange for lending money, but in exchange

for helping the consumer "find" a lender—is selling only its own "work," its own "services," under

the CLRA.  *Id.*; Cal. Civ. Code § 1761(b) (defining "services" to include "work" and "labor").

Indeed, the only thing such a third-party could possibly be selling to the consumer is its own "work"

in helping to facilitate a **separate and distinct** "sale."  *Id.*  As recognized by Judge Chen, the CLRA

issue is not whether the separate "sale" between a consumer and **someone else** was a "sale" of

"goods" or "services"; rather, the CLRA issue is whether **a defendant's own, direct "sale"** to a

plaintiff was primarily a "sale" of "goods" or of "services" (*i.e.,* "labor" or "work")

Here, Defendants' Motions rely heavily on Coinbase's User Agreements with Plaintiffs.

Motion at 4-7; Coinbase's Motion at 6-11. Those User Agreements state as follows:

> When you purchase (buy) or sell Digital Currency on the Coinbase Site, ***you are not***
> ***buying Digital Currency from Coinbase or selling Digital Currency to Coinbase***.

16

***Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase customers***.

\*\*\*

In general, Coinbase makes money when you purchase or sell digital currency on our Site. A full list of Coinbase fees for your Coinbase Account can be found on our [Pricing and Fees Disclosures page] (https://support.coinbase.com/customer/portal/articles/2109597-buy-sell-bank-transferfees).   ***By using Coinbase Services you agree to pay all applicable fees***.

User Agreement (Dkt. 33-8) at 8-9, §§ 3.2 and 3.3.   Defendants' contentions that Plaintiffs' Dogecoin purchases are outside the CLRA's scope conflate two distinct, CLRA "sale[s]," in which the parties' Sweepstakes-entry "transactions" resulted and were "intended to result."   Cal. Civ. Code § 1770.   According to the parties' User Agreements, the first CLRA "sales" made to Plaintiffs were made not by Coinbase, but by "other Coinbase customers"; these were the "sales" of Dogecoins, for which Plaintiffs paid discrete prices labeled "Purchase" prices.   User Agreement (Dkt. 33-8) at 8-9, §§ 3.2 and 3.3; *see also* TAC, ¶46.   The second, distinct CLRA "sales" made to Plaintiffs were made not by "other Coinbase customers," but by Coinbase alone; these were the sales of the "Coinbase Services," for which Plaintiffs paid discrete prices labeled the "Coinbase fee[s]."   *Id.*

Plaintiffs' payments of discrete fees to Coinbase—to have Coinbase act as Plaintiffs' "agent," and "facilitate [a] purchase or sale between [Plaintiffs] and other Coinbase customers"—were payments made solely for Coinbase's "work or labor in finding a [counterparty] for Plaintiffs (rather than negotiating terms of its own [cryptocurrency sales])."   *Sonoda*, 2011 WL 2690451, at \*4; *see also* User Agreement (Dkt. 33-8) at 8, § 3.2 (providing that Coinbase does not charge its users any fee or other money, if it cannot "find a counterparty" for their desired cryptocurrency trades). Plaintiffs' discrete, "Coinbase fee" payments for the "Coinbase Services" were never legally "ancillary" to Plaintiffs' separate, "Purchase" payments for Dogecoins sold by "other Coinbase customers."   *Id.*; *accord Fairbanks*, 46 Cal.4th at 65 (explaining that "ancillary services are provided by the ***sellers*** of virtually all intangible goods"); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1142 (N.D. Cal. 2018) (finding a CLRA "service" where the plaintiffs "signed up for accounts on a web-based platform, maintained by [defendant] where they can engage in activities ranging from private email communication to bank and stock trading");

17

1   *Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST, 2013 WL 5781608, at *10 (N.D. Cal. Oct. 25,

2   2013) ("California courts generally find financial transactions to be subject to the CLRA.").

3   　　　Coinbase charged Plaintiffs discrete fees for matching them as prospective cryptocurrency

4   buyers with prospective cryptocurrency sellers, the same way a dating "service" charges discrete fees

5   for matching prospective couples, or a realtor charges discrete fees for matching homebuyers with

6   home sellers.  *E.g., Doe 1 v. Successfulmatch.Com*, 70 F. Supp. 3d 1066, 1075 (N.D. Cal. 2014)

7   (finding that "Plaintiffs have sufficiently alleged claims for relief under the UCL and CLRA").  The

8   mere fact that going on a date or buying a house is not itself a CLRA "sale" of "goods or services"

9   does not mean that realtors and dating services are not selling ***their own*** CLRA "services" to

10  consumers on one or both sides of a separate "sale" and "transaction."  Cal. Civ. Code § 1770(a).

11  The mere fact that DOGE purchases and sales may not themselves be CLRA "sales" does not

12  somehow immunize Coinbase—and all cryptocurrency exchanges—from affirmatively selling their

13  own CLRA "services."  *Id.*  In other words, the fact that a defendant's customers might engage in a

14  non-CLRA "sale" or "transaction" ***with each other*** does not mean that ***the defendant*** has not made

15  its own, distinct "sale" of its own "services" to each customer.  *Id.*

16  　　　An "ancillary service" is not merely one that is ***tangentially related*** to a non-CLRA "sale," to

17  which the defendant itself is not a party.  Rather, an "ancillary service" is one that a defendant itself

18  offers as part of the primary sale ***of its own non-"goods" and non-"work"*** to consumers (*e.g.,* a

19  lender selling cash, or an insurer selling the promise of cash).

20  　　　Defendants rely primarily upon *Jeong* and *Reeves* to make their "ancillary services"

21  argument, but both cases are inapposite.  In *Jeong*, the alleged CLRA "sale" was a financial loan

22  from the defendant to the plaintiff.  *See generally Jeong v. Nexo Financial LLC*, No. 21-cv-02392-

23  BLF, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022).   The court relied upon the longstanding rule that

24  "***an extension of credit*** was neither a 'good' nor a 'service' under the CLRA." *Id.* at **22-24.

25  Because the plaintiff's "underlying allegations . . . pertain[ed] exclusively to [the defendant's]

26  offering of loans," the court found the CLRA inapplicable to the plaintiff's loan transaction.   *Id.*

27  The plaintiff tried to argue that his loan *also* gave him access to "a cryptocurrency exchange," but the

28  court found the plaintiff's "cryptocurrency exchange" allegations to be completely unrelated to the

1    plaintiff's CLRA claims.  *Id.* at *23 ("[T]he Court does not see how [defendant's] alleged 'service'

2    of allowing users to use a cryptocurrency exchange is related to Plaintiff's CLRA allegations . . . .").

3         In dictum, the *Jeong* court did deem the "cryptocurrency exchange" access provided by the

4    defendant to be merely "ancillary" to the ***defendant's own*** primary "sale" to the plaintiff, which was

5    the defendant's sale and making of a loan to the plaintiff (a non-CLRA "sale").  *Id.*  But the *Jeong*

6    court made such a finding because the primary "sale" (the cash loan) and the "ancillary" service

7    (access to a cryptocurrency exchange) were being provided by the same defendant, for a singular

8    price. *Id.* (explaining the holding of *Fairbanks* as being that "ancillary services offered by ***sellers***" of

9    non-goods do not bring their own, primary sales of non-goods "within the purview of the CLRA").

10   It was obvious that the *Jeong* plaintiff had paid ***the defendant*** primarily for a cash loan (not a CLRA

11   "good" or "service").

12        A similar dynamic existed in *Reeves*.  There, the plaintiff bought digital tokens directly from

13   the defendant.  *See generally Reeves v. Nianic, Inc.*, No. 21-cv-05883-VC, 2022 WL 1769119 (N.D.

14   Cal. May 31, 2022).  The court held that the defendants' "sale" ***of digital tokens*** to the plaintiff was

15   not itself a CLRA "sale" of "goods" or "services."  *Id.* at *2.  Of course, it wasn't.  But *Reeves* did

16   not hold that a defendant charging standalone "fees" for a standalone "service" of matching and

17   facilitating digital-token trades ***between its customers*** is somehow immune from CLRA "services"

18   liability to those customers.  *Id.*  Each customer may well engage in a CLRA "services" transaction

19   ***with the defendant*** at the same time that they engage in a non-CLRA "sale" transaction ***with each***

20   ***other***.  The existence of the latter "sale" by some other consumer does not alter the nature or terms of

21   the defendant's distinct "sale" of only its own "work" (CLRA "services") in facilitating that

22   consumer-to-consumer transaction.  Cal. Civ. Code § 1770(a).

23        Nor is the sale of services by the defendant legally "ancillary" to the sale of non-goods by

24   some other consumer; the defendant is not even a party to the other consumer's sale of non-goods,

25   and the other consumer is not a party to the defendant's sale of its own services to the purchasing

26   consumer.  The purchasing consumer pays the other consumer for whatever, and then separately pays

27   the defendant only for its services.  These are two separate (not "ancillary") CLRA "sales" and

28   "transactions," between two distinct sets of parties.

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

1       In this case, the "Coinbase Services" and "Coinbase fee" payments at issue are not even

2   arguably "ancillary" to Plaintiffs' ***Dogecoin purchases***, because Coinbase separately and specifically

3   charged Plaintiffs for its standalone "Coinbase Services": in isolation.   Moreover, Coinbase itself

4   asserts it was never even a party to any Dogecoin "sale."   User Agreement (Dkt. 33-8) at 8-9, §§ 3.2

5   and 3.3; *see also* TAC, ¶46.   Thus, the only thing for which Plaintiffs could possibly have paid the

6   "Coinbase fee" was Coinbase's "work": as Plaintiffs' purported "agent," in "find[ing] a

7   counterparty" and in executing Plaintiffs' trades.   *Id.*   The fact that Plaintiffs' Dogecoin

8   counterparties (their fellow consumers) made no CLRA "sale" to the Plaintiffs does not imply that

9   ***Coinbase*** made no standalone, CLRA sale of its Coinbase Services to the Plaintiffs: in the form of

10  standalone, "Coinbase fees."   *Sonoda*, 2011 WL 2690451, at \*4

11      Finally, if the statute is "ambiguous" as to whether Plaintiffs' payments for the "Coinbase

12  Services" constituted a "sale" of CLRA "services," the Court must resolve any statutory ambiguity in

13  favor of the CLRA's coverage.   *See* Cal. Civ. Code § 1760 (providing that the CLRA's text "shall be

14  liberally construed and applied to promote its underlying purposes, which are to protect consumers

15  against unfair and deceptive business practices and to provide efficient and economical procedures to

16  secure such protection"); *Fairbanks*, 46 Cal.4th at 64 ("A liberal construction mandate affects

17  statutory construction . . . when the statutory language is ambiguous and the intent of the enacting

18  body is in doubt.").   The legislature's intent is definitely "in doubt" here, as cryptocurrency-exchange

19  "services" did not exist when the CLRA was enacted.

20      For all of these reasons, the Court should find that the parties' Sweepstakes "transactions," as

21  reflected in their Official Rules agreements, were intended by both Defendants to result—and did

22  result—in the "sale" of Coinbase's "services" to Plaintiffs.   The statute should not be construed as

23  ambiguous here, but even if it is, the Court should resolve any ambiguity in Plaintiffs' favor.

24      **B.    Marden- Kane's arguments that it made no "representations," and engaged in
        no "transactions," are clearly incorrect.**

25  Marden-Kane says "Plaintiffs do not allege that Marden-Kane made any *representation* to a

26  consumer or engaged in any *transaction* with a consumer."   Motion at 13.   That argument is facially

27  untrue for at least three reasons.

28

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

***First***, Marden-Kane engaged in a CLRA "transaction" with each Plaintiff via the Official Rules "agreement" for conducting the DOGE Sweepstakes. Cal. Civ. Code § 1761(e) (defining a "transaction" as an "agreement"). Marden-Kane is specifically named as a party to that "agreement," the Sweepstakes "Administrator," who had certain rights and obligations in conducting the Sweepstakes. *E.g.,* Official Rules (Dkt. 83-1), ¶2 (Marden-Kane obligated to maintain "computer systems" that would serve as "the official time-keeping device for the Sweepstakes"); *id.,* ¶4 (Marden-Kane obligated to conduct random drawings of all Sweepstakes winners); *id.,* ¶10 (Marden-Kane asserts contractual right not to be named as a class-action defendant). Even now, Marden-Kane seeks to enforce its own purported rights under its Official Rules agreements with Plaintiffs, by seeking to enforce the Official Rules' class-action waiver. Motion at 7-9. Plaintiffs, as consumers, likewise had certain rights and obligations under the Official Rules agreements. *E.g., id.,* ¶¶3, 10. Therefore, contrary to Marden-Kane's argument, there is no disputing that Marden-Kane "engaged in a[] [consumer Sweepstakes] *transaction*" with Plaintiffs. Motion at 13.

***Second***, Marden-Kane wrongly identifies the "transaction at issue" as being Plaintiffs' "purchase[s] of Dogecoin." Motion at 13. Plaintiffs' DOGE purchases via Coinbase were never the CLRA "transactions" at issue; they are instead the CLRA "obligations" at issue. Cal. Civ. Code §§ 1770(a)(14). The CLRA "transactions" at issue are Plaintiffs' Sweepstakes entries, as reflected in their Official Rules agreements; the CLRA "obligations" at issue are Plaintiffs' unlawful, purported "obligations" to buy or sell Dogecoins via Coinbase. TAC, ¶147.

***Third***, as part of Plaintiffs' and Marden-Kane's consumer-Sweepstakes "transactions," the company's ads and Official Rules "represent[ed]" to Plaintiffs—as Coinbase "account holders"—that they "need[ed] to" and that they "must" trade Dogecoins to obtain entry. TAC, ¶¶11, 28-38; Official Rules (ECF No. 83-1), ¶3. The notion that Marden-Kane never "made" such "representations" to Plaintiffs—because the representations were physically disseminated to Plaintiffs through Coinbase's website instead of Marden-Kane's (Motion at 13)—is contrary to law.

It is well-established that "[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason

to expect that its terms will be repeated or its substance communicated to the other." *Marler v. Johansing*, 199 Cal.App.4th 1450, 1464 (2011) (quoting *Geernaert v. Mitchell*, 31 Cal.App.4th 601, 605 (1995)); *see also Shapiro v. Sutherland*, 64 Cal.App.4th 1534, 1548 (1998) ("[I]t is also established that a defendant cannot escape liability if he or she makes a representation to one person while intending or having reason to expect that it will be repeated to and acted upon by the plaintiff (or someone in the class of persons of which plaintiff is a member).").

Here, Plaintiffs allege that Marden-Kane, as "Administrator" of the DOGE Sweepstakes, "collaborat[ed] with Coinbase to draft, design, and structure Defendants' digital ad campaign for the 'sweepstakes,' and to draft and finalize the 'Official Rules'" agreements governing the DOGE Sweepstakes.  TAC, ¶107; *see also id.* at ¶¶7, 131.  Plaintiffs allege that Marden-Kane "personally participated" in drafting, designing and structuring those deceptive documents, "with full knowledge and intent that Coinbase would electronically disseminate Defendants' false and misleading ads and Official Rules to members of the public nationwide," including millions of Coinbase's existing account holders. *Id.*, ¶129.  At the time when Defendants were preparing their Sweepstakes ads and Official Rules, Marden-Kane could not possibly have believed that Defendants were preparing those documents for Coinbase's private, internal use.  By their very terms, Defendants' Sweepstakes ads and Official Rules were facially intended for dissemination to as many consumers as possible, to attract as much consumer "liquidity" as possible: starting the moment Coinbase opened for DOGE trading on June 3, 2021.  TAC, ¶¶6, 16, 50.[8]

Furthermore, as this Court has already held, Plaintiffs have alleged with specificity exactly which assertions in Defendants' ads and Official Rules were materially misleading, why they were materially misleading, how they were made (via Coinbase's website and mobile app, and via email),

---

[8] For avoidance of doubt, the CLRA's plain text clarifies that a liable "person" need not be the seller of the "goods or services" purchased by a consumer.  *See* Cal. Civ. Code § 1770(a).  Rather, a liable "person" need only make misrepresentations "in a transaction intended to result or that results in the sale" made by someone else.  *Id.*  Here, Marden-Kane made misrepresentations in a Sweepstakes "transaction" that were "intended to result [and] that result[ed] in the sale" of the Coinbase Services to consumers.  The fact that Marden-Kane was a hired gun (a Coinbase vendor) brought in to boost sales for Coinbase—instead of itself—does not immunize Marden-Kane from CLRA liability for making misrepresentations to consumers to boost **Coinbase's** consumer sales.  *Id.*

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

and when they were made.  Order (Dkt. 53) at 13-14; *see generally* TAC.  At this pleading stage, there is no basis for dismissing Plaintiffs' claims against Marden-Kane for lack of specificity.

### C.   Plaintiffs clearly complied with the CLRA's notice and demand requirement.

Marden-Kane makes several arguments asserting that Plaintiffs failed to comply with the CLRA's pre-dispute notice and demand requirement.  Motion at 14-15 (citing Cal. Civ. Code § 1782).  It argues that "Plaintiffs failed to afford [Defendants] the opportunity to remedy their alleged injuries before filing suit."  *Id.* at 14.  Specifically, Marden-Kane complains that Plaintiffs did not send their CLRA notice and demand letter ("Letter") until "*after* filing a federal class action."  *Id.*

The CLRA provides that "prior to commencement of an action ***for damages*** pursuant to this title, the consumer shall" notify the prospective defendant of its "particular alleged violations of Section 1770," and afford the defendant 30 days to provide "an appropriate correction, repair, replacement or other remedy."  Cal. Civ. Code § 1782(a)-(b).  "As to requests for [injunctive and] other *equitable* relief, such as restitution, however, the CLRA does not specify any presuit notice requirement."  *Kennedy v. Natural Balance Pet Foods, Inc.*, No. 07-CV-1082 H (RBB), 2007 WL 2300746 at *3 (S.D. Cal. Aug. 7, 2007); *see also Estakhrian v. Obenstine*, 233 F. Supp. 3d 824, 846 (C.D. Cal. 2017) ("However, plaintiffs have sought certification only of their CLRA [claim] for injunctive relief[,] . . .  and [n]o prelawsuit notice is required in an action seeking only injunctive relief or restitution."); *Henderson v. Gruma Corporation*, No. CV 10-04173 AHM (AJWx), 2011 WL 1362188, at *10 (C.D. Cal. Apr. 11, 2011) ("Prefiling notice is not required for a CLRA claim for restitution," because equitable remedies like "restitution and disgorgement . . . are not considered damages for purposes of the CLRA.")  (collecting cases) (internal quotes omitted).

Here, before serving Defendants with their CLRA Letter, Plaintiffs asserted CLRA claims in their First Amended Complaint ("FAC") for equitable relief only.  *See* FAC (ECF No. 22), ¶134 ("At this time, Plaintiffs do *not* seek their actual damages.  *** Plaintiffs and the Class request *only* injunctive and other *equitable* relief.") (original emphasis); *accord Kennedy*, 2007 WL 2300746 at *3; *Estakhrian*, 233 F. Supp. 3d at 846; *Henderson*, 2011 WL 1362188, at *10.  The FAC further specified Plaintiffs' "inten[t] to request monetary damages for Defendants' violations of the CLRA, *after* Plaintiffs have complied with Cal. Civ. Code § 1782(a)."  FAC (ECF No. 22), ¶134 (original

23

emphasis).  Such proceedings are fully consistent with the aforementioned case law and the statutory text itself, which provides that "after compliance with subsection (a), ***the consumer may amend his or her complaint without leave of court*** to include a request for damages." Cal. Civ. Code § 1782(d). That is why, as Marden-Kane notes, Coinbase previously stipulated to this.  *See* Motion at 15, n. 11.

Marden-Kane's Motion declines to acknowledge the truth.  Plaintiffs' pre-Letter FAC expressly disclaimed any demand for damages or other relief at law.  FAC, ¶134.  It was only Plaintiffs' post-Letter, Second Amended Complaint ("SAC")—which the Court has now sustained in substantial part (ECF No. 53)—that first asserted any claim for damages or other relief at law.  SAC (ECF No. 36), ¶¶134-136.  If Marden-Kane had a problem with this procedure, then it could have have moved to dismiss the SAC.  Instead, Marden-Kane (and Coinbase, who joins Marden-Kane's Motion, *see* Dkt. 88) now moves to dismiss the TAC on this ground, without acknowledging the clear difference between *equitable* relief and *damages* under the CLRA.  *But see Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207, 1221 (E.D. Cal. 2013) ("Defendants contend the notice requirement must be met before a CLRA action may be brought, even if the complaint requests only injunctive relief but no damages under the CLRA, and that if the requirement is not met before suit is commenced, the complaint cannot subsequently be amended to request CLRA damages.  The Court does not agree.").

Marden-Kane also contends that Plaintiffs' CLRA Letter "lacked particularity" as to: (1) "how Marden-Kane was responsible" for Plaintiffs' injuries; (2) "the sum of damages demanded by Plaintiffs"; and (3) the "nonspecific relief" requested on behalf of "an uncertified class."  *Id.*  **First**, at the time Plaintiffs served Marden-Kane with their CLRA demand letter, they had already served Marden-Kane with the FAC, which explained why Plaintiffs believed "Marden-Kane was responsible" for Plaintiffs' injuries.  *See* FAC (ECF No. 22), ¶¶7, 24, 49-56, 90, 100 (specifying allegations and claims against Marden-Kane specifically).  Plaintiffs' Letter repeatedly incorporated by reference the FAC with which Marden-Kane had already been served, in case the company needed any legal or factual details beyond that which Plaintiffs provided on the face of their Letter.  *See* Letter (ECF No. 87-1) at 1 ("As alleged in Plaintiffs' First Amended Class Action Complaint ("FAC") (Dkt. 22), . . . ."); *id.* at 2 (addressing "unlawful conduct as described herein, and as detailed

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

in Plaintiffs' FAC").   The notion that Marden-Kane did not understand Plaintiffs' claims is untenable.

**Second**, Plaintiffs' Letter expressly demanded as damages "the total sum of money that [Plaintiffs] spent to enter" the DOGE Sweepstakes.  *Id.* at 2-3.  The FAC, which Plaintiffs' Letter incorporated by reference, made clear that such sums were exactly $100 for Plaintiff Suski, $220 for Plaintiff Martin, $125 for Plaintiff Calsbeek, and $205 for Plaintiff Maher.  FAC, ¶¶28-38.  The idea that Marden-Kane did not know the "the sum of damages demanded by Plaintiffs" is also untenable.

**Third**, Plaintiffs' Letter specifically defined the "uncertified class" at issue. *See* Letter at 2-3. The statute expressly places the burden on prospective defendants, not plaintiffs, to make "reasonable effort[s] to identify" all "consumers similarly situated" to the CLRA claimant.  *See* Cal. Civ. Code § 1782(c).  Marden-Kane has not made any "showing" that it made any such reasonable efforts.  *Id.*  For all of these reasons, Plaintiffs clearly complied with the CLRA's notice and demand requirements; Marden-Kane simply declined to volunteer any purported remedy.

**Finally**, Marden-Kane complains that venue is improper.  Motion at 16.  But as the Court has held, jurisdiction and venue are proper pursuant to the parties' Official Rules agreement, to which Marden-Kane was always a party (in fact, one of the drafting parties). Dkt. 83-1.  Clearly, venue is proper under the parties' extant forum selection agreement (Dkt. 83-1, ¶10), which this Court has already properly enforced.  *See* Dkt. 53 at 1-10.  It is unclear what an affidavit from Plaintiff Suski would add to the Court's venue analysis here, but as the initial Plaintiff, Plaintiff Suski will file such an affidavit if the Court deems it necessary.[9]

# VI.   <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court deny Marden-Kane's Motion to compel arbitration or to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

---

[9] Plaintiffs have addressed Marden-Kane's lottery arguments in their Opposition to Coinbase's (Renewed) Motion to compel arbitration or dismiss, and request that the Court apply Plaintiffs' lottery-related arguments equally to Marden-Kane's Motion, as well as Coinbase's Motion.

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS

1  Dated: July 9, 2022                          Respectfully submitted,

2                                               FINKELSTEIN & KRINSK LLP

3                                               By: ___*s/ David J. Harris, Jr.*___
4                                                       David J. Harris, Jr., Esq.

5                                               djh@classactionlaw.com
                                                501 West Broadway, Suite 1260
6                                               San Diego, California 92101
                                                Telephone: (619) 238-1333
7                                               Facsimile:  (619) 238-5425

8                                               *Counsel for Plaintiffs and the Putative Class*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MARDEN-KANE'S MOTION TO DISMISS