1    Jeffrey R. Krinsk, Esq. (SBN 109234)
2    jrk@classactionlaw.com
     David J. Harris, Jr. (SBN 286204)
3    djh@classactionlaw.com
     FINKELSTEIN & KRINSK LLP
4    501 West Broadway, Suite 1260
     San Diego, California 92101
5    Telephone: (619) 238-1333
     Facsimile: (619) 238-5425
6
7    *Counsel for Plaintiffs and*
     *the Putative Class*
8

9

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13

14   DAVID SUSKI, JAIMEE MARTIN, JONAS
     CALSBEEK, and THOMAS MAHER,              Case No. 3:21-cv-04539-SK
15   Individually and On Behalf of All Others
     Similarly Situated,
16                                            **PLAINTIFFS' MEMORANDUM OF LAW IN**
17                      Plaintiffs,           **OPPOSITION TO COINBASE, INC.'S**
                                              **RENEWED MOTION TO COMPEL**
18         vs.                                **ARBITRATION AND TO DISMISS**

19   COINBASE, INC. and                       Hearing:     August 22, 2022
20   MARDEN-KANE, INC.,                       Time:        9:30 a.m.
                                              Courtroom:   C
21
                        Defendants.
22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT ...................................................................................... 1

II.     SUMMARY OF FACTS ............................................................................................... 3

III.    RELEVANT PROCEDURAL HISTORY ..................................................................... 7

IV.     ARGUMENT ................................................................................................................. 8

        A.  The Court should reject Coinbase's newly formulated arguments for compelling
            arbitration. ......................................................................................................... 8

            1.  The Official Rules agreements supersede and prevail over the User
                Agreements because both Plaintiffs and Coinbase were parties to both
                agreements. ........................................................................................... 10

            2.  Coinbase's new argument under *Mohamed* is inapposite. ................ 12

            3.  Coinbase's historical integration and modification clauses did not preclude
                the formation of other, future contracts. ............................................ 18

            4.  In the alternative, Coinbase's arbitration and delegation provisions were
                always unconscionable and unenforceable. ......................................... 19

        B.  As Coinbase previously conceded, the Official Rules' class action waiver is
            unconscionable under California law. .............................................................. 19

        C.  Coinbase's new arguments for dismissing Plaintiffs' CLRA claims are procedurally and
            substantively flawed. ....................................................................................... 20

            1.  Coinbase's new Motion to dismiss Plaintiffs' CLRA claims must be denied
                as procedurally improper because it violates Rule 12(g)(2). .............. 20

            2.  Coinbase's new anti-CLRA arguments are also substantively erroneous. ...... 21

        D.  The June 2021 DOGE Sweepstakes was a lottery because Defendants affirmatively and
            objectively represented only that consideration was necessary to enter. ......... 22

V.      CONCLUSION ............................................................................................................ 25

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>                                                                                          <u>Page(s)</u>

3

4   *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*
     2013 WL 2351814 (S.D. Cal. May 24, 2013) ............................................... 18

5   *American Ass'n Naturopathic Phys. v. Hayhurst*
     227 F.3d 1104 (9th Cir. 2000)...................................................................... 20

6

7   *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*
     645 F.3d 522 (2d. Cir. 2011) ......................................................................... 9

8   *Berk v. Coinbase, Inc.*
     840 F. App'x 914 (9th Cir. 2020).................................................................. 19

9

10  *Bielski v. Coinbase, Inc.*
     2022 WL 1062049 (N.D. Cal. Apr. 8, 2022)............................................ 8, 18

11

12  *Chamber of Commerce of U.S. v. Bonta*
      13 F.4th 766 (9th Cir. 2021) ........................................................................ 2

13  *Dillon v. BET Info. Sys., Inc.*
     2019 WL 12338059 (N.D. Cal. Feb. 19, 2019) ........................................... 16

14

15  *Dunn v. FastMed Urgent Care PC*
     424 P.3d 436 (Ariz. Ct. App. 2018) ............................................................ 12

16  *Einstein Noah Rest. Grp., Inc.*
     2019 WL 6835717 & n.1 (N.D. Cal. Oct. 23, 2019).................................... 16

17

18  *Ennenga v. Starns*
     677 F.3d 766 (7th Cir. 2012) ....................................................................... 20

19

20  *First Options of Chicago, Inc. v. Kaplan*
     514 U.S. 938 (1995) ...................................................................................... 9

21

22  *Goldman, Sachs & Co. v. City of Reno*
     747 F.3d 733 (9th Cir. 2014)................................................................. passim

23  *Granite Rock Co. v. Int'l Brotherhood of Teamsters*
     561 U.S. 287 (2010) ...................................................................................... 8

24

25  *Henry Schein, Inc. v. Archer & White Sales, Inc.*
     139 S.Ct. 524 (2019) ..................................................................................... 9

26

27  *Holmes v. Saunders*
     114 Cal.App.2d 389 (1952)......................................................................... 24

28

*Howsam v. Dean Witter Reynolds, Inc.*
  537 U.S. 79 (2002) ............................................................................ 8

*In re Ins. Installment Fee Cases*
  211 Cal.App.4th 1395 (2012) .......................................................... 17

*Ingram Micro Inc. v. Signeo Int'l, Ltd.*
  2014 WL 3721197 (C.D. Cal. July 22, 2014) ............................. 15, 17

*Jacksen v. Chapman Scottsdale Autoplex, LLC*
  2021 WL 3410912 (D. Ariz. July 21, 2021) .................................... 16

*Jeong v. Nexo Fin. LLC*
  2022 WL 174236 (N.D. Cal. Jan. 19, 2022) ................................... 21

*Mohamed v. Uber Techs., Inc.*
  848 F.3d 1201 (9th Cir. 2016) ............................... 1, 12, 13, 14

*NLRB v. Int'l Union of Operating Eng'rs*
  323 F.2d 545 (9th Cir. 1963) ..................................................... 10, 11

*Norris v. AON PLC*
  2021 WL 1238303 (N.D. Cal. Apr. 2, 2021) ................................... 14

*People v. Cardas*
  137 Cal.App.Supp. 788 (1933) ........................................................ 22

*People v. Shira*
  62 Cal.App.3d 442 (1976) .................................................. 22, 23, 24

*Pilgrim Badge & Label Corp. v. Barrios*
  857 F.2d 1 (1st Cir. 1988) ............................................................... 20

*Rent-A-Center, West, Inc. v. Jackson*
  561 U.S. 63 (2010) ............................................................................ 8

*Retailers v. Regal Petroleum Corp.*
  50 Cal.2d 844 (1958) ................................................................ 22, 24

*Royal Ins. Co. of Liverpool v. Caledonian Ins. Co. of Edinburgh, Scotland*
  20 Cal.App. 504 (Cal. Ct. App. 1912) ............................................. 13

*Sourovelis v. City of Phila.*
  246 F. Supp. 3d 1058 (E.D. Pa. 2017) ........................................... 20

*Spark Connected, LLC v. Semtech Corp.*
  2020 WL 6118575 (E.D. Tex. 2020) ............................................... 12

*Taylor v. Shutterfly, Inc.*
  2018 WL 4334770 (N.D. Cal. Sept. 11, 2018) ............................... 16

1

*Tremayne v. Striepeke*
    262 Cal.App.2d 107 (Cal. Ct. App. 1968) .................................................................... 10

2

3

*Trinkle v. California State Lottery*
    105 Cal.App.4th 1401 (Cal. Ct. App. 2003) ................................................................. 22

4

### Statutes

5

9 U.S.C. § 2 ................................................................................................................... 14

6

Cal. Civ. Code § 1698 .................................................................................................... 18

7

Cal. Civ. Code §§ 1751-1752, 1781 ............................................................................... 2

8

Cal. Penal Code § 319 ............................................................................................ 22, 25

9

Cal. Penal Code § 320 .................................................................................................... 22

10

### Other Authorities

11

*Federal Practice and Procedure* § 1388 ....................................................................... 20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs David Suski, Jaimee Martin, Jonas Calsbeek, and Thomas Maher submit this Memorandum of Law in Opposition to Defendant Coinbase, Inc.'s ("Coinbase") Motion to Compel Arbitration or to Dismiss Plaintiffs' Third Amended Class Action Complaint (Dkt. 88) ("Motion").

## I.   <u>SUMMARY OF ARGUMENT</u>

Coinbase previously moved to compel arbitration, or to dismiss all of Plaintiffs' claims under Rule 12(b)(6).  *See generally* Dkt. 33 (Coinbase's prior motion to compel or dismiss); Dkt. 43 (Coinbase's prior reply brief in support thereof)).  The Court denied Coinbase's prior motion to compel arbitration.  *See generally* Order (Dkt. 53).  The Court also denied Coinbase's prior Rule 12(b)(6) motion to dismiss all claims, except for Plaintiffs' claims that the Dogecoin "Sweepstakes" was a lottery.  *Id.*  The Court granted Plaintiffs leave to amend the lottery claims, which they have done by filing their Third Amended Class Action Complaint (Dkt. 83) ("TAC").

Coinbase now seeks to use the TAC's amended lottery allegations as an opportunity to seek reconsideration of the Court's prior Order.  The Court should deny Coinbase's renewed Motion because it cites no new facts, and no change in law, that would justify reconsideration of the Court's prior Order.  Moreover, to the extent Coinbase raises new merits defenses that could have been raised in its earlier Rule 12(b)(6) motion, this offends Rule 12(g)(2).  In sum, Coinbase's Motion is procedurally defective, because it is primarily an unjustified attack on the Court's prior Order.

In addition, Coinbase's renewed Motion is substantively flawed.  It argues that the Official Rules agreements cannot conflict with or supersede the User Agreements, because Defendant Marden-Kane, Inc. ("Marden-Kane") was a party to the Official Rules agreements but not the User Agreements.  That preexisting fact, however, is entirely inconsequential.  The fact of consequence is that both Coinbase and Plaintiffs were subject to both agreements, and the two agreements' terms conflict.  This conflict forced the Court to choose which agreement would govern Plaintiffs' claims, and this Court chose correctly under Ninth Circuit precedent.  *See* Order (Dkt. 53) at 1-10.

Coinbase now attempts to argue, under *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016), that the contractual conflicts previously identified by the Court are "artificial" conflicts. This ultimately amounts to an argument that the Official Rules agreements do not mean what they say.  To be sure, *Mohamed* did hold that an isolated contractual term did not mean what it said, but

1  *Mohamed* held that in a very different contractual context that is wholly inapposite here.  There is a

2  reason why Coinbase did not rely on *Mohamed* in its previous motion to compel arbitration (Dkt.

3  33), outside of one stray quote in its reply brief.  Dkt. 43 at 6.  The reason is that *Goldman, Sachs &*

4  *Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014), not *Mohammed*, is controlling of cases like this

5  one, involving multiple contracts formed at different times among different sets of contracting

6  parties.  Coinbase's renewed Motion continues to ignore *Goldman* and other authorities previously

7  relied upon by this Court, and the Motion should be denied as a result.

8  Recognizing that arbitration is not an option here, Coinbase now seeks to enforce the Official

9  Rules' standalone class *litigation* waiver, which Coinbase previously conceded to be unconscionable

10  under California law.  Dkt. 40 at n.7.   Coinbase's new argument for enforcing the Official Rules'

11  class litigation waiver is meritless.  Defendants' standalone, class-action litigation waiver is exactly

12  the type that has repeatedly been held unconscionable by California's Supreme Court.  The U.S.

13  Supreme Court later deemed California unconscionability law preempted by the Federal Arbitration

14  Act ("FAA"), but only as applied to class *arbitration* waivers.   The FAA, decidedly, has no

15  preemptive power in the absence of an agreement to arbitrate Plaintiffs' claims.  *See Chamber of*

16  *Commerce of U.S. v. Bonta*, 13 F.4th 766, 780 (9th Cir. 2021) ("Does the text of the FAA or the

17  precedent interpreting it expand the preemptive scope of the statute to situations in which there is no

18  agreement to arbitrate at issue?  [T]he answer to that question is 'no.'").  Coinbase's class-action

19  *litigation* waiver is plainly unconscionable and unenforceable under longstanding California law, and

20  California law is not even arguably preempted by the FAA in this case because—as the Court has

21  held—the parties here have not agreed to arbitrate their controversies.  Dkt. 53 at 1-10.

22  Coinbase seeks to further attack Plaintiffs' anti-class-waiver rights by attacking their CLRA

23  claims.  The CLRA expressly precludes consumers from waiving the right to initiate a class action.

24  Cal. Civ. Code §§ 1751-1752, 1781.  It follows that if Coinbase wants to eliminate all absent Class

25  members from this case—and it does—then it must eliminate Plaintiffs' CLRA claims.   To

26  accomplish this, Coinbase argues, for the first time, that consumer "transactions" involving

27  cryptocurrencies are outside the scope of the CLRA.  Coinbase could have made this argument in its

28  prior Rule 12(b)(6) motion, but failed to do so.  *See* Dkt. 33; Dkt. 43.  The argument is therefore

2

PLAINTIFFS' OPPOSITION TO COINBASE'S MOTION TO COMPEL OR DISMISS

barred by Rule 12(g)(2).  Moreover, Coinbase's procedurally improper CLRA argument is substantively wrong.  Coinbase is unambiguously selling a "service" under the CLRA, by matching cryptocurrency buyers with cryptocurrency sellers and executing their trades for them in exchange for discrete fees.  Coinbase's new CLRA argument seeks to immunize all cryptocurrency exchanges from CLRA liability in every circumstance, but there is no basis in law for this.

Finally, both Defendants challenge the TAC's amended lottery allegations by asserting that Coinbase users, in fact, could have enter the Dogecoin Sweepstakes for free.  The problem with Defendants' assertion is: is there is no *objective* basis for this Court to find such a fact.  As the TAC alleges, Defendants' "Sweepstakes" solicitations and Official Rules *objectively* provided *only* that Coinbase users "need[ed] to"— that they "must"—trade Dogecoins and pay transaction fees to obtain entry.  TAC, ¶¶28-42, 60-74, 101-110; *see also* Official Rules (Dkt. 83-1), ¶3.  Solely because Defendants' Sweepstakes solicitations *and* Official entry Rules objectively provided *only* that consideration was necessary for *them* to enter, Plaintiffs paid consideration to enter.  That constitutes a lottery, and Defendants intentionally made it a lottery, to create massive "liquidity" for themselves at many consumers' expenses.  TAC, ¶¶6, 16, 50.  This was criminal, and Defendants are civilly liable.  Cal. Penal Code §§ 319, 320.

For each of the above reasons, and as further detailed both herein and in Plaintiffs' Opposition to Marden-Kane's Motion to compel or dismiss, Coinbase's (renewed) Motion to compel arbitration or to dismiss should be denied.

## II.  SUMMARY OF FACTS

Coinbase is one of the largest online cryptocurrency exchanges in the world. ¶1.[1]  Plaintiffs are consumers who created online cryptocurrency trading accounts with Coinbase, months or years before June 2021.  When Plaintiffs first signed up for their Coinbase accounts, Coinbase required them to agree to various iterations of Coinbase's "User Agreements."  *See* Dkt. 33-1.  The User Agreements contained mandatory arbitration agreements, including agreements delegating certain "arbitrability" disputes to an arbitrator.  *See* Dkt. 33-7; Dkt. 33-8; Dkt. 33-9; Dkt. 33-10.

---

[1] References to ¶_ or ¶¶___ are to Plaintiffs' TAC, unless otherwise indicated.

In June 2021, Coinbase added a new cryptocurrency, called "Dogecoin" (or "DOGE"), to the list of tradable cryptocurrencies on its exchange. ¶¶3-5.  Coinbase opened for DOGE trading on June 3, 2021. ¶¶6-7.  The same day, Coinbase launched a new "Sweepstakes" promotion.  *Id.*  Defendant Coinbase retained Defendant Marden-Kane to serve as its third-party Sweepstakes administrator.  *Id.*

On June 3, 2021, Coinbase directly emailed and otherwise solicited Plaintiffs, and millions of other Coinbase users, to enter the Dogecoin Sweepstakes.  *Id.*  Coinbase's mass emailing and digital advertising displayed large, colorful graphics and language stating:

> Trade DOGE. Win DOGE. Starting today, you can trade, send, and receive Dogecoin on Coinbase.com and with the Coinbase Android and iOS apps. *To celebrate, we're giving away $1.2 million in Dogecoin. Opt in and then buy or sell $100 in DOGE on Coinbase by 6/10/2021 for your chance to win. Terms and conditions apply.*

¶¶8-9.[2]   Below that text was a link to the Sweepstakes' Official Rules, as well as a larger and bolder action button stating, "See how to enter." *Id.*   Upon clicking "See how to enter," Plaintiffs were taken to an "Opt-in" page.  ¶¶28-39.  The Opt in page similarly stated:

> *Trade DOGE.  Win DOGE.*  Dogecoin is now on Coinbase, and *we're giving away $1.2 million in prizes* to celebrate.  *Opt in and then buy or sell $100 in DOGE on Coinbase by 6/10/2021 for your chance to win.*

¶¶10-11.  Upon clicking the "Opt in" button, the "Opt in" page changed slightly, and stated:

> You're one step closer to winning. You've successfully opted in to our Dogecoin Sweepstakes. *Remember, you'll still need to buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win.*

*Id.*  Plaintiffs relied on Defendants' statement that they would "need to" trade Dogecoins on Coinbase, and pay Coinbase's associated transaction fees, "for a chance to win."  ¶¶27-42.  Each Plaintiff thus spent between $100 and $220 buying Dogecoins on Coinbase, and paying Coinbase's associated transaction fees, to earn a chance to win.  *Id.*

As an express condition of entry, Defendants required Plaintiffs and each Class member to agree and adhere to the terms and conditions provided in Defendants' "Official Rules" for the Dogecoin Sweepstakes.  *See* Official Rules (Dkt. 83-1).  The Official Rules provided that any legal resident of the continental United States, who was at least 18 years old, was eligible to enter the Sweepstakes.  *Id.*  The Official Rules agreement further provided the following entry rules.

---

[2] All emphasis in quotations contained herein is added unless otherwise stated.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.     How to Enter:

Two methods of entry:

<u>Method 1</u>:  Existing account holders and new* account holders must opt-in to participate in the Sweepstakes and must complete $100usd (cumulative the transaction fee)) in trade (buy/sell) of Dogecoin on Coinbase.com (.com and/or Coinbase app) during the Promotion Period to earn one (1) entry into the Sweepstakes.

[omitted text that is irrelevant to the Motion]

<u>Method 2</u>:  To enter via email, hand write the following on the front of a 3x5 card, your name, address, city, state, zip, e-mail address, telephone number and date of birth.  Insert single card in an envelope and mail with sufficient postage to: Coinbase Dogecoin Sweepstakes, PO Box 738, Syosset, NY 11791-0738 — return address and mailing address on envelope must be handwritten.

[omitted text that is irrelevant to the Motion]

**Participants must comply with these Official Rules and the Conditions of Entry.** Determination of compliance will be in the sole discretion of the Sponsor/Administrator [*i.e.,* Coinbase and Marden-Kane].

Official Rules (Dkt. 83-1) at 3-5, ¶3.  As the Court previously recognized, these Official entry Rules—like Defendants' Sweepstakes ads—made it objectively apparent that Coinbase "account holders" had to trade to enter, even as ***non-***"account holders" were free to enter by mail.

[THE COURT:]  I'm looking at the [Official Rules] in front of me.  It makes it look like if you are an existing accountholder or a new accountholder, you have to complete the $100 transaction.  If you're not an existing account holder or a new accountholder, you can enter for free.  That's what Mr. Harris' argument is, which he wants to have leave to amend so he can make the argument.  In other words, it's not only misleading; it could be objectively read to mean that if you actually currently are a Coinbase accountholder, you must have this $100 transaction.  Everybody else can just mail in this little card.

\*\*\*

I have to say it is confusing; I mean, if I were entering this contest, I would be confused by this.

Jan. 10, 2022 Hearing Transcript (Dkt. 62) at 27:15 - 28:9.

Indeed, to objectively interpret "<u>Method 2</u>" as being available to "[e]xisting account holders" like Plaintiffs would be to interpret  the first sentence of "<u>Method 1</u>" as objectively false.  Thus, at the time of the Sweepstakes, the best, objective reading of the Official Rules was that Coinbase users were in fact required to trade DOGE and pay "the transaction fee" to "earn one (1) entry into the Sweepstakes."   Official Rules (Dkt. 83-1) at 3-5, ¶3.  This objective interpretation is especially

salient, in light of the Sweepstakes solicitations' overt statement regarding payment for entry: "Remember, *you'll* still *need to* buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win." TAC, ¶11.  The solicitations were fully and objectively consistent with the Official Rules, as **both** objectively demanded payments from Coinbase "account holders": in exchange for their entries.

Each Plaintiff traded Dogecoins on Coinbase, as objectively required by Defendants, and paid all associated transaction fees, to obtain their chances to win Sweepstakes prizes.  ¶¶27-42.  If Defendants had not affirmatively and objectively made Plaintiffs' entries contingent upon their trades, then Plaintiffs would not have traded DOGE on Coinbase as instructed, or paid the associated transaction fees.  *Id.*  From Plaintiffs' perspective, they each paid for their chances to win only because that was what Defendants objectively required of them in writing.  *Id.*

Importantly, unlike Coinbase's original User Agreements with Plaintiffs, Defendants' adhesive, Official Rules agreements for this Sweepstakes contained no arbitration provisions.  Quite the opposite, they provided as follows.

> **Disputes:** All federal, state and local laws and regulations apply.  THE CALIFORNIA COURTS (STATE AND FEDERAL) SHALL HAVE SOLE JURISDICTION OF ANY CONTROVERSIES REGARDING THE PROMOTION[3] AND THE LAWS OF THE STATE OF CALIFORNIA SHALL GOVERN THE PROMOTION. EACH ENTRANT WAIVES ANY AND ALL OBJECTIONS TO JURISDICTION AND VENUE IN THOSE COURTS FOR ANY REASON AND HEREBY SUBMITS TO THE JURISDICTION OF THOSE COURTS.  Claims may not be resolved through any form of class action.  [***irrelevant text omitted***]  By entering and participating in the Promotion, Entrants hereby expressly agree and accept that for all that is related to the interpretation, performance, and enforcement of these Official Rules, each of them expressly submit themselves to the laws of the United States of America and the State of California, expressly waiving to any other jurisdiction that could correspond to them by virtue of their present or future domicile or by virtue of any other cause.

Official Rules (Dkt. 83-1), ¶10 (original emphasis).

The Official Rules affirmatively conditioned Plaintiffs' and the Class's entries and potential prizes upon their compliance with ¶10's dispute resolution terms.  *See id.*, ¶9 ("[Coinbase] reserves the right to prohibit the participation of an individual . . . if the participant fails to comply . . . with any provision in these Official Rules."); *id.*, ¶1 ("Winning a prize is contingent upon fulfilling all requirements set forth herein.").  Thus, if Plaintiffs had filed suit outside of California, or filed an

---

[3] The word "PROMOTION" here refers to the DOGE Sweepstakes.  Official Rules (Dkt. 83-1), ¶1.

PLAINTIFFS' OPPOSITION TO COINBASE'S MOTION TO COMPEL OR DISMISS

arbitration demand with the AAA to resolve their Sweepstakes-related claims, then they would have violated ¶10's mandatory, exclusive jurisdiction clause and faced disqualification from the Sweepstakes. *Id.*

Hence, when Plaintiff Suski learned that he was deceived into paying for his entry into an unlawful "Sweepstakes," he complied with Official Rules ¶10 by invoking this Court's exclusive "JURISDICTION" to resolve his Sweepstakes-related "CONTROVERSIES." Dkt. 1; Dkt. 22; Dkt. 36; Dkt. 83. In response, Coinbase again seeks to disavow the parties' express litigation agreement, which Coinbase itself drafted and insisted upon as a condition of conducting the Sweepstakes. Not one statute or judicial decision supports Coinbase's latest attempt to evade its own adhesive contracts.

## III.   RELEVANT PROCEDURAL HISTORY

On June 11, 2021, with the Sweepstakes still pending, Plaintiff Suski filed an initial Class Action Complaint, asserting claims against Coinbase Global, Inc. and Marden-Kane for violations of California's False Advertising Law ("FAL") and Unfair Competition Law ("UCL"). Dkt. 1.

On August 31, 2021, Plaintiffs Jaimee Martin, Jonas Calsbeek, and Thomas Maher joined Plaintiff Suski in filing a First Amended Class Action Complaint. Dkt. 22 ("FAC"). The FAC included additional factual details, and claims for equitable relief under California's Consumer Legal Remedies Act ("CLRA"), as well as additional claims that Coinbase Global, Inc. and Marden-Kane conducted an unlawful lottery, or in the alternative, violated California's sweepstakes statutes. *Id.*

On October 19, 2021, Coinbase filed a motion to compel arbitration or to dismiss Plaintiffs' claims under Rule 12(b)(6). Dkt. 33. By stipulation of the parties, this motion applied equally to both Plaintiffs' FAC and Plaintiffs' Second Amended Class Action Complaint (Dkt. 36) ("SAC"), which amended the FAC only to: (1) replace Coinbase Global, Inc. with Coinbase, Inc. as a Defendant; and (2) allege Plaintiffs' compliance with the CLRA's notice provisions. Dkt. 35.

On October 20, 2021, Plaintiffs filed the SAC. Dkt. 36.

On January 10, 2022, this Court held oral argument on Coinbase's motion to compel arbitration, or to dismiss Plaintiffs' SAC under Rule 12(b)(6). Dkt. 62 (Hearing Transcript).

On January 11, 2022, the Court denied Coinbase's motion to compel arbitration, granted Coinbase's Rule 12(b)(6) motion to dismiss Plaintiffs' lottery-based claims, and denied Coinbase's

7

Rule 12(b)(6) motion to dismiss with respect to all other claims.  Dkt. 53.  The Court granted Plaintiffs leave to amend their lottery-based claims.  *Id.*

On February 9, 2022, Coinbase filed its notice of interlocutory appeal regarding this Court's order declining to compel arbitration. Dkt. 58.  The same day, Coinbase filed a motion to stay this case pending the outcome of the interlocutory appeal.  Dkt. 59.

On April 19, 2022, the Court denied Coinbase's motion to stay, finding that "Coinbase fail[ed] to show how the Court erred," and "find[ing] that Coinbase fail[ed] to show there is a reasonable probability that the Ninth Circuit will disagree with the Court."  Dkt. 76 at 2.

On May 10, 2022, Plaintiffs filed the TAC, which amended their lottery allegations, and additionally, relied upon Judge Alsup's recent decision in *Bielski v. Coinbase, Inc.*, No. C 21-07478, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022) to allege that the arbitration and delegation provisions in Coinbase's User Agreements were facially unconscionable and unenforceable when made.  ¶93.

On May 11, 2022, Coinbase filed its opening appellate brief on the merits in the Ninth Circuit.

On May 16, 2022, Coinbase filed a motion to stay in the Ninth Circuit, consisting primarily of a merits argument for why Coinbase believes this Court erred in declining to compel arbitration.

On May 27, 2022, the Ninth Circuit summarily denied Coinbase's motion to stay.

On June 9, 2022, Marden-Kane filed its own motion to compel arbitration or to dismiss Plaintiffs' TAC.  Dkt. 87.  Coinbase has now joined in Marden-Kane's motion, while also filing its instant Motion (Dkt. 88) to compel arbitration or to dismiss Plaintiffs' TAC.

## IV.    ARGUMENT

### A.  The Court should reject Coinbase's newly formulated arguments for compelling arbitration.

"The FAA reflects the fundamental principle that arbitration is a matter of contract."  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010).  It merely "places arbitration agreements on an equal footing with other contracts."  *Id.*  Consequently, "a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *see also Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 302-03 (2010) ("[T]he FAA's proarbitration policy does not operate without regard to the

1  wishes of the contracting parties."). Sometimes, it is unclear whether contracting parties intended to

2  submit a particular dispute to arbitration. Courts have settled rules for discerning the parties' intent,

3  if their intent is unclear from the plain text of their contract (or contracts).

4      Under the FAA, ambiguities concerning the scope of an arbitration clause, as applied to a

5  particular dispute, create a rebuttable presumption in favor of arbitration. *Goldman, Sachs & Co. v.*

6  *City of Reno*, 747 F.3d 733, 742-43 (9th Cir. 2014). In other words, ambiguities in arbitration

7  clauses themselves give rise to a rebuttable presumption in favor of arbitration. *Id.* Importantly,

8  however, ambiguities concerning the *existence* of an agreement to arbitrate a dispute create no

9  presumption. *Id.* Instead, ambiguities concerning the existence of an agreement to arbitrate must be

10  resolved by ordinary rules of contract interpretation. *Id.* (citing *Applied Energetics, Inc. v. NewOak*

11  *Capital Markets, LLC*, 645 F.3d 522 (2d. Cir. 2011)). Where—as here—the interpretive question

12  does not concern the scope of an arbitration clause itself, but rather, concerns whether a later forum-

13  selection clause "superseded" or modified an earlier arbitration clause, the dispute is one "over the

14  existence, rather than the scope, of the agreement to arbitrate." *Id.* Ordinary rules of contract

15  interpretation therefore apply, and "the presumption in favor of arbitrability [does] not apply." *Id.*

16      Contracting parties are free to agree to arbitrate some disputes and not others, and they are

17  free to agree that an arbitrator will decide threshold jurisdictional issues. *Henry Schein, Inc. v.*

18  *Archer & White Sales, Inc.*, 139 S.Ct. 524, 530 (2019). The presumption, however, is that a court,

19  not an arbitrator, can determine its own jurisdiction in any given case. *First Options of Chicago, Inc.*

20  *v. Kaplan*, 514 U.S. 938, 943-44 (1995). To rebut this presumption of a court's authority to decide

21  its own jurisdiction, contracting parties bear a heavy burden of "clearly and unmistakably" providing

22  that an arbitrator will decide their threshold jurisdictional disputes, in addition to their merits

23  disputes. *Id.* (holding that courts "should not assume that the parties agreed to arbitrate arbitrability

24  [or justiciability] unless there is *clear and unmistakable* evidence that they did so.").

25      Applying the above principles, this Court has already correctly decided: (1) that with respect

26  to any controversies regarding the DOGE Sweepstakes, the Official Rules agreements superseded

27  and prevailed over the User Agreements,; and (2) based on the terms of the Official Rules

28  agreements, and on the absence of any reference to arbitration therein, the parties had not "clearly

9

1   and unmistakably" delegated to an arbitrator any threshold jurisdictional controversies regarding the

2   Sweepstakes.  *See* Order (Dkt. 53) at 1-10.  Coinbase previously attempted to argue that the Court

3   erred in these holdings, but "fail[ed] to show how the Court erred."  Order (Dkt. 76) at 2.

4          Nothing has changed.

5          **1.    The Official Rules agreements supersede and prevail over the User
                   Agreements because both Plaintiffs and Coinbase were parties to both
6                  agreements.**

7          The  Court  previously  relied  on  Circuit  precedent,  and  on  the  general  rule  that  where

8   contracting  parties  form  conflicting  agreements  over  time,  covering  the  same  subject  matter,  the

9   more recent agreement controls.  *Id.* (citing *Goldman*, 747 F.3d 733, among other authorities); *see*

10  *also NLRB v. Int'l Union of Operating Eng'rs*, 323 F.2d 545, 548 (9th Cir. 1963) ("[S]ince the

11  contracts were entered into by the same parties and cover the same subject matter, it is a well settled

12  principle of law that the later contract supersedes the former contract as to inconsistent provisions");

13  *Tremayne v. Striepeke*, 262 Cal.App.2d 107, 114 (Cal. Ct. App. 1968) (explaining that "a later

14  instrument supersedes an earlier one whenever they are inconsistent.").  Coinbase asks the Court to

15  reconsider  its  prior  holdings,  based  on  no  new  facts  or  law,  and  without  addressing  the  case  law

16  previously relied upon by the Court.

17         Coinbase  now  argues  that  because  Defendant  Marden-Kane  was  not  a  party  to  both

18  agreements,  the  latter  contract  cannot  supersede  the  earlier  contract  as  between  *Plaintiffs  and*

19  *Coinbase*.  Motion at 6-7.  As an initial matter, all parties and the Court were fully aware of Marden-

20  Kane's single-contract status throughout this litigation.  *Cf.* Order *See, e.g.,* Order (ECF No. 76) at 2

21  (reasoning that Marden-Kane was never "subject to an arbitration agreement" because it was never a

22  party to Coinbase's User Agreements).  Marden-Kane was always personally named as a party to the

23  Official Rules agreements, and not the User Agreements.  *See, e.g.,* Dkt. 22-1, ¶1; Dkt. 33-7; Dkt.

24  33-8. So it is unclear why Coinbase is only raising this purported issue now.

25         In any event, Coinbase's new argument is decidedly wrong.  The mere fact that Marden-Kane

26  may have been a party to the Official Rules agreements, and not the User Agreements, cannot change

27  the material fact that *Plaintiffs and Coinbase* were parties to two different, conflicting agreements

28  "covering the same subject matter."  *Int'l Union*, 323 F.2d at 548; *accord* Order (ECF No. 53) at 9-

10.  Indeed, in both *Goldman* and *Int'l Union*, the contracting parties addressed by the Ninth Circuit were not identical when comparing the conflicting contracts.  What mattered was that both ***litigating*** parties had overlapping rights or obligations under two conflicting agreements.

Specifically, in *Goldman*, the original arbitration agreement at issue was among Goldman and other members of the National Association of Securities Dealers ("NASD"), which had promulgated FINRA Rule 12200.  *Goldman*, 747 F.3d at 739, n.1.  The City of Reno ("Reno") was a third-party beneficiary of the arbitration agreement among Goldman and the NASD members.  *Id.* Meanwhile, the more recent forum selection agreement was between Reno and Goldman only.  *Id.* at 736-37. The Ninth Circuit still found that the forum-selection agreement between Reno and Goldman superseded the prior arbitration agreements among Goldman and NASD members, notwithstanding the fact that the contracts involved distinct parties.  What mattered was that both litigating parties were parties to (or beneficiaries of) both agreements.  Because the two agreements conflicted, the Ninth Circuit was forced to choose which agreement would govern.

The same was true in *Int'l Union*.  There, the two contracts at issue were the "AGC contract" and an earlier "National Agreement."  *Int'l Union*, 323 F.2d at 546.  The later AGC contract was formed between a trade "association" and a "Union," while the National Agreement had been formed between two association members and the "Union's parent body."  *Id.*  These were not identical sets of contracting parties, yet the Ninth Circuit still found that the later AGC contract superseded the earlier National Agreement.  *Id.*  What matter was that the *litigating* parties were ultimately bound by both agreements.

Here, as the Court knows, Plaintiffs and Coinbase each bound themselves to both the User Agreements and the Official Rules agreements.  What matters is that both written contracts are enforceable by Plaintiffs and Coinbase*,* against each other, yet the two writings conflict with each other.   Therefore, the most recent agreements between Coinbase and each Plaintiff are controlling.  The mere fact that Marden-Kane may have bound itself to the Official Rules agreements, but not to the User Agreements, is not an argument for ordering *Plaintiffs and Coinbase* into arbitration.

Rather, it is an argument for ordering Marden-Kane into litigation.

The cases Coinbase cites in favor of its new argument are neither controlling nor persuasive. The decision in *Dunn v. FastMed Urgent Care PC* , 424 P.3d 436 (Ariz. Ct. App. 2018) was one of Arizona contract law, which has no applicability here. *Id.* at 440; *see also* Official Rules (Dkt. 83-1), ¶10 (providing that California law governs). Moreover, it was clear in *Dunn* that the two contracts at issue did not cover the same subject matter. *Id.* at 440-42. As for the differences in the contracting parties, the problem was that not all parties to the *earlier* agreements had been involved in the later agreements. *Id.* The original contracting parties' rights could not possibly be "superseded" by a later contract that the original parties never agreed to. By contrast here, Coinbase and Plaintiffs were all parties to the earlier, User Agreements; thus, they all had the freedom to agree in the future to different terms *among themselves* and a third party. No party to the earlier User Agreements was left in the dark by the subsequent Official Rules agreements; hence the Official Rules clearly had the ability to supersede the User Agreements.

Coinbase's citation to *Spark Connected, LLC v. Semtech Corp.*, No. 4:18-cv-748-KPJ, 2020 WL 6118575, at *5 (E.D. Tex. 2020) is likewise inapposite. By their terms, the contracts at issue in that case did not apply to the same subject matter, and as in *Dunn*, multiple parties to the *earlier* agreement were missing-in-action from the later agreement. *See generally id.* That is why the later agreement could not "supersede" the other; some of the original parties were missing from the later agreement, and the two contracts had substantially nothing to do with each other.

There is simply no straight-faced argument for why the Court should reverse its prior, correct holding that Official Rules ¶10 superseded and prevailed over Plaintiffs' and Coinbase's original agreements to arbitrate. Both parties to the earlier User Agreements were parties to the later Official Rules agreements, and that is sufficient to create a contractual conflict resulting in supersession. The later formed contract controls the conflict, as the Court correctly held on Coinbase's prior motion.

### 2.   Coinbase's new argument under *Mohamed* is inapposite.

Coinbase makes another, newly formulated argument for why the Court should reverse itself on the arbitration issue, again based on no new law or facts. Coinbase now contends that *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) precludes the Court from deciding whether it has

12

jurisdiction over Plaintiffs' controversies regarding the Sweepstakes.  Motion at 7-9.  Coinbase's contention is inapposite and erroneous.

In *Mohamed*, the Ninth Circuit addressed purportedly "clear and unmistakable" delegation clauses *contained within the same contracts* as forum selection clauses.  *Id.* at 1207-09.  The district court had decided that the arbitration language and exclusive-jurisdiction language *contained in a single writing* were confusing and "inconsistent." *Id.* at 1209.  The Ninth Circuit acknowledged that the arbitration language and the exclusive-jurisdiction language *within each isolated agreement* were in conflict, if read literally.  *Id.*  Nevertheless, the *Mohamed* court said that those *internal* conflicts were "artificial."  *Id.*

It is important to understand why, so as not to bend *Mohamed* to its breaking point.

The reason why the linguistic conflicts in *Mohamed* were deemed "artificial" contractual conflicts was because those linguistic conflicts were contained within a single written contract, executed at a single point in time.  *See generally id.*  **Each individual contract** simultaneously provided that an arbitrator had jurisdiction, and that a court had jurisdiction.  *Id.*  It goes without saying that contracting parties cannot agree to polar-opposite terms and results in a single agreement; they cannot possibly have contractual "Intent X" and contractual "Intent NOT X" at the same point in time, for a single transaction.

Because each individual contract at issue in *Mohamed* contained "clear and unmistakable" delegation language, the Ninth Circuit deemed the conflicting, forum-selection language to be "clearly and unmistakably" intended only for enforcing arbitration awards and resolving non-arbitrable disputes.  *Id.*  Again, it was only because the conflicting clauses were part of the same contract that the Court was forced to reconcile them, and label any linguistic conflicts "artificial." *Id.* at 1209; *accord Royal Ins. Co. of Liverpool v. Caledonian Ins. Co. of Edinburgh, Scotland*, 20 Cal.App. 504, 506 (Cal. Ct. App. 1912) ("It is a well recognized rule that every part of a contract must be given some effect if possible, and two apparently conflicting provisions **of the same contract** must be reconciled if such may be done without doing actual violence to the language of the contract.").  It is impossible for parties to have two, mutually exclusive intentions at the same time, in forming a single agreement.  That, however, does not mean that courts must deem "clearly and

13

unmistakably" ***uniform*** seemingly different intentions that parties might manifest at different times, in different contracts, evidencing different transactions, involving different sets of parties.

Here, Coinbase and each Appellee "clearly and unmistakably" manifested one intention when Appellees first created their Coinbase accounts. Then, months or years later, Coinbase, Appellees, *and* Marden-Kane all "clearly and unmistakably" manifested a different intention, at a different time: when they executed their new Sweepstakes "transaction." 9 U.S.C. § 2. Indeed, the *only* "contract evidencing a [Sweepstakes] transaction" here contains no arbitration language whatsoever (*id.*), much less "clear and unmistakable" language saying that an arbitrator will resolve any jurisdictional, interpretative, or other "CONTROVERSIES" regarding the Sweepstakes. *See generally* Official Rules (Dkt. 22-1).

*Mohammed* did not hold that once a "clear and unmistakable" delegation agreement is formed between two parties, it can never be rendered *less than* "clear and unmistakable" by any future agreement that *precludes* arbitration by its own terms. Such an unprecedented rule would contradict *Goldman*'s holding that a subsequent agreement need not specifically mention "arbitration" to manifest an affirmative intent to litigate. *See Goldman*, 747 F.3d at 744-46. Nor did *Mohamed* prohibit contracting parties from "carving out" particular disputes from otherwise "clear and unmistakable" delegation agreements. In fact, *Mohamed* itself found a legitimate carve-out contained within one of the contracts at issue there. *See Mohamed*, 848 F.3d at 1208-09, 1212 (respecting a specific, contractual "carve-out" from a generalized delegation agreement).

Importantly, a delegation agreement is nothing but "a sub-category of arbitration agreement." *Norris v. AON PLC*, No. 21-cv-00932-CRB, 2021 WL 1238303, at *3 (N.D. Cal. Apr. 2, 2021). If the question of whether a later forum-selection agreement "superseded" an earlier arbitration agreement is a question of the *existence* of an arbitration agreement (*Goldman*, 747 F.3d at 742-43), then the question of whether a later forum-selection agreement "superseded" an earlier delegation agreement likewise concerns the *existence* of a delegation agreement. Hence, the question is not whether the User Agreements' delegation clauses were "clear and unmistakable" by their own terms, when they were first made. That is the wrong question to ask as a matter of law. *Id.*

---

14

The correct question is whether Official Rules ¶10 and the User Agreements' delegation clauses are "clearly and unmistakably" consistent *by their own terms*.  Manifestly, they are not. Coinbase's threshold jurisdictional dispute with Appellees—regarding the proper forum for resolving Sweepstakes disputes—is at least arguably a "CONTROVERS[Y] REGARDING THE [Sweepstakes] PROMOTION."  Dkt. 83-1, ¶10.  And if it is, then even the parties' threshold jurisdictional "CONTROVERSY" here is one over which "THE CALIFORNIA COURTS (STATE AND FEDERAL)" have "SOLE JURISDICTION."  *Id.*  For this reason alone, Official Rules ¶10 and the parties' original delegation agreements are not "clearly and unmistakably" consistent with each other; thus, the parties' original delegation agreements do not "clearly and unmistakably" exist today, even if they might have: absent any subsequent, conflicting agreement.  *Accord Goldman*, 747 F.3d at 742-43; *Applied Energetics*, 645 F.3d at 524-26.

This conclusion is only reinforced by the fact that the Official Rules Agreement contains its own form of "delegation clause."  Specifically, in the same paragraph that grants "SOLE JURISDICTION" to "THE CALIFORNIA COURTS (STATE AND FEDERAL)," the Official Rules preclude Appellees from invoking "any other jurisdiction"—"by virtue of any other cause"—to decide matters "related to the interpretation, performance and enforcement *of these Official Rules*." *Id.*  The phrase "any other cause" at least arguably includes the original, generalized delegation agreements between Coinbase Appellees.

Reasonably read, then, Official Rules ¶10 precluded Appellees from invoking any arbitrator's "jurisdiction" to decide disputes "related to the interpretation, performance [or] enforcement" of the Official Rules themselves.  *See Goldman*, 747 F.3d at 744 (explaining that, "because the presumption in favor of arbitrability does not apply here, the forum selection clauses need only be sufficiently specific to impute to the contacting parties the reasonable expectation that they would litigate any disputes").  For each of the above reasons, it is far from "clear and unmistakable" that the parties here delegated to an arbitrator their threshold jurisdictional "CONTROVERSIES" regarding "the interpretation, performance and enforcement" *of Official Rules ¶10*.  *See Granite Rock*, 561 U.S. at 297 ("reemphasiz[ing]" that "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*") (emphasis in original); *First*

15

1   *Options*, 514 U.S. at 943-44 (holding that courts may not delegate threshold jurisdictional issues to

2   an arbitrator absent "clear and unmistakable evidence").

3       In short, *Mohamed* did not address contracts that looked anything like the contracts at issue

4   here; it addressed linguistic conflicts ***contained within a single writing***, executed at a single point in

5   time between two parties.   Similarly, the district court cases cited by Coinbase did not address

6   multiple contracts that looked anything like the ones at issue here.  COB at 18; *See Dillon v. BET*

7   *Info. Sys., Inc.*, No. 18-cv-4717-JST, 2019 WL 12338059 (N.D. Cal. Feb. 19, 2019) (addressing

8   delegation and forum selection clauses contained within one contract); *Jacksen v. Chapman*

9   *Scottsdale Autoplex, LLC*, No. CV-21-00087-PHX-DGC, 2021 WL 3410912, at *3 (D. Ariz. July 21,

10  2021) (addressing delegation and severability clauses contained in one contract); *Taylor v. Shutterfly,*

11  *Inc.*, No. 18-cv-00266-BLF, 2018 WL 4334770, at *5 (N.D. Cal. Sept. 11, 2018) (same); *Einstein*

12  *Noah Rest. Grp., Inc.*, No. 19-cv-00771-JSW, 2019 WL 6835717, at *3 & n.1 (N.D. Cal. Oct. 23,

13  2019) (addressing just one contract).

14      Not only are the Official Rules Agreements in this case markedly different (an exclusive-

15  jurisdiction clause, that *includes* threshold, interpretive disputes regarding the Official Rules

16  themselves) but so too is the factual context in which the contracts at issue were formed.   In the

17  decisions cited by Coinbase, there were only two contracting parties involved.  *See generally id.*;

18  *Mohamed*, 848 F.3d at 1209.   By contrast here, there are different contracts involved that were

19  formed by different groups of contracting parties.

20      It may well be true that, even if Coinbase had initially preferred to arbitrate all disputes with

21  Appellees, contractual newcomer Marden-Kane (or Coinbase itself, or both companies) preferred not

22  to arbitrate any "CONTROVERSIES" regarding this particular Sweepstakes.  Official Rules, ¶10.  It

23  may well be that Coinbase, in drafting the parties' Official Rules Agreements, deferred to the

24  preferences of its new business partner, Marden-Kane.[4]  This Court is in no position to find it "clear

25  and unmistakable" that this ***didn't*** happen.

26

27  ───────────────

    [4] Of course, only after being hit with a class action, Marden-Kane now purports to prefer arbitration.
28  Dkt. 87.   But that litigation reality is irrelevant to determining what Marden-Kane's original intent
    was at the time when the Official Rules Agreements were formed.

1    Whatever might have happened in corporate negotiations between Coinbase and Marden-
2  Kane, they wrote what they wrote, and they are stuck with it.  The contractual dynamics here are
3  nothing like the ones at issue in the opinions cited by Coinbase, all of which involved just two parties
4  assenting to a single writing, at a single point in time.   In such cases, there can only be one
5  contractual intent; here, there could well have been different intentions among different parties at
6  different points in time.

7    If Coinbase and Marden-Kane had wanted to "clearly and unmistakably" delegate to an
8  arbitrator any threshold jurisdictional controversies regarding the Sweepstakes, or any threshold
9  interpretive disputes regarding the Official Rules, then they could have and would have done so **by**
10 **drafting very different language into their own Official Rules Agreements**.  *See, e.g.,* Request for
11 Judicial Notice Regarding Another Coinbase Sweepstakes, Ex. C (Dkt. 41-3) at § 11 (Coinbase's
12 "Official Rules" contract for another "sweepstakes" promotion, providing clearcut arbitration and
13 delegation provisions in English); *see also* Order (Dkt. 53) at 1 (granting Request for Judicial
14 Notice).   Coinbase's post-lawsuit sweepstakes contracts are what "clear and unmistakable"
15 agreements to arbitrate look like.  Nothing in the parties' contracts ***here*** "clearly and unmistakably"
16 provides that an arbitrator will resolve the parties' jurisdictional "CONTROVERSIES REGARDING
17 THE PROMOTION." Official Rules (Dkt. 22-1), ¶10.   Nothing in the parties' Official Rules
18 agreement "clearly and unmistakably" provides that an arbitrator can decide the parties' disputes
19 over "the interpretation, performance and enforcement of th[e] Official Rules."  *Id.*

20    This Court correctly applied the most applicable precedent, rather than extending *Mohamed*
21 to the exclusion of *Goldman*, of *Int'l Union*, and of long-settled principles of contract law.   Order
22 (Dkt. 53) at 8 (holding that "the dispute over how to address the interaction between two separate
23 contracts is not clearly and unmistakably delegated"); *Ingram Micro Inc. v. Signeo Int'l, Ltd.*, 2014
24 WL 3721197, at *3 (C.D. Cal. July 22, 2014) (holding that "clear and unmistakable evidence of
25 intent to arbitrate arbitrability does not exist where an arbitration provision has been excluded from
26 superseding agreements").  Nothing in *Mohamed* abrogates these holdings, as *Mohamed* did not
27 address "superseding agreements" or "separate contracts."  *Id.*

28

PLAINTIFFS' OPPOSITION TO COINBASE'S MOTION TO COMPEL OR DISMISS

### 3.   Coinbase's historical integration and modification clauses did not preclude the formation of other, future contracts.

Coinbase argues that its Official Rules contracts are unenforceable because its prior User Agreements contained standard "integration" and "modification" clauses.   Motion at 9-10. Integration clauses, however, do not preclude separate, written contracts from being formed by parties in the future. *See, e.g., In re Ins. Installment Fee Cases*, 211 Cal.App.4th 1395, 1413-14 (2012) (holding that an integration clause "does not relate to *future* agreements and does not bar extrinsic evidence that proves that the parties *subsequently* modified their *integrated* writing") (original emphasis).   Integration clauses merely preclude the parties' contemporaneous (or earlier) agreements from being used as evidence of the parties' then-existing terms. *Id.*   That is the function that Coinbase's integration clauses served here. *See, e.g.,* Dkt. 33-8 at 29, ¶9.4 (providing that the User Agreement "supersedes any and all ***prior*** discussions, agreements and understandings of any kind").   Because Plaintiffs and Coinbase admittedly formed their Official Rules agreements ***after*** their User Agreements, the User Agreements' integration clauses mean nothing relevant here.

The same goes for the User Agreements' "modification" clauses.   California law is clear that any "contract in writing may be modified by a contract in writing."   Cal. Civ. Code § 1698.   This rule "has no application" in situations where "a modification is ***in accordance*** with a provision authorizing and setting forth a method for [the original contract's] revision." *Jones v. Citigroup, Inc.*, 135 Cal.App.4th 1491, 1496 (2006); *Mandel v. Household Bank*, 105 Cal.App.4th 75, 82 (2003) (same).   In such situations, "there is no alteration" at all, since the purported "modification is in accordance with the terms of the [original] contract." *Id.*

The rule of Cal. Civ. Code § 1698 applies only where, as here, the subsequent "contract in writing" was ***not*** made "in accordance with" the earlier contract's "provision authorizing and setting forth a method for its revision." *Id.*; Cal. Civ. Code § 1698.   Indeed, "[u]nder California law, a written agreement may be modified by the parties' conduct, even if the written agreement includes a clause ***expressly prohibiting*** modification." *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG (RBB), 2013 WL 2351814, at *7 (S.D. Cal. May 24, 2013).   Clearly, nothing about the User Agreements' standard "amendment" or "modification" clauses precluded Plaintiffs or

18

Coinbase from forming additional or different agreements, apart from the User Agreements, in the future.  That is all that the parties did here.  *See generally* Order (Dkt. 53) at 1-10.

At bottom, there is no lawful reason for this Court to reverse its prior, correct decisions that the Official Rules agreements superseded, modified, and prevailed over the User Agreements. Therefore, Coinbase's latest Motion to compel arbitration must be denied, for lack of any extant agreement to arbitrate "CONTROVERSIES REGARDING" the Sweepstakes.  Dkt. 83-1, ¶10.

### 4. In the alternative, Coinbase's arbitration and delegation provisions were always unconscionable and unenforceable.

Even if the Court somehow reverses its own prior decision that the Official Rules agreements supersede the User Agreements (Dkt. 53), the Court should still decline to compel arbitration. Recently, in *Bielski v. Coinbase, Inc.*, No. C 21-07478, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022), Judge Alsup held that the arbitration and delegation provisions in Coinbase's User Agreements—the same ones at issue here—are unconscionable as a matter of law.  *See generally id.*   Plaintiffs respectfully incorporate Judge Alsup's reasoned analysis by reference, as if fully set forth herein.  *Id.*

Coinbase cites *Berk v. Coinbase, Inc.*, 840 F. App'x 914 (9th Cir. 2020) for the proposition that "[t]he User Agreement is not unconscionable" (Motion at 11), but *Berk* expressly did not consider whether the User Agreements were unconscionable.  *See id.* at 915 ("The only question before us is whether the arbitration clause in the User Agreement encompasses the plaintiffs' claims.").  Coinbase also cites inapposite, out-of-District decisions for the proposition that its User Agreements are enforceable.  Motion at 11.  Yet Coinbase offers no reason for why the Court should follow inapposite, out-of-District decisions to the exclusion of an on-point decision in this District.

Coinbase's arbitration and delegation agreements were indeed unconscionable when made.

### B. As Coinbase previously conceded, the Official Rules' class action waiver is unconscionable under California law.

In its prior motion to compel arbitration or dismiss, Coinbase conceded that absent an agreement to arbitrate Plaintiffs' claims, the Official Rules' standalone, class-action *litigation* waiver was unconscionable under California law.  *See* Dkt. 40 at n.7; Dkt. 43 (no rebuttal).  Coinbase has now changed its mind.  It argues for the first time that the Court must enforce the Official Rules' class-litigation waiver, absent any agreement to arbitrate Plaintiffs' claims.  *See* Motion at 11-15.

Both Defendants have made similar arguments that the Official Rules' class-*litigation* waiver is enforceable.  *See id.*; Marden-Kane's Motion (Dkt. 87) at 7-9.  Plaintiffs have thoroughly argued—in their Opposition to Marden-Kane's Motion—that the Official Rules' class-litigation waiver is unconscionable and unenforceable, pursuant to un-preempted State law.  Plaintiffs respectfully ask that the Court apply Plaintiffs' full Opposition argument in this regard equally to both Motions.

**C.  Coinbase's new arguments for dismissing Plaintiffs' CLRA claims are procedurally and substantively flawed.**

**1.  Coinbase's new Motion to dismiss Plaintiffs' CLRA claims must be denied as procedurally improper because it violates Rule 12(g)(2).**

"A fundamental tenet of the Federal Rules of Civil Procedure is that certain defenses under Fed. R. Civ. P. 12 must be raised at the first available opportunity or, if they are not, they are forever waived."  *American Ass'n Naturopathic Phys. v. Hayhurst*, 227 F.3d 1104, 1107 (9th Cir. 2000) (citing Fed. R. Civ. P. 12(g)).  With certain exceptions inapplicable here, "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2).  "The policy behind Rule 12(g) is to prevent piecemeal litigation in which a defendant moves to dismiss on one ground, loses, then files a second motion [to dismiss] on another ground."  *Ennenga v. Starns*, 677 F.3d 766, 772-73 (7th Cir. 2012) (citing *Pilgrim Badge & Label Corp. v. Barrios*, 857 F.2d 1, 3 (1st Cir. 1988)).

Here, Coinbase previously filed a Rule 12(b)(6) motion to dismiss Plaintiffs CLRA claims, arguing **only** that its Sweepstakes ads were not false or misleading, and that its Sweepstakes was not a lottery.  *See generally* Dkt. 33; Dkt. 43.  Now, under Rule 12(b)(6), Coinbase "rais[es]" another "defense" to Plaintiffs' CLRA claims that it could have raised previously.  Coinbase argues that its alleged conduct was never within the scope of the CLRA, which applies only to transactions in "goods" or "services."  Motion at 17-18.  Coinbase now contends, for the first time, that Plaintiffs' Dogecoin purchases were not purchases of "goods" or "services."  *Id.*  That "defense" was fully "available" for Coinbase to "raise" when it filed its first motion to dismiss, and yet the defense was "omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2).  Thus, Coinbase's latest Motion to dismiss Plaintiffs' CLRA claims is barred by Rule 12(g)(2).

20

Certainly, nothing about Plaintiffs' filing of the TAC permitted Coinbase to assert brand new Rule 12(b)(6) defenses, which were available to be asserted against the FAC or the SAC.  *See, e.g., Sourovelis v. City of Phila.*, 246 F. Supp. 3d 1058, 1077 (E.D. Pa. 2017) ("[F]iling an amended complaint does not affect Rule 12(g)'s prohibition against successive motions to dismiss."); *Jaddo v. Town & City of Stamford*, 3:21-cv-350 (OAW), 2022 WL 2168077, at *3 (D. Conn. June 16, 2022) ("Moreover, the filing of an amended complaint has no bearing on a motion subject to Rule 12(g)'s consolidation principle."); 5C Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 1388 ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading.").

Nor does Coinbase's citation to two (inapposite) cases decided this year render Coinbase's latest defense ***unavailable*** to Coinbase at the time when it filed its motion to dismiss last year. Motion at 18 (citing *Jeong v. Nexo Fin. LLC*, No. 21-CV-02392- BLF, 2022 WL 174236 (N.D. Cal. Jan. 19, 2022)).  *Jeong* announced no new legal "defense" under the CLRA; it applied preexisting CLRA law to a financial loan transaction, and financial loan transactions have long been outside the CLRA's scope.  *See generally id.  Jeong* made no change in the law that created a new Rule 12(b)(6) "defense" within the meaning of Rule 12(g)(2).

The same goes for *Reeves v. Niantic, Inc.*, 21-cv-05883-VC, 2022 WL 1769119, at *2 (N.D. Cal. May 31, 2022).  *Reeves* simply "agree[d] with" older CLRA decisions that were published years before Coinbase ever moved to dismiss.  *Id.* at *2 (citing older cases).  It is a rare thing for any judicial decision to create a new "defense" under Rule 12(b)(6).  And clearly, neither *Jeong* nor *Reeves* created such a new defense against CLRA claims.

If Coinbase wanted to raise the (erroneous) defense that it did not sell Plaintiffs any "goods or services" under the CLRA, it could have raised that argument in 2021.  The Court should deny as procedurally improper Coinbase's second, Rule 12(b)(6) Motion to dismiss Plaintiffs' CLRA claims.

### 2.    Coinbase's new anti-CLRA arguments are also substantively erroneous.

Both Defendants have made similar arguments that Plaintiffs' cryptocurrency purchases are outside the CLRA's scope, saying that cryptocurrencies are not themselves "goods or services."  *See* Motion at 17-18; Marden-Kane's Motion at 13, n.10.  Plaintiffs have thoroughly addressed this

PLAINTIFFS' OPPOSITION TO COINBASE'S MOTION TO COMPEL OR DISMISS

argument in their Brief in Opposition to Marden-Kane's Motion, and respectfully request that the Court apply their responsive opposition argument similarly to both Motions here.

### D. The June 2021 DOGE Sweepstakes was a lottery because Defendants affirmatively and <u>only</u> represented <u>only</u> that consideration was necessary to enter.

"A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, . . . whether called a lottery, raffle, or gift enterprise, or by *whatever* name the same may be known." Cal. Penal Code § 319. It is unlawful for any person to "contrive[], prepare[], set[] up, propose[], or draw[] any lottery." Cal. Penal Code § 320. The elements of a lottery are: (1) consideration given by entrants; (2) in exchange for a chance; (3) to win a prize. *Trinkle v. California State Lottery*, 105 Cal.App.4th 1401, 1406 (Cal. Ct. App. 2003). Here, Defendants do not dispute the chance or prize elements; they argue only that their Dogecoin Sweepstakes lacked the "consideration" element of a lottery.

Under California law, "in order for a promotional giveaway scheme to be legal[,] any and *all* persons must be given a [chance to win] free of charge[,] and *without any* of them paying for the opportunity of a chance to win the prize." *People v. Shira*, 62 Cal.App.3d 442, 459 (1976). "Conversely, a promotional scheme is illegal where any and all persons cannot participate in a chance for the prize and *some* of the participants who want a chance to win *must* pay for it."). *Id.* Critically, the "question of consideration is not to be viewed from the standpoint of the defendant, but from that of the [entrants]." *Cal. Gas. Retailers v. Regal Petroleum Corp.*, 50 Cal.2d 844, 860 (1958) (holding that the "question of consideration is not to be viewed from the standpoint of the defendant, but from that of the [entrants]") (citing *People v. Cardas*, 137 Cal.App.Supp. 788 (1933)). In other words, an objective inquiry must be made from the perspective of a reasonable entrant, not a reasonable operator, to determine whether a payment of "consideration" was necessary for "some" entrants to obtain a chance to win. *Id.*; *Shira*, 62 Cal.App.3d at 459.

Here, Plaintiffs' counsel originally misread the Official Rules agreement, and pleaded (wrongly) in the FAC and SAC that the Official Rules evinced a free-entry option for Plaintiffs. Dkt. 22; Dkt. 36. However, during the Court's January 10, 2022 Hearing on Coinbase's first motion to

dismiss, Plaintiffs' counsel admitted his error, and asserted that the best, objective reading of the Official Rules was that the free-entry method ("Method 2") was available only to entrants who were ***not*** Coinbase "account holders."  *See* January 10, 2022 Hearing Transcript (Dkt. 62) at 25:8 – 27:4. Upon reviewing Official Rules ¶3, and speaking on the spot, the Court agreed that Defendants' Official entry Rules could be objectively read to require Coinbase "account holders" to pay for entry.

> [THE COURT:]  I'm looking at the [Official Rules] in front of me.  It makes it look like if you are an existing accountholder or a new accountholder, you have to complete the $100 transaction.  If you're not an existing account holder or a new accountholder, you can enter for free.  That's what Mr. Harris' argument is, which he wants to have leave to amend so he can make the argument.  In other words, it's not only misleading; it could be objectively read to mean that if you actually currently are a Coinbase accountholder, you must have this $100 transaction.  Everybody else can just mail in this little card.
>
> ***
>
> I have to say it is confusing; I mean, if I were entering this contest, I would be confused by this.

*See* Dkt. 62 at 27:15 - 28:9; *see also* Official Rules (Dkt. 83-1) at 3-5, ¶3.

Indeed, reading free-entry "Method 2" as being available to Coinbase "account holders" like Plaintiffs would render the first sentence of "Method 1" false.  Objectively, the only way to reconcile the plain terms of free-entry "Method 2" and paid-entry "Method 1" was to interpret free-entry "Method 2" as being available ***only*** to individuals who were not Coinbase "account holders." *Accord id.*; *Goldman*, 747 F.3d at 754 (explaining that "if contract clauses appear to be repugnant to each other, the court should interpret the contract in a way which reconciles all its provisions, if possible.").  The only way to "reconcile" the provisions of "Method 2" with the first sentence of "Method 1" is to objectively read "Method 2" as available only to non-"account holders" seeking entry.

Such a reasonable, objective interpretation of Official Rules ¶3 is only bolstered by the Sweepstakes solicitations' affirmative statement to Coinbase users that: "Remember, ***you'll*** still ***need to*** buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win." TAC, ¶11. Such a conclusion is even further reinforced by the fact that, as detailed in the TAC, numerous media outlets ***objectively publicized*** that trading DOGE ***was*** necessary for Coinbase users to obtain a chance to win.  *See* TAC, ¶¶60-66.  Several media outlets did so, while linking their articles directly to the

PLAINTIFFS' OPPOSITION TO COINBASE'S MOTION TO COMPEL OR DISMISS

Official Rules, lending further credence to the notion that Defendants' Official entry Rules *objectively* required payment for entry with respect to Coinbase users.  *Id.*

In sum, viewing the Dogecoin Sweepstakes ads and Official Rules objectively, from entrants' perspectives, Coinbase "account holders" who "want[ed] a chance to win [were required] to pay for it" by trading DOGE on Coinbase, and paying all associated transactions costs.  *Shira*, 62 Cal.App.3d at 459; Official Rules, ¶3.  The mere fact that Plaintiffs received some Dogecoins, in addition to their chances to win prizes, does not negate the element of consideration in Defendants' Dogecoin *Lottery*.  *See Holmes v. Saunders*, 114 Cal.App.2d 389, 390 (1952) ("It is sufficient that the consideration, as here, be paid for something else *and* the chance to win the prize.").

Defendants counter-allege that, in fact, they would have allowed, and did allow, Coinbase "account holders" to enter for free: contrary to the best, objective reading of their own Sweepstakes solicitations and "Official Rules." Motion at 15 (counter-alleging that "[t]he Dogecoin Sweepstakes [in fact] had a free alternative method of entry that *any* consumer could use to enter the contest without having to [trade] Dogecoin");  *see also* Marden-Kane's Motion (Dkt. 87) at 10 (counter-alleging "the dispositive fact that there was a free, alternative method that [Coinbase account holder] participants could (and did) use to enter the Dogecoin Sweepstakes").  The flaw in that argument is that it rests entirely on *Defendants' subjective knowledge*, as the Dogecoin Lottery operators.

Just as an entrant's subjective ignorance of a free entry-method is insufficient to prove a lottery (*accord* Order (Dkt. 53) at 12-13), so an operator's subjective knowledge of a free entry-method is insufficient to *disprove* a lottery.  Neither an entrant's nor an operator's subjective knowledge, standing alone, governs the lottery element of consideration.  Instead, the question is whether, from the objective perspective of a reasonable entrant (*Regal Petroleum*, 50 Cal.2d at 860), consideration was required for some entrants to obtain their chances.  *Shira*, 62 Cal.App.3d at 459.

Here, the best, objective interpretation of Defendants' Sweepstakes solicitations and "Official" Rules was that trading DOGE was necessary for Coinbase "account holders" to enter. TAC, ¶¶10-11 ("Remember, you'll still need to buy or sell $100 in Dogecoin on Coinbase by 6/10/2021 for a chance to win."); *accord* Official Rules, ¶3 ("Existing account holders and new* account holders *must* opt-in to participate in the Sweepstakes and *must* complete $100usd

(cumulative the transaction fee)) in trade (buy/sell) of Dogecoin on Coinbase.com (.com and/or Coinbase app) during the Promotion Period to **earn** one (1) entry into the Sweepstakes.").

The mere fact that Defendants might have **subjectively** harbored a free entry-method for Coinbase "account holders")—while **objectively** telling "account holders" **only** that they must pay to enter—did not somehow transform the "consideration" Plaintiffs paid into a free gift of patronage from the Plaintiffs to Coinbase.  Rather, Plaintiffs paid for their "Sweepstakes" entries because, objectively, Defendants affirmatively told Plaintiffs that this was their only option for entry.

This case may be an unprecedented case under California's lottery statutes, but it is not a close case.  Defendants objectively offered Coinbase "account holders"—in writing—the chance to win prizes, but only if they would opt in and trade DOGE to enter.  Official Rules, ¶3; TAC, ¶11. Plaintiffs, being Coinbase "account holders," all accepted Defendants' written offer by paying to enter, as expressly required by Defendants' own written Rules and solicitations.   This clearly constituted an unlawful, cryptocurrency lottery under California Penal Code §§ 319 and 320.

> "When you see these sort[s] of practices done by both scammers and legitimate entities, it makes it really hard to distinguish between the two of them." -Benjamin Powers, Coindesk.com (June 4, 2021)

TAC (Dkt. 83) at 1.

## V.   **CONCLUSION**

At bottom, a written offer was made by Defendants, objectively contingent upon payment, and Plaintiffs accepted and performed Defendants' offer, exactly as written.  No more is required, or could possibly be required, to allege "consideration" as a matter of California lottery law.

Coinbase violated multiple, independent laws in conducting the June 2021 Dogecoin Lottery, and the company's latest attempt to evade responsibility lacks legal support.

Therefore, for each of the reasons explained herein, and in Plaintiffs' contemporaneously filed Opposition to Marden-Kane's Motion to compel arbitration or dismiss, Plaintiffs respectfully request that the Court deny Coinbase's latest Motion to compel arbitration or to dismiss Plaintiffs' claims under Rule 12(b)(6).

1   Dated: July 9, 2022                                 Respectfully submitted,

2                                                       FINKELSTEIN & KRINSK LLP

3                                                       By: ___*s/ David J. Harris, Jr.*___
4                                                               David J. Harris, Jr., Esq.

5                                                       djh@classactionlaw.com
                                                        501 West Broadway, Suite 1260
6                                                       San Diego, California 92101
                                                        Telephone: (619) 238-1333
7                                                       Facsimile:  (619) 238-5425

8
                                                        *Counsel for Plaintiffs and the Putative Class*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO COINBASE'S MOTION TO COMPEL OR DISMISS